UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13 CR 572 |
| v. | ) | |
| | ) | Judge Elaine E. Bucklo |
| C. GREGORY TURNER | ) | |
| also known as "Greg Turner" | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, through ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, hereby respectfully submits its Sentencing Memorandum to aid the Court in addressing issues that may arise during the sentencing of defendant C. Gregory Turner.

For the reasons stated herein, the government respectfully requests that the Court impose a sentence within the applicable Sentencing Guidelines range of 15-21 months' imprisonment, which is reasonable upon consideration of the relevant sentencing factors set forth in 18 U.S.C. § 3553(a).

**I.     PROCEDURAL HISTORY**

On August 27, 2013, defendants Prince Asiel Ben Israel and C. Gregory Turner were charged with (a) conspiring to commit a violation of Title 18, United States Code, Section 951(a), in violation of Title 18, United States Code, Section 371 [Count One]; (b) acting in the United States as an agent of a foreign government without prior notification to the Attorney General, in violation of Title 18, United States Code, Sections 951(a) and 2 [Count Two]; and (c) violating the International

1

Emergency Economic Powers Act ("IEEPA"), in violation of Title 50, United States Code, Section 1705(c) and Title 31, Code of Federal Regulations, Sections 541.201, 541.204, and 541.405 [Count Four].

Ben Israel was separately charged with willfully failing to file a registration statement with the Attorney General while acting as an agent on behalf of foreign principals, in violation of Title 22, United States Code, Sections 612 and 618(a), commonly known as the Foreign Agents Registration Act ("FARA") [Count Three]. In April 2014, Ben Israel pled guilty to violating FARA and was later sentenced to seven months' incarceration.

On September 29, 2014, a jury trial against Turner began. On October 10, 2014, the jury found Turner guilty on Count Four (Count Three in the redacted indictment submitted to the jury) and not guilty on Counts One and Two.

Sentencing is currently scheduled for January 9, 2015.

## II.   FACTUAL BACKGROUND

### A.   Zimbabwe Sanctions

On March 6, 2003, President George W. Bush issued Executive Order 13288, titled "Blocking Property of Persons Undermining Democratic Processes or Institutions in Zimbabwe." The Executive Order, which was issued by the President pursuant to his authority under IEEPA, Title 50, United States Code, Section 1701 *et seq.*, stated that the President had determined that:

> the actions and policies of certain members of the Government of Zimbabwe and other persons to undermine Zimbabwe's democratic processes or institutions, contributing to the deliberate breakdown in

2

>the rule of law in Zimbabwe, to politically motivated violence and intimidation in that country, and to political and economic instability in the Southern African region, constitute an unusual and extraordinary threat to the foreign policy of the United States.

As a result of these circumstances, the Executive Order continued, the President had declared "a national emergency to deal with that threat." As a result, under the Executive Order, any "transaction or dealing by a United States person . . . in property or interests blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of any person listed in the Annex to this Order. . . ." *See* Executive Order 13288, Section 2(a). Section 2(c) of the Executive Order further stated that "any conspiracy formed to violate the prohibitions set forth in this order is prohibited."

The Annex to Executive Order 13288 identified 77 individuals of Zimbabwe's government (and some family members of those individuals) who were designated by President Bush. Those individuals included Zimbabwe's President Robert Mugabe; Simon Khaya Moyo, Zimbabwe's ambassador to South Africa; and Samuel Simbarashe Simbanenduko Mumbengegwi, Zimbabwe's Foreign Minister.

On November 25, 2005, President Bush issued Executive Order 13391, which expanded the list of designated Zimbabwean government officials to include Gideon Gono, the Governor of the Federal Reserve Bank of Zimbabwe. Since their issuance, both Executive Orders have been continued for one-year periods and remain in effect. The individuals designated in those Executive Orders are commonly referred to as Specially Designated Nationals ("SDNs").

In addition, under Title 31, Code of Federal Regulations, Section 541.201 *et seq.*, certain property of those Zimbabweans listed in the Executive Orders, or determined by the Secretary of the U.S. Department of the Treasury, is blocked. Under Title 31, Code of Federal Regulations, Section 541.405, these prohibitions apply to services performed in the United States or by United States persons, wherever located, on behalf of or for the benefit of a Zimbabwean whose property or interests in property are blocked by Title 31, Code of Federal Regulations, Section 541.201. These restrictions will be referred to collectively as "the Sanctions."

A United States person may apply for a license from the Treasury Department which, if issued, would allow them to provide services to SDNs without running afoul of the Sanctions. *See* 31 C.F.R. § 501.801(b).

### B. Defendant Enters Into an Agreement to Provide Services to SDNs

Between 2008 and 2010, defendants Ben Israel and Turner provided services to SDNs Mugabe, Gono, Moyo, and Mumbengegwi. More specifically, defendant and Ben Israel entered into an agreement with Mugabe, Gono, and others, to lobby United States politicians to lift the Sanctions against the SDNs as well as to provide public relations and media services in the United States on their behalf.

In early November 2008, defendant and Ben Israel began having discussions with Mugabe, Gono, and other high-ranking Zimbabwean government leaders regarding the influence that defendant and Ben Israel could have in efforts to remove U.S. sanctions against Zimbabwe. Defendant and Ben Israel discussed with

4

Mugabe, Gono, and others defendant's and Ben Israel's associations with many United States public officials, at the local, state, and federal level, who purportedly had close connections to then President-elect Barack Obama.

On November 13, 2008, Simon Khaya Moyo, Zimbabwe's Ambassador to South Africa and an SDN, sent a letter to defendant, thanking him and Ben Israel for facilitating a meeting with Illinois State Senator Donne Trotter, and stating that Zimbabwean officials were looking "forward to working closely with the Chicago Lobby Team and following up on the proposals presented to the President."

On November 29, 2008, defendant arranged for a $90,000 wire transfer to be sent from the bank account of Zimbabwean Senator Monica Mutsvangwa to Ben Israel's bank account in Chicago. According to an email defendant sent to Ben Israel's assistant, that money was intended to compensate defendant and Ben Israel for their efforts in arranging a mid-December 2008 meeting in Harare, Zimbabwe with Senator Trotter, Illinois State Representative Ken Dunkin, Mugabe, Gono, and other Zimbabwean officials.

Ben Israel's U.S. bank grew suspicious of the wire transaction because of Mutsvangwa's role in Zimbabwe's government as well as the role played by her husband, Christopher Mutsvangwa, a member of the ruling ZANU-PF party and Zimbabwe's ambassador to China. After reaching out to Ben Israel for more information regarding the transaction, bank representatives received a Consulting Agreement through an email from Ben Israel's email account. The Consulting

Agreement was provided to the bank in order to respond to the bank's inquiries and effectuate the wire.

According to the Consulting Agreement, in exchange for his services, Ben Israel would be paid $3,405,000 in four installments: (1) $90,000 at the signing of the contract; (2) $1,105,000 upon completion of the "Zimbabwe meeting (date to be determined)"; (3) $1,105,000 "upon completion of the South Africa meeting"; and (4) $1,105,000 "upon completion of" the project.

### C. Defendant and Ben Israel Arrange Meetings and Trips on Behalf of Zimbabwean Officials

Defendant and Ben Israel proceeded to arrange, or attempt to arrange, on behalf of designated Zimbabwean government officials, meetings between U.S. and Zimbabwean government officials to discuss the lifting of the Sanctions. Each man played a distinct role in those efforts. Defendant, who spent much of his time in Africa, was the point of contact for the Zimbabwean officials; Ben Israel, who lived in Chicago, was the point person for U.S. officials. The meetings defendant and Ben Israel arranged or attempted to arrange included the following:

- In or around December 2008, defendant and Ben Israel arranged for State Senator Trotter and State Representative Dunkin to meet with Mugabe and Gono in Zimbabwe regarding, among other things, the Sanctions.

- In or around January 2009, defendant and Ben Israel arranged for U.S. Representative Danny Davis, attorney (and former Chief of Staff to Congressman Davis) Richard Boykin, and others to attend a meeting with Gono in South Africa regarding the Sanctions.

6

- In or around January 2009, defendant and Ben Israel arranged for Illinois State Representative Dunkin and others to attend a meeting with Gono in Zimbabwe regarding the Sanctions.

- During the summer of 2009, defendant asked a staffer of U.S. Representative Diane Watson to invite Gono to attend a forum on African issues that Congresswoman Watson was hosting in Washington, D.C., where Gono would speak about the United States's economic policy related to Zimbabwe. Defendant also attempted to assist Gono with obtaining visas to travel to Washington, D.C. to attend the forum.

- In or around September 2009, Ben Israel arranged for several U.S. Congressmen to meet with Mugabe in New York when Mugabe was there to attend the United Nations General Assembly. At the meeting, Mugabe discussed the Sanctions with the U.S. Congressmen and directed defendant and Ben Israel to engage with Zimbabwe's Foreign Minister (and SDN) Mumbengegwi to devise a plan for the lifting of the Sanctions.

Following this September 2009 meeting, defendant made several overtures to Mumbengegwi. For example, on October 5, 2009, defendant forwarded a letter from Ben Israel, addressed to Mumbengegwi, in which Ben Israel told Mumbengegwi that he (Ben Israel) had been meeting with U.S. Congressmen regarding lifting the Sanctions. In the letter, Ben Israel said that he and Turner would be in Harare in a few days later to meet with Mumbengegwi, Mugabe, and other Zimbabwean leaders.

In addition to engaging with Mumbengegwi, in the fall of 2009, defendant engaged with Mugabe through his Chief of Staff, Dr. Sibanda. For example, on November 15, 2009, defendant wrote to Dr. Sibanda: "Sorry for the delay in expressing my sincire appreciation to you for facilitating our efforts to serve you and the President . . . . We are planning a follow up trip for Minister Mizimbi

7

[Zimbabwe's Minister of Tourism] very soon which will have the Financial substance and gain support for the lifting of the sanctions including ZEDERA." Defendant went on to say that "he will contact Ambassador Moyo and brief him today. We had no luck with Gono due to his busy schedule. Need your assistance."

Later, in or around December 2009, defendant and Ben Israel arranged for several members of the National Black Caucus of State Legislators, led by Senator Trotter, to travel to Zimbabwe during that same time period. That trip ultimately did not occur. Finally, during the winter of 2009-10, defendant attempted to schedule a trip for Zimbabwe's tourism minister to travel to Chicago to discuss, among other things, the sanctions. This trip also never happened.

### D. Defendant and Ben Israel Coordinate Letter Exchanges Between U.S. and Zimbabwean Officials.

In addition to arranging meetings and trips between U.S. officials and Zimbabwean officials, defendant and Ben Israel facilitated correspondence between Zimbabwean officials, including Mugabe and Gono, and U.S. federal and state public officials. Staying within their respective U.S.- and Africa-oriented roles, Ben Israel obtained or created the letters from the U.S. officials and defendant forwarded them to Zimbabwean officials. The letters included the following:

- On November 20, 2008, defendant forwarded a draft letter to Ben Israel for signature, addressed from Senator Trotter to Gono, which discussed the sanctions against Zimbabwe and Gono, and stated that Senator Trotter hoped that the election of President Obama would cause the United States to take a new and fresh look at the Sanctions. At trial, Senator Trotter testified that he did not authorize the letter.

8

- On December 24, 2008, defendant and Ben Israel caused Gono to write a letter to Congressman Davis asking to meet with him about the Sanctions in an "off the record discussion" in South Africa in January 2009.

- On January 13, 2009, defendant forwarded a letter addressed from Senator Trotter to Mugabe, informing Mugabe that Senator Trotter was prepared to lead a group of elected U.S. officials to Zimbabwe and conduct an on-site investigation there so that those officials could then implore the White House to meet with Mugabe. Senator Trotter testified that he did not sign nor authorize the letter.

- On September 29, 2009, defendant forwarded to Zimbabwe's Ambassador to China, Chris Mutsvangwa, a letter, dated July 6, 2009, purportedly from Senator Trotter to Mugabe, about organizing a group of state legislators to travel to Zimbabwe to observe the effects of the Sanctions. Senator Trotter testified that he did not sign nor authorize the letter.

- On October 17, 2009, defendant forwarded to Chris Mutsvangwa a letter from Congressman Davis to Mugabe, thanking Mugabe for meeting with Congressman Davis in New York, requesting an invitation for Congressman Davis to travel to Zimbabwe in December 2009, and expressing Congressman Davis's commitment to working toward the removal of the sanctions.

- On November 24, 2009, defendant forwarded to Dr. Sibanda, Mugabe's chief of staff, a letter addressed from Senator Trotter to Mugabe, discussing traveling to Zimbabwe with Ben Israel in December 2009 so that the two men could meet with Mugabe in order to update him on efforts to end the Sanctions. Senator Trotter testified that he did not sign nor authorize the letter.

- On November 24, 2009, defendant forwarded to Dr. Sibanda a second letter, this one addressed from Senator Trotter to Gono, stating that Ben Israel and Zimbabwe's Ambassador to the United States had been invited to a caucus of state legislators to discuss the effects of the Sanctions, and requesting a meeting with Gono while Senator Trotter was in Zimbabwe in December 2009. Senator Trotter testified that he did not sign nor authorize the letter.

**E.    Defendant Pledges His Support to Zimbabwean Officials**

In addition to facilitating meetings and letters among U.S. and Zimbabwean officials, defendant also expressed his allegiance to the Zimbabwe officials.

For example, on March 1, 2009, defendant emailed Gono's secretary. The subject line of the email read: "Victory is our only Option." In the body of the email, defendant pledged his commitment to Gono and stated "we hope the work of Gidons [Gideon Gono] Army will not be wasted."

Similarly, on March 9, 2009, defendant sent a letter to Gono. In it he stated, "we remain the spiritual warriors of Gidons Army . . . . surrender is not an option." And on November 24, 2009, defendant told Moyothat "know for sure your team is in charge of all matters concerning Zimbabwe in the US."

### F. Defendant Seeks Payment from Zimbabwean Officials

Throughout the time period of the conspiracy, and in addition to the $90,000 payment discussed above, defendant informed several of his friends and associates (but none of the U.S. politicians he interacted with as part of his efforts on behalf of Zimbabwean officials) that he was trying to get paid by Zimbabwean officials.For example:

- On February 11, 2009, defendant wrote in an email that he "will call from harare with invoice for Media Consulting to the Reseve Bank of Zim."

- On June 19, 2009, defendant told his friend, Avi Melech, that he has been on the road and "chasing the cash. Things did not work out in Zim but I am going back next week to try and close it out . . . . I think Prince might have to come my way and help me close out Zim."

- On June 21, 2009, defendant again told Melech that "Prince is getting documents for me to go back and pitch for the Money."

- On September 2, 2009, defendant told an associate located in South Africa that he was having trouble collecting the cash. Defendant told this individual, "I am catching hell collecting from the RZB [Reserve Bank of Zimbabwe] but I know you know. Been to Harare 6 times and to the US trying to keep floating."

- On October 4, 2009, defendant wrote his son that he is "on my way to see the President [Mugabe], hopefully we get paid and I can go home." Attached to the email was a promotional flyer for "Hello Zimbabwe" (a tourism campaign that defendant and his associates were spearheading) that included a picture of defendant with Mugabe.

- On October 6, 2009, defendant emailed an associate in Israel: "I return to Zimbabwe on Thursday –- for the most important trip of the year. THE PAY DAY."

### G. Defendant Lacked Proper Authorization

Defendant never applied for or received a license from the U.S. Department of the Treasury, which would have given him the legal authority to provide services on behalf of Zimbabwean SDNs Mugabe, Gono, Moyo and Mumbengegwi.

### III. ADVISORY SENTENCING GUIDELINE COMPUTATIONS

Defendant was convicted of a violation of IEEPA, Title 50, United States Code, Section 1705. Such violations are governed by Guideline § 2M5.1(b).[1] Pursuant to USSG § 2M5.1(b), defendant's base offense level is 14. There are no applicable enhancements or reductions, and defendant has zero criminal history points.

---

[1] U.S.S.G. § 2M5.1(a), which calls for an offense level of 26, applies when the sanctions are based on national security or weapons controls, or financial transactions with countries who support international terrorism. Neither of these conditions apply. U.S.S.G. § 2M5.1(b) is, therefore, the default subsection.

Therefore, the total offense level is 14, and the criminal history category is category I, which results in an anticipated advisory Sentencing Guidelines range of 15 to 21 months' imprisonment, in addition to any supervised release and fine the Court may impose.

## IV.  SECTION 3553(a) FACTORS

As the Court is aware, Title 18, United States Code, Section 3553(a), states that "the court, in determining the particular sentence to be imposed, shall consider . . . " certain enumerated factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to provide just punishment for the offense and to afford adequate deterrence to criminal conduct." A Guidelines-range sentence would be a reasonable sentence in this case, as it is sufficient but not greater than necessary to reflect the nature and circumstances of the offense, defendant's history, and the seriousness of his offense as well as to deter future criminal conduct and promote respect for the law.

### A.  The Nature and Circumstances of the Offense

This is a serious offense. Defendant worked for individuals who have been designated as SDNs by the United States government because they have persistently violated the human rights of the Zimbabwean people, using violence, intimidation, harassment, corruption, torture, and repression of the media to maintain control over the country.

### 1.     Mugabe's History of Human Rights Abuses

Media and human rights watchdog groups have long documented human rights abuses of the Mugabe regime. In February 2009, during the midst of the defendants' engagement with Mugabe and Gono, Mugabe and his party, ZANU-PF, entered into a power-sharing agreement with Morgan Tsvangirai and his party, Movement for Democratic Change ("MDC"). The expectation and hope was that a coalition government would stabilize the Zimbabwean economy and put an end to the rampant human rights abuses. This was not the case.

Several months after the coalition government was formed, Human Rights Watch, an organization whose mission is to uncover and report human rights abuses, wrote, in a report titled "False Dawn," that "Zimbabwe's economic and humanitarian crises have been essentially caused by institutionalized political repression and disregard for the rule of law."[2] The report cited examples of political violence and prosecution against MDC activists, harassment of the media, persecution of lawyers and judicial officers, illegal attacks on commercial farmers, and human rights violations in the Marange Diamond Fields. The report found that "the bulk of Zimbabwe's violence committed before the 2008 elections and since has been organized and implemented by ZANU-PF elements in state agencies. The perpetrators have acted – and continue to act – with impunity."[3] The report concluded with a recommendation that the United States support the country's

---

[2] The report is available at http://www.hrw.org/print/reports/2009/08/31/false-dawn (last accessed on December 17, 2014).
[3] *Id.*

13

most vulnerable communities but continue to "withhold development aid to Zimbabwe in the absence of clear progress in implementing key human rights reforms."[4] Amnesty International similarly wrote, in its 2010 annual report on Zimbabwe, that "harassment and intimidation persisted of human rights defenders, political activists and supporters of the Movement for Democratic Change."[5]

These problems in Zimbabwe were caused not by the United States' designations of the country's leaders, as the Sanctions were not imposed against the country as a whole (like the sanctions that the United States has imposed against Iran or Syria, for example), but rather by Mugabe's policies and actions. Human Rights Watch, in its 2009 annual report on Zimbabwe, wrote that "Zimbabwe's longstanding authoritarian rule and associated economic crisis plunged it into a humanitarian crisis."[6]

### 2. The Purpose and Scope of the Sanctions

The U.S. government enacted the Sanctions to pressure Mugabe to change the actions and policies of his government because of their contribution "to the deliberate breakdown in the rule of law in Zimbabwe, to politically motivated violence and intimidation in that country." *See* Executive Order 13288. In order to give the Sanctions teeth, the law prohibits any United States person from dealing in

---

[4] *Id.*

[5] *See* http://www.amnestyusa.org/research/reports/annual-report-zimbabwe-2010?page=show (last accessed on December 17, 2014).

[6] *See* http://www.hrw.org/print/world-report-2009/zimbabwe (last accessed on December 15, 2014).

any property of a SDN and/or providing services to or on behalf of, any SDN. The Sanctions also block any property of a SDN that is within the United States. Without these legal prohibitions the sanctions would be meaningless. If Mugabe were able to engage United States persons to provide him with services, maintain property within the control of the United States, or engage in banking transactions through the United States, the United States' goal in enacting the Sanctions would be thwarted as Mugabe would not feel the intended pressure to change his tyrannical ways.

The United States's efforts to help Zimbabweans have two prongs: targeted sanctions against its leaders and direct aid to its people. According to the United States Embassy in Harare, Zimbabwe:

> U.S. sanctions do not block the Government of Zimbabwe as a whole, nor do they prohibit all business with the country of Zimbabwe or transactions involving that jurisdiction. The United States has imported goods from Zimbabwe and Zimbabwe has imported goods from the United States on an ongoing basis both before and after the targeted sanctions commenced. Since 1980, the U.S. has provided over $2 billion in assistance to Zimbabwe. In 2013 alone, our support to Zimbabwe was over $130 million, largely in health, agricultural development, humanitarian assistance, and support for democratic institutions, rule of law and human rights.[7]

### 3. Defendant's Crime Compromised the Effectiveness of the Sanctions

Defendant, in direct contravention of the law, chose to engage with, and act on behalf of, Mugabe, Gono and other SDNs, by providing them with his services –

---

[7] *See* http://harare.usembassy.gov/latest_embassy_news.html (last accessed on December 15, 2014).

consulting, lobbying and public relations services – thereby undermining the purpose of the Sanctions. Further, defendant, in order to conceal his relationship with the SDNs, knowingly failed to register with the Attorney General as an agent of both Zimbabwe and of its leaders. Had he registered, his relationship with Mugabe would have been exposed and his hopes of financial gain may have been jeopardized.

It would be naive to believe that defendant engaged with Mugabe, Gono, and other Zimbabwean government officials as part of some humanitarian effort to help the people of Zimbabwe. Defendant engaged with the very same people responsible for committing atrocities against the Zimbabwean people. The designations by the United States government have been an effort to stop these atrocities by putting political and economic pressure on their perpetrators. Defendant's actions undermined these efforts.

> Lifting the Sanctions, an act even the Human Rights Watch has not advocated, would not eliminate the human rights violations committed by Mugabe's government but would encourage Mugabe to continue with his autocratic rule. Nor would lifting the Sanctions provide any humanitarian relief to the Zimbabwean people. Instead, the lifting of the sanctions would simply do nothing more than personally benefit the SDNs.

**4. Defendant Was Motivated by Money.**

Defendant's motivation was his own financial enrichment. He sought to parlay his close relationships with well-connected government officials to score a big payday. He and Ben Israel: (a) entered into a lucrative contract which called for them to receive $3.4 million dollars to arrange meetings with, and to lobby, their

16

political friends; (b) lobbied United States Congressmen, an Illinois State Senator, an Illinois State Representative, and others, to take action to lift the Sanctions; (c) arranged meetings between the politicians, Mugabe and Gono, with the agenda of lifting the sanctions; and (d) sought to collect payment in cash in order to avoid any risk that the United States Government would learn of the transaction.

The government respectfully submits that the Court give considerable weight to the nature and circumstances of defendant's crime in fashioning a sentence.

### B. History and Characteristics of Defendant

Defendant is well connected both to the regime in Zimbabwe, which, as discussed above, has violated the rights of its own people, and, through his co-defendant Ben Israel, to several United States politicians and officials. Defendant sought to take advantage of these relationships in order to enrich himself at the expense of the national interest of the United States and of the Zimbabwean people. While the government anticipates that defendant will present himself at his sentencing hearing as a humanitarian who sought to advance the well-being of others, that image must be counterbalanced by defendant's true conduct in this case.

### C. A Sentence Promoting Respect for the Law, and Serving as a Deterrent to Future Violations is Appropriate

Finally, in fashioning an appropriate sentence, the Court should also focus on promoting respect for the law and the general deterrent effect of the sentence. Those who seek to enrich themselves by circumventing the government's

17

designations and sanctions will take note of the penalties meted out to similarly situated individuals who violate these laws. A sentence fully reflecting the serious nature of defendant's crime will serve as a warning to those tempted to break the law on behalf of foreign principals.

## CONCLUSION

The government requests the Court reflect on the severity of the offense in fashioning an appropriate sentence and sentence the defendant to a Guidelines-range sentence of 15 and 21 months' imprisonment.

>Respectfully submitted,
>
>ZACHARY T. FARDON
>United States Attorney

By: /s/ *Barry Jonas*
Barry Jonas
Georgia N. Alexakis
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

David Recker
Trial Attorney
National Security Division
Counterespionage Section
600 E. Street, N.W., Tenth Floor
Washington, D.C., 20530
(202) 233-2261

DATE: December 18, 2014