1

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
2     EASTERN DIVISION

3     UNITED STATES OF AMERICA,          )     No. 2013 CR 572
                      Plaintiff,         )     October 1, 2014
4              v.                        )     9:20 a.m.
      C. GREGORY TURNER,                 )
5                     Defendant.         )

6     TRANSCRIPT OF PROCEEDINGS - TRIAL
      BEFORE THE HON. ELAINE E. BUCKLO
7     VOLUME III
      APPEARANCES:
8
      On behalf of Plaintiff:  MR. BARRY JONAS
9                              MS. GEORGIA N. ALEXAKIS
                               ASSISTANT UNITED STATES ATTORNEY
10                             219 South Dearborn Street, 5th floor
                               Chicago, Illinois 60604
11                             (312) 353-5300

12                             MR. DAVID RECKER
                               US DEPARTMENT OF JUSTICE
13                             COUNTERESPIONAGE SECTION
                               600 E Street N.W., 10th floor
14                             Washington, D.C. 20004
                               (202) 233-2261
15
      On behalf of Defendant:  MR. JAMES D. TUNICK
16                             LAW OFFICES OF JAMES D. TUNICK
                               30 North LaSalle Street, Suite 2140
17                             Chicago, Illinois 60602
                               (312) 580-1839
18
                               MR. MICHAEL I. LEONARD
19                             LEONARD LAW OFFICES, INC.
                               230 North LaSalle Street, suite 1620
20                             Chicago, Illinois 60601
                               (312) 380-6559
21

22

23              MICHAEL P. SNYDER, FCRR
                Official Court Reporter
24           United States District Court
      219 South Dearborn Street, Room 2244A
25              Chicago, Illinois 60604
                   (312) 435-5563

        MICHAEL P. SNYDER, Official Court reporter

1          (Proceedings in open court.  Jury out.)

2               THE COURT:  I'm going to move the trial up to Judge

3     Zagel's courtroom.

4               MR. TUNICK:  Judge, I want to apologize for the

09:20:53  5     outbursts.

6               MS. ALEXAKIS:  Did you want to change it this morning?

7               THE COURT:  I think it's probably not feasible without

8     losing time to do it, but I had just thought, well, it will be

9     easy enough to do it here.  In some a ways it's more

09:20:55  10    convenient.  But I think if you put too many people in a room,

11    and it turns out Judge Zagel is gone the next two weeks, so we

12    are just going to move up there.

13              MR. LEONARD:  You mean after lunch?

14              THE COURT:  I trust it would be best to do it at

09:20:55  15    lunch, and I trust everybody will keep themselves in check this

16    morning.

17              MR. LEONARD:  Sure.

18              THE COURT:  And I'll think, oh, it probably wasn't

19    even necessary.  But I think it will be better.

09:20:56  20              MR. LEONARD:  All right.  We are good either way.

21              MS. ALEXAKIS:  All right, Judge.  I'll let our office

22    know.

23              THE COURT:  All right.  I thought maybe Larry Collins

24    had, but if not, you'd better let them know.

09:20:56  25         (Recess.  Jury out.)

              MICHAEL P. SNYDER, Official Court reporter

1    THE COURT:  I want to make sure we don't have these

2  issues.

3    MR. JONAS:  Just to reiterate, I've been asked to ask

4  Your Honor again regarding the media's request to get some of

09:26:54    5  our exhibits.  We don't take a position.  I said I'm not going

6  to bring it up again; I said I'd do it one more time, and

7  that's it.  I'm putting it before Your Honor.  If Your Honor

8  says the media can have the exhibits --

9    THE COURT:  I think there's enough media attention.

09:27:07    10    MR. LEONARD:  We'd rather they wait.

11    MR. JONAS:  I'm just surprised because pretrial you

12  guys gave them a copy of the letter sent to Zimbabwe.

13    MR. LEONARD:  We did?

14    MR. JONAS:  Yes.  An article.

09:27:21    15    MR. LEONARD:  Oh, that's not evidence.

16    THE COURT:  I haven't read it, but I was told there

17  was an article this morning that started out quoting what at

18  least purported to be evidence.

19    MR. LEONARD:  We think they should wait, Judge.

09:27:44    20    THE COURT:  I sure wish you people would all agree one

21  way or another on something.

22    MR. JONAS:  We are not asking for it.  We are not

23  taking a position.  We are just passing it along.

24    THE COURT:  The problem is, you know, I do the best I

09:28:04    25  can to keep the jury from seeing headlines in the news, but

MICHAEL P. SNYDER, Official Court reporter

1    it's an imperfect system.  And my problem with one part of

2    anything is that they, is that it's selective.  I guess my

3    preference would be not to.  If they make a motion or

4    something, I'd have to deal with it.

09:28:32  5         MR. JONAS:  That's fine, Your Honor.  We'll pass it

6    back.

7         THE COURT:  Okay.  And you've told your office that

8    I'm going to move the trial, right?

9         MR. JONAS:  I heard that.

09:28:42  10         THE COURT:  I just think, I assume it won't be too

11   difficult.  I just think you put too many people in too small a

12   space, that maybe it exacerbates emotions.

13         MR. JONAS:  I have just -- I don't know how long it's

14   going to take our ALS people to move the equipment up to Judge

09:29:07  15   Zagel's courtroom.

16         THE COURT:  That's why I thought we would do it at

17   noon.

18         MR. JONAS:  Yes.  I am saying it could take less than

19   an hour.  We may conceivably need a few more minutes.  I don't

09:29:16  20   know.  But they'll be here at noon.

21         THE COURT:  Yes.  I thought this would be all right,

22   but I would just as soon all of you were not getting upset with

23   each other.

24         Okay.  I actually am going to give the jury a little

09:29:31  25   reminder.  When we were first picking the jury, one of the

MICHAEL P. SNYDER, Official Court reporter

1    first things I say is objections aren't evidence, and neither

2    are unanswered questions.  But from what I heard from my staff,

3    the jury was sort of going back and forth yesterday in terms of

4    probably not really understanding, and there were so many, and

09:29:52    5    I'm just going to say that, exactly that, neither objections

6    nor unanswered questions are evidence, and we'll go on from

7    there.

8              If they are ready, we'll begin.

9              MR. JONAS:  If we can move this back over here so I

09:30:11    10    don't have to keep getting up and walking around to see what

11    he's writing?

12             MR. LEONARD:  I'm just putting "not guilty" in big

13    letters.

14             MR. JONAS:  Excellent.

09:30:16    15    THE COURT:  What do you have on there?

16             MR. LEONARD:  Nothing, Judge.

17             MR. JONAS:  Right now it's blank.

18             MR. LEONARD:  No, Judge, I have names of --

19             THE COURT:  I thought that's what you were writing.

09:30:25    20    MR. LEONARD:  I have names of politicians and names of

21    specially designated nationals.

22             MR. JONAS:  I understand.  I do need to see it, so I

23    keep getting up, walking around.

24             MR. LEONARD:  This time we'll tell you then.  So Carol

09:30:33    25    Adams' name is going to be written.

MICHAEL P. SNYDER, Official Court reporter

1      THE COURT:  Who?

2      MR. LEONARD:  There's going to be two names written on

3  there today, Carol Adams and then the specially designated

4  national with the strange long name.

09:30:42    5      MR. JONAS:  If you can spell it correctly.

6      MR. LEONARD:  I can.

7      MR. JONAS:  If that's all that's being written and

8  nothing else, that's fine.  But if there's going to be more

9  written, I think it's just fair that we move it back here so I

09:30:50    10  have a chance to see it.

11      MR. LEONARD:  That's all that's going on today.  It's

12  so small that -- we don't have the resources the government

13  has, so it's so small that --

14      THE COURT:  All right.  Do you need, if I turn down

09:31:01    15  the lights, have I turned down the lights too much?  Okay.

16      If you guys will get your witness.

17      (Recess.  Jury in.)

18      THE COURT:  Good morning.

19      Okay.  We are going to begin.  I just want to remind

09:34:26    20  you, actually just as I was beginning jury selection, I had

21  said this, but if I was being picked for a jury, I'm not sure I

22  would have remembered something that was said then.  But

23  anyway, I just want to remind you that neither objections,

24  which lawyers are required to make when they believe it's

09:34:51    25  necessary, nor, the objections aren't evidence, and neither are

MICHAEL P. SNYDER, Official Court reporter

Noldin - cross by Leonard

7

1  unanswered questions.  If the question is unanswered because I

2  sustained an objection, you must not draw any conclusion from

3  the question as to what you think the answer might have been.

4          Okay.  Let's go on.

09:35:10  5      STEVEN NOLDIN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

6                  CROSS-EXAMINATION (resumed)

7  BY MR. LEONARD:

8  Q.  Welcome back, Agent.

9  A.  Good morning.

09:35:16  10  Q.  Just a couple follow-up with you, sir.

11          We talked about some of the Illinois politicians

12  yesterday who went to Zimbabwe.  One of them was Carol Adams,

13  right, sir?

14  A.  Yes.

09:35:33  15  Q.  And Carol Adams at the time she went to Zimbabwe, that was

16  what, 2008, 2009?

17  A.  January of 2009.

18  Q.  And at the time when she still is an African-American

19  female member of -- strike that.

09:35:48  20          At the time, let's start again.  She's an

21  African-American female, right?

22          MR. JONAS:  Objection, relevance.

23          THE COURT:  Sustained.

24  BY MR. LEONARD:

09:36:11  25  Q.  She's a female, right?

MICHAEL P. SNYDER, Official Court reporter

Noldin - cross by Leonard

1    MR. JONAS:  Objection, relevance.

2    THE COURT:  Some objections may not be worth making.

3    MR. JONAS:  I know.

4    THE COURT:  You can answer this if you know.

09:36:22  5  BY THE WITNESS:

6    A.  Yes, she is a female.

7    MR. LEONARD:  Sometimes Carol is a male, sometimes

8    Carol is a female.

9    THE COURT:  That's true.

09:36:29  10  BY MR. LEONARD:

11   Q.  In any event, when she went there in 2009, Mrs. Adams was

12   employed by the State of Illinois in a position with the State,

13   correct?

14   A.  That's correct.

09:36:38  15  Q.  What was her position back then?

16   A.  She was with the Department of Human Services, I believe.

17   Q.  And that's an appointed position by the Governor of the

18   State of Illinois, correct?

19   A.  I believe it is.

09:36:49  20  Q.  And now she is the President of the Dusable Museum in

21   Chicago?

22   A.  Correct.

23   Q.  And when she went to Zimbabwe in 2009, was Mr. Turner

24   there?

09:37:02  25  A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Noldin - cross by Leonard

9

1   Q.  And when she went there in 2009, she didn't receive any

2   money from Mr. Turner, did she, sir?

3   A.  Not that I'm aware of, no.

4   Q.  And Mr. Turner didn't receive any money for bringing her

09:37:18   5   there, did he, sir?

6   A.  Not that I'm aware of, no.

7   Q.  And Miss Adams went there because she wanted to see for

8   herself what the sanctions, what effect the sanctions were

9   having on the country of Zimbabwe, right?

09:37:37   10          MR. JONAS:  Objection.

11          THE COURT:  Sustained.

12   BY MR. LEONARD:

13   Q.  Did you talk to Miss Adams?

14   A.  I did, yes.

09:37:41   15   Q.  You've interviewed her several times, right?

16   A.  Yes.

17   Q.  Let also talk about the specially designated national that

18   we did not cover yesterday.  A very lengthy name.  I have very

19   poor print, but I'm going to write it out.  Samuel Simbarashe

09:38:13   20   Mumbengegwi, although that's probably not the way you say it.

21          That gentleman is another one of these specially

22   designated nationals, correct, sir?

23   A.  Yes, he is a specially designated national.

24   Q.  And he was back in '08 and '09, right?

09:38:38   25   A.  Yes, he was.


          MICHAEL P. SNYDER, Official Court reporter

1  Q.  And you contend that Mr. Turner met with him?

2  A.  Yes.

3  Q.  And this gentleman, he never sent any emails, this

4  gentleman who is a specially designated national, to Mr. Turner

09:38:57  5  directing him to perform some acts on his behalf, go do this,

6  go do that, go do that?  That never happened, did it?

7  A.  Well, we can't be sure because we don't have any emails

8  from the defendant's inbox.

9  Q.  Sir, I want you to answer my question.  I don't want you to

09:39:11  10  start explaining things, okay?  Mr. Jonas can get up here and

11  try to put your testimony in perspective.  You've just got to

12  answer my questions right now.  Okay?

13       Do you have any emails that say that or not?

14  A.  There were nothing in the inbox.

09:39:22  15  Q.  Okay.  So the answer is no?

16  A.  That's correct.

17  Q.  Do you have letters from the specially designated national

18  to Mr. Turner where this specially designated national tells

19  Mr. Turner, do this, go do that, go do that?  Do you have any

09:39:38  20  of that?

21  A.  No.

22  Q.  And these alleged meetings between Mr. Turner and that

23  specially designated national, of course, we have no audio or

24  video of those meetings, do we, sir?

09:39:49  25  A.  Not from South Africa or Zimbabwe, no.

MICHAEL P. SNYDER, Official Court reporter

Noldin - cross by Leonard

11

1   Q.  The answer is no, right?

2   A.  It's no.

3   Q.  Now, you played some calls for the jury yesterday.  I just

4   want to clarify a couple points.

09:40:08   5          Number one, those weren't all the calls, right?

6   A.  That's correct.

7   Q.  There were thousands of them, correct?

8   A.  Yes.

9   Q.  Did you listen to them all?

09:40:17   10  A.  Not all of them, no.

11  Q.  Why not?

12  A.  There were several thousand calls.

13  Q.  So how did you choose what was a good one and what was a

14  bad one?  We are not going to listen to this one, I'm going to

09:40:31   15  listen to this one.  How would you know in advance not listen

16  to a call?

17  A.  Sure.  Tech cuts or summaries of the calls were produced

18  when they are reviewed by whoever reviews the call.  So I

19  reviewed the tech cuts for pertinent portions.

09:40:45   20  Q.  So somebody else reviewed them for you?

21  A.  Assisted.

22  Q.  Okay.  Now, I thought I heard you say yesterday; I just

23  want to clarify this.  I thought I heard you tell us that

24  Carolyn Jordan is an associate of Greg Turner.  Didn't I hear

09:41:03   25  you say that to us yesterday?

MICHAEL P. SNYDER, Official Court reporter

1   A.  I believe that's how I characterized it, yes.

2   Q.  That's not true, is it, sir?

3   A.  To me it is.  That's how I understand her relationship.  I

4   don't know the full nature of their relationship.

09:41:14   5   Q.  Well, let's talk about who she is.

6          She's a lawyer in Washington D.C., African-American

7   female, correct?

8              MR. JONAS:  Objection.

9              THE COURT:  We'll have to take a sidebar.

09:41:30   10      (Discussion on the record at sidebar.)

11             THE COURT:  I'm sorry.  What is the objection?

12             MR. JONAS:  Mr. Leonard is trying to play the race

13   card.

14             THE COURT:  Oh.

09:41:48   15             MR. LEONARD:  He's trying to play the associate card.

16   Because someone is black, they are an associate of him.

17             THE COURT:  No, that's --

18             MR LEONARD:  She's not an associate.

19             THE COURT:  There was a basis for that, but I think

09:41:59   20   it's right, what is the point of saying this person is black,

21   this person is --

22             MR. LEONARD:  Because if they are black, they are an

23   associate of Turner.  If they are white, they are not.  This

24   guy is the one who is characterizing them that way.  That's

09:42:10   25   ridiculous.


           MICHAEL P. SNYDER, Official Court reporter

Noldin - cross by Leonard

13

1          MR. JONAS:  That is so --

2          MR. LEONARD:  It's a complete mischaracterization

3    Carolyn Jordan is a prominent attorney in Washington, D.C..

4    She's not an associate of Greg Turner's.  It's ridiculous.

09:42:21    5          MR. JONAS:  There is nothing in this record at all

6    where this defendant or anyone ever said the association

7    because of race.  That is completely improper conduct.

8          THE COURT:  I don't think there's a basis in good

9    faith for that.

09:42:33   10          MR. JONAS:  Your Honor, if Mr. Leonard asks the

11   question, I think there needs to be admonishment by the Court.

12   He's trying the jury nullification argument, Judge.

13          (End of discussion at sidebar.)

14          THE COURT:  The objection is sustained.  Please ask

09:43:03   15   another question.

16   BY MR. LEONARD:

17   Q.  Carolyn Jordan is an attorney in Washington, D.C., isn't

18   she?

19   A.  Yes, she is.

09:43:09   20   Q.  Does that make her an associate of Greg Turner?

21   A.  If they have contact, I would say so.

22   Q.  So anyone he has contact with is an associate of him?

23   A.  In general terms an associate, a friend, a contact.

24   Q.  So is she part of the conspiracy, this Washington D.C.

09:43:25   25   attorney, is she part of the conspiracy of Greg Turner?

          MICHAEL P. SNYDER, Official Court reporter

Noldin - cross by Leonard

14

1   A.  I wouldn't say that she's a part of the conspiracy.

2   Q.  And you also told us that Mr. McDowell is an associate of

3   Greg Turner, one of the other voices on the tapes, right?

4   A.  Yes.

09:43:43   5   Q.  McDowell is an associate of Greg Turner, did I hear that

6   right?

7   A.  Yes.

8   Q.  Mr. McDowell is a vice-president with American Express,

9   isn't he, sir?

09:43:55   10   A.  I believe he is or he was.

11   Q.  You believe?  You actually know it.  You've talked to him,

12   haven't you?

13   A.  I have, yes.

14   Q.  So he is that, right?

09:44:03   15   A.  Yes.

16   Q.  Okay.  And is he part of the conspiracy too, this executive

17   at American Express?

18   A.  No.

19   Q.  During the time period covered by those Yahoo emails that

09:44:23   20   you told us about, Mr. Turner was living in Israel, wasn't he,

21   sir?

22   A.  I believe he lived in Israel and South Africa on the

23   African continent at times.  I can't be sure where he was

24   living throughout the entire time period.

09:44:39   25   Q.  Did you try to find out?

MICHAEL P. SNYDER, Official Court reporter

Noldin - cross by Leonard

15

1  A.  I did not.

2  Q.  You made no effort to find out where he was living while he

3  was sending those emails?

4  A.  I don't recall actually checking myself.

09:44:48  5  Q.  Did your team make any effort to figure out where he was,

6  where he was sending those emails?

7  A.  If they did, I don't know.

8  Q.  But you did at some point during the investigation find out

9  for yourself that he lived in Israel, right?

09:45:04  10  A.  I became aware of it, yes.

11  Q.  Now, you indicated that you had met Mr. Turner before,

12  correct, sir?

13  A.  Yes.

14  Q.  You met him because was it you that placed a phone call to

09:45:19  15  him and told him about the fact that he was being charged in a

16  federal criminal case?  Was that you?

17          MR. JONAS:  Objection.

18          THE COURT:  Sustained.

19  BY MR. LEONARD:

09:45:29  20  Q.  You picked him up at the airport, didn't you?

21  A.  No, sir.

22  Q.  Who did?

23  A.  Nobody picked him up at the airport.

24  Q.  He came here from Israel voluntarily --

09:45:38  25          MR. JONAS:  Objection.

        MICHAEL P. SNYDER, Official Court reporter

Noldin - redirect by Jonas

16

1   BY MR. LEONARD:

2   Q.  -- to face these charges, didn't he?

3           THE COURT:  Sustained.

4           MR. LEONARD:  Can I have a moment, Judge?

09:45:45   5           THE COURT:  Yes.

6       (Pause.)

7   BY MR. LEONARD:

8   Q.  Just to be clear, so you didn't pick him up.  You met him

9   at the airport?

09:45:56   10          MR. JONAS:  Objection.

11          THE COURT:  Sustained.

12          MR. LEONARD:  Nothing further.

13          MR. JONAS:  Can I have just one moment?

14          THE COURT:  Yes.

09:46:03   15          MR. JONAS:  There will be redirect.

16                  REDIRECT EXAMINATION

17  BY MR. JONAS:

18  Q.  Mr. Noldin, did you lie before a grand jury?

19  A.  I don't believe I did, no.

09:46:31   20  Q.  Did you lie before a judge?

21  A.  No.

22  Q.  Have you lied in this courtroom?

23  A.  Absolutely not.

24  Q.  Mr. Leonard kept saying to you in his questions, your team,

09:46:41   25  your team.  Let's make sure we are clear about this.

MICHAEL P. SNYDER, Official Court reporter

Noldin - redirect by Jonas

17

           1        MR. JONAS:  Would you pull up Government's Exhibit
           2   GT --
           3        Your Honor, can I move the screen?
           4        THE COURT:  Yes, you may.
09:47:02   5        MR. JONAS:  Your Honor, I want to make sure there's
           6   nothing blocking you from the jury.
           7        THE COURT:  No, I'm fine.
           8        MR. LEONARD:  Can you tell us what you're going to
           9   show?
09:47:11  10        MR. JONAS:  GT 92.
          11        MR. LEONARD:  This is beyond the scope.  It should be
          12   in direct examination, and it's cumulative.
          13        THE COURT:  I don't know what the question is.  Did I
          14   miss something?
09:47:19  15        MR. JONAS:  Your Honor, I had said, do you recall Mr.
          16   Leonard asking or saying to you in his questions over and over
          17   again, your team, your team.
          18        THE COURT:  Right, I heard that part.  Let me just see
          19   what you're wanting to refer to.  I think you're going to have
09:47:33  20   to ask your question because I don't know, I can't rule.
          21        MR. JONAS:  Can we pull up GT 92.
          22   BY MR. JONAS:
          23   Q.  You don't have that in front of you?
          24   A.  I can either find it or turn that around.
09:47:46  25   Q.  Can you see it on the screen?

                    MICHAEL P. SNYDER, Official Court reporter

1   A.  It's upside down.

2       MR. JONAS:  Your Honor, may I approach to fix the

3   small screen for the witness?

4       THE COURT:  Sure.

09:48:12   5   BY MR. JONAS:

6   Q.  Can you see the screen now?

7   A.  Yes.

8   Q.  Can you see where the defendant says "Chicago lobby team"?

9       MR. LEONARD:  Objection.  This has nothing to do with

09:48:24   10   the FBI team.  This is Mr. Jonas' direct examination, and he

11   can't show documents to the jury before he gets a ruling from

12   Your Honor whether he can ask the question.

13      THE COURT:  I agree with the latter part, that you

14   should have asked that first, but --

09:48:35   15      MR. JONAS:  I want to make sure that --

16      THE COURT:  I'll let him answer this one.

17   BY MR. JONAS:

18   Q.  I just want to make sure, Agent Noldin.  Were you part, is

19   the team that Mr. Leonard is asking you about, are you part of

09:48:48   20   the Chicago lobby team?

21   A.  No.

22   Q.  Do you recall being asked questions about the President,

23   Barack Obama?

24   A.  Yes.

09:48:55   25      MR. LEONARD:  Judge, can we take that off the screen

        MICHAEL P. SNYDER, Official Court reporter

Noldin - redirect by Jonas

19

1    now?

2              THE COURT:  Yes.

3              MR. JONAS:  Your Honor, I'd like to pull up GT 14,

4    which goes to the questions regarding letters from Ken Dunkin

09:49:05   5    to the President, the transition team.  That was specifically

6    asked about.

7              THE COURT:  Yes, okay.

8    BY MR. JONAS:

9    Q.  We'll go to the second page.

09:49:16   10             Do you recall being asked questions about contacting

11   the President Barack Obama?

12   A.  Yes, I do.

13   Q.  As an FBI agent, are you able to pick up the phone and call

14   the President of the United States?

09:49:26   15   A.  No, I'm not.

16   Q.  In this letter, it discusses a meeting that Ken Dunkin

17   allegedly had with the president, is that correct, in the

18   letter?

19   A.  Yes.

09:49:35   20   Q.  Do you know if Ken Dunkin actually had a meeting with the

21   President of the United States?

22   A.  No, I don't.

23   Q.  Do you know if Ken Dunkin even signed this letter?

24   A.  No, I don't.

09:49:44   25   Q.  Did you attempt to get records from Ken Dunkin regarding

              MICHAEL P. SNYDER, Official Court reporter

1  the letter?

2  A.  Yes, we did.

3  Q.  And what did you get in response?

4  A.  We got several documents, none of which included this

09:49:52  5  letter.

6  Q.  Mr. Leonard asked you about the White House making a

7  referral of the case when Ken Dunkin -- regarding Ken Dunkin

8  contacting the White House to the FBI.  Are you familiar with

9  that?

09:50:06  10  A.  Yes.

11  Q.  Do you recall the questions he asked you about that?

12  A.  I do.

13  Q.  Did the White House referral say anything about Ken Dunkin

14  meeting with the President of the United States?

09:50:13  15  A.  No.

16  Q.  What did it say?

17  A.  That he was requesting a meeting.

18  Q.  And did that cause concern on the White House's part?

19  A.  It did.

09:50:22  20  Q.  Mr. Leonard asked you about contacting I believe it was

21  Susan Rice?

22  A.  Yes.

23  Q.  You didn't contact Susan Rice?

24  A.  No.

09:50:32  25  Q.  What's the FBI's ability to pick up the phone and contact

MICHAEL P. SNYDER, Official Court reporter

1  someone like Susan Rice, who at that time was, what, a

2  high-ranking member of the US government?

3  A.  Correct.

4  Q.  Can you just pick up the phone and call her?

09:50:43  5  A.  No, we cannot.

6  Q.  Go to two more pages of this exhibit.  Part of the same

7  exhibit, there's another letter from Ken Dunkin, correct?

8  A.  Correct.

9  Q.  You see that on the screen before you?

09:50:59  10  A.  Yes.

11  Q.  Who is this letter to?

12  A.  Office of the President-Elect Reggie Love.

13  Q.  Who is Reggie Love?

14  A.  He was on the transition team at the time for the

09:51:09  15  President-Elect.

16  Q.  Is he still on the transition team?

17  A.  No, he's not.

18  Q.  Did the FBI contact Reggie Love?

19  A.  Yes, we did.

09:51:16  20  Q.  Was he interviewed?

21  A.  Yes.

22  Q.  Did he have any information regarding a meeting between Ken

23  Dunkin and the President of the United States?

24  A.  No knowledge whatsoever.

09:51:23  25  Q.  You were asked about whether you reviewed all the emails of

MICHAEL P. SNYDER, Official Court reporter

1  the FBI that they collected in this case from the defendant's

2  account.  Do you recall that question?

3  A.  Yes, I do.

4  Q.  Did the FBI review all the emails?

09:51:37  5  A.  Yes, they were reviewed.

6  Q.  So you just didn't review all of them yourself, but you and

7  other agents did?

8  A.  That's correct.

9  Q.  You were asked about all the phone calls that were captured

09:51:46  10  by the FBI.  Did you review all the phone calls yourself?

11  A.  No, I did not.

12  Q.  Were all the phone calls reviewed?

13  A.  They were reviewed.

14  Q.  You were asked about the Kellogg Foundation.  Do you recall

09:52:00  15  those questions?

16  A.  Yes.

17  Q.  And you said you interviewed someone from Kellogg's, is

18  that correct?

19  A.  Yes.

09:52:07  20  Q.  Had the FBI subpoenaed records from Kellogg's?

21  A.  We did.

22  Q.  Do you remember when that was?

23  A.  The, I think it was a couple years ago, a year or two ago.

24  Q.  Did Kellogg's give the defendant money?

09:52:22  25  A.  They did, yes.

MICHAEL P. SNYDER, Official Court reporter

1    MR. LEONARD:  Objection to foundation, best evidence

2    and hearsay.

3        THE COURT:  Sustained.

4    BY MR. JONAS:

09:52:30    5    Q.  Can a person get money from the Kellogg Foundation, to the

6    best of your knowledge, and still provide services to a

7    specially designated national?

8        MR. LEONARD:  Objection, foundation.  This is

9    foundation, Judge; it's a legal question.

09:52:45    10       THE COURT:  That's true.  Sustained.

11   BY MR. JONAS:

12   Q.  You were asked questions about the government getting the

13   defendant's bank account.  Did the government subpoena the

14   defendant's bank accounts in the United States?

09:52:59    15   A.  I don't recall.

16   Q.  Is there anything that would refresh your recollection?

17   A.  Yes, I'm sure there would be.

18       MR. JONAS:  Your Honor, if I could have a moment?

19       THE COURT:  Yes.

09:53:08    20     (Pause.)

21       MR. JONAS:  Your Honor, I'll come back to that

22   question in a moment.

23   BY MR. JONAS:

24   Q.  Was the government aware of -- was the FBI able to get bank

09:53:34    25   accounts from people overseas?

        MICHAEL P. SNYDER, Official Court reporter

1   A.  Yes.

2   Q.  Was the government aware of the defendant's bank account,

3   if the defendant had a bank account overseas anywhere?

4   A.  Yes.

09:53:41   5   Q.  Did the government attempt to get those bank accounts?

6   A.  Yes.

7   Q.  Was the government successful?

8   A.  Yes.

9   Q.  To get the defendant's bank accounts from overseas?

09:53:50   10   A.  No, I don't think we were.

11   Q.  Getting back to the question about subpoenaing domestic

12   bank accounts.

13          MR. JONAS:  If I may approach the witness, Your Honor?

14   BY MR. JONAS:

09:54:00   15   Q.  I'm going to show you an email.  If you could just take a

16   quick look at this to see if it refreshes your recollection

17   about the government subpoenaing defendant's domestic bank

18   records.

19   A.  It does refresh my memory a little bit, yes.

09:54:40   20   Q.  And do you recall now whether the government subpoenaed the

21   defendant's domestic bank records?

22   A.  Yes.

23   Q.  Do you recall emails, the defendant's emails that we went

24   through where the defendant talked about going to Zimbabwe in

09:54:55   25   order to "chasing the cash," that was Government's Exhibit GT

MICHAEL P. SNYDER, Official Court reporter

Noldin - redirect by Jonas

25

1  Email 24?

2  A.  Yes.

3  Q.  Another email where he talked about --

4       MR. LEONARD:  Objection, leading, cumulative.  This is

09:55:08  5  direct examination, Judge.

6       MR. JONAS:  Judge, they asked specific questions.

7       THE COURT:  You may ask the question.

8       MR. JONAS:  Thank you, Judge.

9  BY MR. JONAS:

09:55:13  10  Q.  Do you recall emails about Government's Exhibit GT 26 where

11  the defendant talked about going to pitch for the money?

12  A.  Yes.

13  Q.  And GT 28 where he talked about closing in on the cash?

14  A.  Yes.

09:55:25  15  Q.  Please explain how the FBI could get records of cash

16  payments made in Zimbabwe.

17  A.  If there's a way, I'm not aware of how we could find that

18  information.

19  Q.  You were asked about meetings between the defendant and

09:55:39  20  Robert Mugabe and Gideon Gono and how the meetings were not

21  recorded.  Do you recall those questions?

22  A.  Yes.

23  Q.  Prior to these meetings happening, was the FBI aware that

24  they were going to happen?

09:55:49  25  A.  No.

MICHAEL P. SNYDER, Official Court reporter

1   Q.  Can you please explain how the FBI could record either

2   audio or video of meetings that they didn't know were going to

3   happen yet?

4   A.  It's impossible unless -- we don't know.

09:56:00   5   Q.  It's impossible?  How do you record a meeting you're not

6   aware of?

7   A.  Can't do it.

8   Q.  You learned, the FBI learned about these meetings after the

9   fact?

09:56:08   10   A.  Correct.

11   Q.  You were asked about a number of meetings that the

12   defendant had with Gideon Gono.  Do you recall those questions?

13   A.  Yes.

14   Q.  And the defendant said -- well, withdrawn.

09:56:23   15          MR. JONAS:  Your Honor, I'd like to -- one moment,

16   Your Honor.

17          (Pause.)

18          MR. JONAS:  May I approach the witness?

19          THE COURT:  Yes, you may.

09:56:36   20   BY MR. JONAS:

21   Q.  Agent Noldin, I'm handing you what's been marked as

22   Government's Exhibit GT Email 124, which is not in evidence

23   yet.  Where does this come from?

24   A.  The email account of the defendant.

09:57:10   25   Q.  And this is in the email account you reviewed?

MICHAEL P. SNYDER, Official Court reporter

1    A.  Yes.

2    Q.  Is this a -- is there a picture attached showing the

3    defendant with somebody?

4    A.  Yes.

09:57:18    5           MR. JONAS:  Your Honor, at this time I would offer

6    into evidence Government's Exhibit GT Email 124.

7           MR. LEONARD:  No objection.

8           THE COURT:  It's admitted.

9        (Government Exhibit GT Email 124 received in evidence.)

09:57:28    10          MR. JONAS:  This is not in the computer.  I need to

11   put it on the Elmo.  If I may approach the witness to get that

12   back?

13          THE COURT:  Yes.

14   BY MR. JONAS:

09:58:05    15   Q.  Agent Noldin, can you read that?

16   A.  Yes, I can.

17   Q.  What's the date of this email?

18   A.  December 5th, 2005.

19   Q.  Who is it to?

09:58:14    20   A.  Mayainc@hotmail.com.

21   Q.  Do you know who that is?

22   A.  No, I don't.

23   Q.  What's the subject line?

24   A.  "Photos with Gov. Gono and Minister of Finance at banking

09:58:25    25   conference."

        MICHAEL P. SNYDER, Official Court reporter

Noldin - redirect by Jonas

28

09:58:37

1  Q.  Turn to the second page.

2      Who is that?

3  A.  The defendant.

4  Q.  Do you recognize who that is?

5  A.  It appears to be Governor Gideon Gono.

6  Q.  Agent Noldin, you testified that there are a number of

7  meetings referenced in the emails between defendant and Gideon

8  Gono, is that correct?

9  A.  Yes.

09:58:54

10  Q.  And there is evidence of a December of 2008 trip?

11  A.  Yes.

12  Q.  Meeting, a January 2009 meeting in South Africa?

13  A.  Correct.

14  Q.  A January 2009 meeting in Zimbabwe?

09:59:05

15  A.  Yes.

16  Q.  A July meeting, July 2009 meeting in Zimbabwe?

17  A.  Yes.

18  Q.  A September 2009 meeting in Zimbabwe?

19  A.  Yes.

09:59:13

20  Q.  And you mentioned the defendant said there were four

21  meetings in the past two years on a phone call?

22  A.  Yes, that's right.

23  Q.  You were questioned about meetings with Robert Mugabe.  Do

24  you recall those questions?

09:59:26

25  A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

1           MR. JONAS:  Your Honor, I'd like to pull up

2  Government's Exhibit GT 51.

3           THE COURT:  All right.

4  BY MR. JONAS:

09:59:44  5  Q.  What's this?

6  A.  An email from the defendant's email account.

7  Q.  Who is it to?

8  A.  Maureensambasi@hotmail.com.

9  Q.  Go to the next page.

09:59:56  10           MR. LEONARD:  Judge, this is cumulative and

11  duplicative.

12           MR. JONAS:  Judge, this is in response to the

13  questions about meetings with Mugabe.

14           THE COURT:  I'll let you ask the questions.

10:00:06  15           MR. JONAS:  Thank you.

16  BY MR. JONAS:

17  Q.  Agent Noldin, just remind the jury who is in this picture.

18  A.  From left to right, the defendant Mr. Turner, Prince Asiel

19  Ben Israel, Zimbabwe President Robert Mugabe, and Oscar Webb.

10:00:28  20  Q.  This is a picture that the defendant forwarded to somebody?

21  A.  Yes.

22  Q.  How many times did he send this picture to people?

23  A.  Several times.

24  Q.  At least three or four, would you say, if not more?

10:00:42  25  A.  Yes.

          MICHAEL P. SNYDER, Official Court reporter

10:00:57

10:01:03

10:01:24

10:01:37

10:02:00

1    Q.  Do you recall the defendant talking about meetings with

2    Mugabe in New York?

3    A.  Yes.

4    Q.  Did he talk about meetings with Mugabe with Mugabe's chief

5    secretary?

6    A.  Yes.

7    Q.  Did he talk to the chief secretary about his team being in

8    control?

9    A.  Yes.

10   Q.  Were the meetings with the, did the defendant discuss

11   meetings with specially designated national Simon Moyo?

12   A.  Yes.

13   Q.  Mr. Leonard asked you about directions from Mr. Moyo to the

14   defendant.  Do you remember that?

15   A.  Yes.

16        MR. JONAS:  If we can pull up Government's Exhibit GT

17   3.

18   BY MR. JONAS:

19   Q.  What's the date of this email?

20   A.  November 15, 2008.

21   Q.  Can we go do the next page.

22        What's this?

23   A.  It's a letter addressed to the defendant from SK Moyo.

24   Q.  Do you remember if there was an email with the defendant

25   where he talked to Chris Mutsvanga about the UN meeting in

        MICHAEL P. SNYDER, Official Court reporter

Noldin - redirect by Jonas

31

1    September of '09 with President Mugabe?

2    A.  Yes.

3    Q.  Do you recall if the defendant told Mutsvanga anything

4    about directions that Mugabe gave them regarding who they are

10:02:14    5    to deal with in the Zimbabwe government?

6    A.  Yes.

7    Q.  What did the defendant say in that email?

8    A.  In short, to reach out to the foreign minister of Zimbabwe.

9    Q.  Mr. Leonard asked you about payments to Carol Webb from the

10:02:34    10    defendant.  Do you recall that?  That was just this morning?

11    A.  To Carol Adams?

12    Q.  I'm sorry.  Carol Adams.

13    A.  Yes.

14    Q.  And you didn't recall any?

10:02:43    15    A.  Correct.

16    Q.  You don't know one way or the other, do you?

17    A.  I don't, no.

18    Q.  Did you interview a man named Oscar Webb?

19    A.  Yes.

10:02:51    20    Q.  OJ Webb?

21    A.  Yes.

22    Q.  We have seen emails with him and this defendant throughout

23    the testimony yesterday?

24    A.  Yes.

10:02:57    25    Q.  He was in that picture we pulled up a few moments ago with

MICHAEL P. SNYDER, Official Court reporter

|         |    |                                                                         |
|---------|----|-------------------------------------------------------------------------|
|         | 1  | the defendant and the President of Zimbabwe?                             |
|         | 2  | A.  Correct.                                                            |
|         | 3  | Q.  Did Oscar Webb get money from either the defendant or Ben            |
|         | 4  | Israel?                                                                  |
| 10:03:06 | 5 | A.  Yes, he did.                                                        |
|         | 6  | Q.  And did this payment occur in Zimbabwe?                              |
|         | 7  | A.  Yes, it did.                                                        |
|         | 8  | Q.  You were asked about Carolyn Jordan and whether she was an           |
|         | 9  | associate of the defendant, and Craig McDowell as well?  Why            |
| 10:03:19 | 10 | did you say they were associates of the defendant?                     |
|         | 11 | A.  They had communications with the defendant.                         |
|         | 12 | Q.  Whether they are associates or not, did that change what            |
|         | 13 | the defendant said to them in those phone calls we played?             |
|         | 14 | A.  It does not.                                                        |
| 10:03:31 | 15 | MR. JONAS:  One moment, Your Honor.                                    |
|         | 16 | (Pause.)                                                                |
|         | 17 | MR. JONAS:  No further questions.                                      |
|         | 18 | THE COURT:  Okay.                                                       |
|         | 19 | RECROSS-EXAMINATION                                                     |
| 10:03:44 | 20 | BY MR. LEONARD:                                                         |
|         | 21 | Q.  Sir, you just said that you didn't lie to the grand jury.           |
|         | 22 | Is that what you just told us?                                          |
|         | 23 | A.  Yes, sir, that's correct.                                           |
|         | 24 | Q.  That was false, wasn't it?                                          |
| 10:03:53 | 25 | MR. JONAS:  Objection.                                                 |

MICHAEL P. SNYDER, Official Court reporter

1   BY MR. LEONARD:

2   Q.  Were you talking about when you testified on August 27th?

3              MR. JONAS:  There's an objection.

4              MR. LEONARD:  I can't say that was false as a

10:04:03   5   preliminary matter to impeaching him, Judge?

6              THE COURT:  All right.  He's answered it.  Go ahead,

7   ask your question.

8   BY MR. LEONARD:

9   Q.  Were you talking about not lying on August 27 of 2013

10:04:18   10   before the grand jury, is that the not lying you're talking

11   about?

12             THE COURT:  I'm afraid we'd better take a sidebar

13   because I don't know what we are talking about.

14          (Discussion on the record at sidebar.)

10:04:37   15             THE COURT:  What's the issue?

16             MR. LEONARD:  Judge, the issue is this.  Mr. Jonas

17   gets up and says, did you lie before the grand jury?  Oh, no, I

18   didn't.

19             I have to just accept it at face value?  I can't

10:04:47   20   confront him with his statement under oath where we say he did

21   lie?

22             MR. JONAS:  He asked him about this yesterday, Judge.

23   I rehabilitated him with questions.  I'm allowed to do that.

24   This is ground that he covered, and he couldn't go beyond this

10:05:00   25   in the consulting agreement.

              MICHAEL P. SNYDER, Official Court reporter

```
 1        MR. LEONARD:  Judge, I just asked him if he didn't
 2  lie.  He said, no, I didn't lie.  And now I'm supposed to
 3  accept that at face value?  We can't confront him with
 4  statements where we said he lied, take Mr. Jonas'
 5  representation --
 6        MR. JONAS:  And we should accept Mr. Leonard's
 7  representation that he did lie?
 8        MR. LEONARD:  No.  We should go to the document, and
 9  he can say what he testified to.
10        THE COURT:  I told you with respect to the document,
11  in your own case if you want to bring it in, it hasn't been
12  brought in.  You can call him --
13        MR. LEONARD:  Judge, this is impeachment.  He
14  testified on redirect that he didn't lie.
15        THE COURT:  The problem is if we go into this now,
16  then we have to go to whether there was an agreement, what the
17  nature of the agreement was.
18        MR. LEONARD:  Let's limit it to this right now, Judge.
19        THE COURT:  But there's no way.  I mean, right now, as
20  far as I know, without going through all of this, I really have
21  no idea whether it would be impeaching.
22        MR. LEONARD:  We don't have to prove up impeachment at
23  the time.  We can confront him with a statement, he can deny
24  it, and we can prove it up later in the trial.
25        THE COURT:  What is it you would ask him about?  You
```

MICHAEL P. SNYDER, Official Court reporter

1    said he lied.

2           MR. LEONARD:  Judge, he asked him if he didn't lie,

3    and I'm saying he did.  And I want to say this is what you

4    said.  We'll leave it at that.  If I can't impeach their

5    witnesses, we have to move for a mistrial.  We have to be able

6    to put on a defense, Judge.  When a witness says "I didn't

7    lie," we don't have to accept it at face value.  We would like

8    to confront him with the statement.  Then the jury can draw

9    their own conclusion.

10          We can limit it to these questions.  We can prove up

11   the impeachment with other witnesses in the case.  We don't

12   have to go to the consulting agreement right now.  I'm not

13   asking to go to the consulting agreement right now.

14          MR. JONAS:  Your Honor, if they try to go down this

15   road, I will have to go there to show how this witness did not

16   lie before the grand jury.

17          MR. LEONARD:  That's his choice.  Mr. Jonas made a

18   tactical choice to get up there and say, did you lie before the

19   grand jury?

20          MR. JONAS:  Because I had to rehabilitate him after

21   you made multiple accusations.  I am entitled to do that, and

22   it should stop right there, Judge.

23          MR. LEONARD:  We are allowed to impeach, Judge.  This

24   is really impeaching.

25          THE COURT:  The problem is I don't know if this is

MICHAEL P. SNYDER, Official Court reporter

1    impeaching.

2           MR. JONAS:  That's right, Judge.  It's not.

3           MR. LEONARD:  The jury decides that, Judge.

4           THE COURT:  Right now there is no way in the world,

5    without going into all kinds of other things, that we could do

6    that.

7           MR. LEONARD:  Well, you either let us or you let us in

8    close.  Mr. Jonas keeps telling you that after we get done with

9    this witness --

10          THE COURT:  All right, go back to it then, but not

11   now.  I'm not going into this.

12          MR. LEONARD:  We can't ask him about this statement

13   under oath?  This is his statement.

14          THE COURT:  You can ask him, "Did you say" -- I think

15   it would be all right to say, "Did you testify that there was

16   an agreement between" --

17          MR. LEONARD:  Thank you, Judge.

18          MR. JONAS:  Just those questions.  Without the

19   accusation of you lied.

20          MR. LEONARD:  I already made the accusation.

21          THE COURT:  You did make it.  You can just ask, did

22   you testify this.

23          MR. LEONARD:  Yes, absolutely.

24        (End of discussion at sidebar.)

25   BY MR. LEONARD:


            MICHAEL P. SNYDER, Official Court reporter

Noldin - recross by Leonard

37

1 Q. Sir, you appeared before the grand jury on August 27th of

2 2013, right?

3 A. Yes.

4 Q. And you took an oath to tell the truth, right?

10:08:15  5 A. Yes, I did.

6 Q. And there was a group of citizens sitting there listening

7 to you, right?

8      MR. JONAS: Objection. It's not going to the

9 questions that we discussed at sidebar.

10:08:23  10      MR. LEONARD: It's a foundational question, Judge.

11 BY MR. LEONARD:

12 Q. Right?

13 A. Yes.

14 Q. Okay. Were you asked the following questions under oath

10:08:32  15 before a grand jury on August 27, 2013:

16      "Question: Was there a written agreement?

17      "Answer: Yes, there was a consulting agreement.

18      "Question: Who is the agreement between?

19      "Answer: The agreement was between Prince Ben Israel

10:08:53  20 and a lady by the name of Monica Mutsvanga, who was a member of

21 the Zimbabwe government.

22      "Question: Can you spell Mutsvanga?

23      "Answer: M-u-t-s-v-w-a-n-g-a-i, I believe.

24      "Question: Okay. Do you have a copy of the

10:09:14  25 agreement?"

     MICHAEL P. SNYDER, Official Court reporter

1        MR. JONAS:  Objection.

2    BY MR. LEONARD:

3    Q.  (Reading:)

4            "Answer:  Yes, I do."

10:09:18    5        Wasn't that your testimony under oath back in August

6    27 of 2013, sir?

7    A.  Yes, it was.

8    Q.  Sir, you were shown a picture, the first picture Mr. Jonas

9    sent, put up on the screen.  Sir, this picture is from 2005,

10:10:03   10   right?

11   A.  Indicated by the email, yes.

12   Q.  Okay.  And this young guy that I'm pointing to, do you

13   happen to know who he is?

14   A.  He's not familiar to me.  I don't recognize the photograph.

10:10:15   15   Q.  Do you happen to know it's Dr. Ekra from the country of

16   Benin?

17   A.  I didn't know that.

18   Q.  And you do now know that since this was in '05 when Mr.

19   Turner was meeting with those people, that was the same time

10:10:28   20   that Mr. Turner was in Zimbabwe working on the soya project,

21   right?

22        MR. JONAS:  Objection.  Objection.

23        THE COURT:  He may answer.

24   BY MR. LEONARD:

10:10:46   25   Q.  Correct?

        MICHAEL P. SNYDER, Official Court reporter

Noldin - recross by Leonard

39

1    A.  Mr. Leonard, I can't be sure what he was working on at that

2    time.

3    Q.  Well, if you remember, going back to yesterday, I showed

4    you an email that you forgot to look at that talked about Mr.

10:10:57    5    Turner working on the soya project in the country of Zimbabwe

6    in 2005.  Do you remember us going through that little drill?

7           MR. JONAS:  Your Honor, I am going to object.  This

8    goes to a violation of court order.

9           THE COURT:  It's sustained.  I should have sustained

10:11:10    10    the prior question.

11           MR. JONAS:  Thank you.

12    BY MR. LEONARD:

13    Q.  So it's certainly clear to you that at least as of 2005,

14    three years prior to this consulting agreement, Mr. Turner was

10:11:22    15    in country in Zimbabwe, right?

16    A.  According to the email you showed me.

17    Q.  Well, do you now doubt it?  When I show it to you, do you

18    doubt it, but when Mr. Jonas shows you, you think it's right?

19    Are you doubting that it was from 2005 now?

10:11:38    20           MR. JONAS:  Objection.

21           THE COURT:  Sustained.

22    BY MR. LEONARD:

23    Q.  According to the email, it's from 2005, right?

24    A.  Yes.

10:11:44    25    Q.  So you now know Mr. Turner was in country in Zimbabwe based

MICHAEL P. SNYDER, Official Court reporter

1    upon the evidence that you have three years prior to this

2    alleged consulting agreement, right, sir?

3             MR. JONAS:  Objection.

4             THE COURT:  The way the question is phrased, I will

10:12:05    5    sustain the objection.

6    BY MR. LEONARD:

7    Q.  Does that picture suggest to you that Mr. Turner was in

8    Zimbabwe three years prior to 2008?

9    A.  The picture doesn't tell me where he was.

10:12:19   10    Q.  Oh, so you don't even think that was in Zimbabwe?

11             MR. JONAS:  Objection.

12             THE COURT:  What was the actual question?

13             MR. LEONARD:  The question was, doesn't it tell you

14    that he was in Zimbabwe three years prior to 2008?

10:12:37   15             THE COURT:  That one has been asked and answered.

16    BY MR. LEONARD:

17    Q.  And did you, over the last four or five years, did you ever

18    try to figure out where those people in the picture were when

19    they were meeting, when Turner was meeting with Mugabe and this

10:12:53   20    guy from the country of Benin?  Did you make any effort at all

21    to find out where that he meeting took place?

22             MR. JONAS:  Objection.

23             THE COURT:  Sustained.

24    BY MR. LEONARD:

10:13:07   25    Q.  Do you care where it took place?


                 MICHAEL P. SNYDER, Official Court reporter

1          MR. JONAS:  Objection.

2          THE COURT:  Sustained.

3   BY MR. LEONARD:

4   Q.  What were they doing at that meeting in 2005, Mugabe,

10:13:15   5   Turner, the doctor from the country Benin?  What were they

6   doing back in 2005 in that picture that you just testified

7   about?

8          MR. JONAS:  Objection.

9   BY MR. LEONARD:

10:13:25   10   Q.  And Gono.  What were they doing?

11          MR. JONAS:  Your Honor, objection.

12          THE COURT:  You can answer that.

13   BY THE WITNESS:

14   A.  I don't know what they were doing, to be honest with you.

10:13:37   15   BY MR. LEONARD:

16   Q.  Were they conspiring to violate the law back then?

17          MR. JONAS:  Objection.

18          THE COURT:  Sustained.

19   BY MR. LEONARD:

10:13:48   20   Q.  Now, I thought I heard you say that if you as an FBI agent

21   learned that someone has talked to the President about a

22   subject that merits investigation potentially, just so I get

23   this correctly, nobody in the FBI is allowed to contact the

24   President or his legal counsel or his office to ask if the

10:14:15   25   President can be questioned?  Is that what you're trying to

MICHAEL P. SNYDER, Official Court reporter

1    tell this jury?

2            MR. JONAS:  Objection.

3            MR. LEONARD:  He just testified about this, Judge.

4            MR. JONAS:  That wasn't the question.

10:14:27    5            THE COURT:  I'll let him answer that.

6    BY MR. LEONARD:

7    Q.  Go ahead, sir.  Answer it.

8    A.  There are steps that can be taken, but it's not a direct

9    phone call.

10:14:36   10    Q.  I understand that.  What you're trying to tell us is you're

11    a low level FBI agent, you can't pick up the phone yourself and

12    say, "Hey, Obama, I want to talk to you."  You couldn't do

13    that.  That would be absurd, right?

14    A.  That's not how the chain of command works.

10:14:54   15    Q.  Understood.  So if you wanted to, you could have followed

16    the chain of command and got to a high level person in the FBI

17    who then could have contacted Obama or his legal team and say,

18    "Hey, by the way, we want to talk to you about Ken Dunkin."

19    That could have happened, right?

10:15:10   20    A.  We spoke to the individual who he reached out to for that.

21    Q.  Just listen to my question.  Right now we are talking about

22    the steps within the FBI, okay?

23            MR. JONAS:  Objection.

24            THE COURT:  Sustained.  This is --

10:15:19   25    BY MR. LEONARD:

        MICHAEL P. SNYDER, Official Court reporter

1    Q.  Well, you just said a minute ago --

2              MR. JONAS:  Objection.

3    BY MR. LEONARD:

4    Q.  -- there were procedures to follow.  What did you mean?

10:15:24   5              MR. JONAS:  Objection.

6              THE COURT:  Sustained.

7    BY MR. LEONARD:

8    Q.  Susan Rice.  You testified that you couldn't contact her

9    either, correct?

10:15:31   10              MR. JONAS:  Objection.

11   BY MR. LEONARD:

12   Q.  You just testified to that a minute ago, right?

13              MR. LEONARD:  Judge, they elicited testimony.  We

14   can't question him about it?

10:15:41   15              THE COURT:  Ask a question.

16   BY MR. LEONARD:

17   Q.  You just testified that you couldn't contact Susan Rice?

18   Didn't you just tell us that when Mr. Jonas was up at the

19   podium?

10:15:52   20   A.  Not directly, no.

21   Q.  You didn't say that or you couldn't contact her directly?

22   A.  That we couldn't contact her directly.

23   Q.  Meaning you because of your level within the FBI, right?

24   A.  Correct.

10:16:02   25   Q.  Again, there are procedures in place within the FBI if the

            MICHAEL P. SNYDER, Official Court reporter

Legarreta - direct by Alexakis

44

1    Bureau wanted to talk to Rice?  People high above you could do

2    that, right?

3    A.  That's correct.

4    Q.  Okay.

10:16:18    5         MR. LEONARD:  Nothing further.

6              THE COURT:  Any more?

7              MR. JONAS:  No, Judge.

8              THE COURT:  All right.  You may be excused.  Thank

9    you.

10:16:24    10       (Witness excused.)

11             THE COURT:  Please call your next witness.

12             MS. ALEXAKIS:  The government calls Alex Legarreta.

13             THE COURT:  If you'll come up here, please.

14             Raise your right hand.

10:16:54    15        ALEX LEGARRETA, PLAINTIFF'S WITNESS, SWORN

16             THE COURT:  Please be seated.

17                          DIRECT EXAMINATION

18   BY MS. ALEXAKIS:

19   Q.  Could you please state your name for the record.

10:17:10    20   A.  Alex Legarreta.

21   Q.  Could you please spell it for the record.

22   A.  A-l-e-x L-e-g-a-r-r-e-t-a.

23   Q.  Mr. Legarreta, what do you do for a living?

24   A.  I am a loss prevention associate for PNC Bank.

10:17:23    25   Q.  How long have you been with PNC Bank?

              MICHAEL P. SNYDER, Official Court reporter

Legarreta - direct by Alexakis

45

1   A.  Four years.

2   Q.  Have you worked for other retail banks?

3   A.  Yes, I have for the last 19 years.

4   Q.  So 19 years of experience?

10:17:32   5   A.  Yes.

6   Q.  What are your responsibilities as a loss prevention

7   associate at PNC Bank?

8   A.  Insure that the branches are following policies and

9   procedures, adhering to compliance, following bank regulations,

10:17:46   10   assisting branches with investigations, research.

11   Q.  Are you familiar with various business records maintained

12   by PNC Bank?

13   A.  Yes, I am.

14   Q.  How are you familiar?

10:17:57   15   A.  It's part of my job assisting branches, doing research for

16   branches.

17   Q.  Did PNC Bank at one point acquire a bank known as National

18   City Bank?

19   A.  Yes.  That happened in 2008.

10:18:10   20   Q.  And as part of this acquisition of National City Bank, did

21   PNC come to possess documents and records that had previously

22   been part of National City Bank?

23   A.  Yes, that is correct.

24   Q.  Are you familiar with those records that PNC received from

10:18:26   25   National City Bank?

MICHAEL P. SNYDER, Official Court reporter

1    A.  Yes, I am.

2    Q.  How are you familiar with those?

3    A.  I have to assist employees in branches with customer

4    investigation, research, pulling statements, for example.

10:18:37    5         MS. ALEXAKIS:  Your Honor, if I can approach the

6    witness?

7              THE COURT:  Yes.

8    BY MS. ALEXAKIS:

9    Q.  Mr. Legarreta, I have handed you an exhibit that's marked

10:18:55    10   Government's Exhibit BI Bank Record.  Do you have that in front

11   of you?

12   A.  Yes, I do.

13   Q.  Do you recognize the exhibit?

14   A.  Yes, this is an account statement from October 25th, 2008,

10:19:06    15   through November 21st, 2008.

16   Q.  And what are account statements?

17   A.  Account statements have a record of all transactions that

18   happened during that statement cycle.

19   Q.  Would the transactions that appear on that monthly

10:19:21    20   statement, are they recorded by National City Bank at or near

21   the time of the transaction?

22   A.  Yes.

23   Q.  How were they recorded?

24   A.  Between one business day, the bank has to record the

10:19:32    25   customer transaction, deposit, withdrawal, transfer in these

              MICHAEL P. SNYDER, Official Court reporter

Legarreta - direct by Alexakis

47

1    transactions.

2    Q.  And how frequently is the statement, the account statement

3    that you're looking at, how frequently is that produced or

4    reported by the bank?

5    A.  Every month the bank has to generate an account statement

6    and send that to the customer.

7    Q.  Is the information that appears in the account statement

8    maintained by the bank as part of its regular course of

9    business?

10   A.  Yes, it is.

11   Q.  And is the creation of the monthly statement itself part of

12   the bank's regular activities?

13   A.  Yes.

14   Q.  Does the bank then retain that monthly statement as part of

15   its regular course of business?

16   A.  Yes.

17          MS. ALEXAKIS:  Your Honor, at this time the government

18   moves to admit Government Exhibit BI Bank Records.

19          THE COURT:  Any objection?

20          MR. TUNICK:  No objection.

21          THE COURT:  It's admitted.

22      (Government Exhibit BI Bank Records received in

23      evidence.)

24   BY MS. ALEXAKIS:

25   Q.  Mr. Legarreta, I've handed you what has been marked as

          MICHAEL P. SNYDER, Official Court reporter

10:19:44

10:19:54

10:20:03

10:20:10

10:20:21

Legarreta - direct by Alexakis

48

1    Government Exhibit BI Wire?  Do you have that in front of you?

2    A.  Yes, I do.

3    Q.  Do you recognize that document?

4    A.  Yes.

10:20:38    5    Q.  Can you generally describe this document.

6    A.  This is an email with a screen shot from a wire transfer

7    screen.

8    Q.  And if you could just focus on the screen shot for the time

9    being.

10:20:51    10         Was this screen shot made at -- well, let me take a

11   step back.

12         Do you see a date for the incoming wire on the screen

13   shot?

14   A.  Yes.

10:20:58    15   Q.  What's the date?

16   A.  December 5th, 2008.

17   Q.  Was this screen shot made at or near the time of that wire?

18   A.  Yes.

19   Q.  How do you know that?

10:21:07    20   A.  When an incoming wire comes in, we can see it in our

21   systems.  So this screen shot is then, you know, well, then

22   it's generated through the computer.

23   Q.  Was this screen shot created by National City Bank in the

24   regular course of its business?

10:21:25    25   A.  Yes.

             MICHAEL P. SNYDER, Official Court reporter

1    Q.  Was the screen shot kept or maintained by National City

2    Bank in its regular course of business?

3    A.  Yes.

4    Q.  Now, focusing your attention on the email portion of this

10:21:34    5    exhibit, generally speaking who is sending and receiving the

6    email that contains the screen shot?

7    A.  From one PNC, well, National City employee to other

8    National City employees.

9    Q.  What is the date on the email?

10:21:47    10   A.  December 5th, 2008.

11   Q.  Is that the same date of the wire?

12   A.  Yes.

13   Q.  So is it fair to say that that email was created at or

14   around the time the wire reflects in the screen shot?

10:21:58    15   A.  Yes.

16   Q.  Is it part of National City Bank's regular business

17   practices to have employees send emails reflecting incoming

18   wires?

19   A.  Yes.

10:22:08    20        MS. ALEXAKIS:  Your Honor, at this time the government

21   moves to admit Government Exhibit BI Wire.

22        MR. TUNICK:  No objection.

23        THE COURT:  Admitted.

24      Government Exhibit BI Wire received in evidence.)

10:22:30    25        MS. ALEXAKIS:  I have no further questions at this

MICHAEL P. SNYDER, Official Court reporter

1    time.

2              THE COURT:  Thank you.

3                        CROSS-EXAMINATION

4    BY MR. TUNICK:

10:22:41    5    Q.  Good afternoon, sir.  Or good morning.

6    A.  Good morning.

7    Q.  There's nothing on any of those bank records that mentions

8    Greg Turner, correct?

9    A.  What was the question?

10:22:50    10    Q.  There's nothing on any of those bank records that you have

11    before you that mentions the name Greg Turner, Gregory Turner,

12    correct?

13              MS. ALEXAKIS:  Objection, Your Honor.  Lack of

14    personal knowledge.

10:23:01    15              THE COURT:  He may answer.

16    BY MR. TUNICK:

17    Q.  There's nothing that mentions Gregory Turner on any of

18    those documents, correct?

19    A.  Correct.

10:23:12    20    Q.  And the wire was attempted to be sent to Prince Ben Israel,

21    correct?

22    A.  Yes.

23    Q.  What was the address that, to Mr. Ben Israel that's listed

24    on that wire?

10:23:29    25    A.  The address here is 4846 South Forrestville Avenue,

                  MICHAEL P. SNYDER, Official Court reporter

1    Chicago, Illinois 60645.  There's another address in here

2    listed which is 1130 South Michigan Avenue, Chicago, Illinois

3    60605.

4    Q.  Okay.  And do you know whether that was the account of A

5    Better World Foundation?  Do you know that?

6            MS. ALEXAKIS:  Objection, Your Honor.

7            MR. TUNICK:  I'm asking if he knows.

8            MS. ALEXAKIS:  He hasn't established the foundation

9    that the witness should have any knowledge of that.

10           THE COURT:  Prior to foundation, that would be.  He

11   may answer.  Do you know?

12   BY THE WITNESS:

13   A.  Can you repeat the question again?

14   BY MR. TUNICK:

15   Q.  Do you know whether that account is for a foundation called

16   A Better World?  Do you know?

17   A.  No.

18   Q.  Now, how do you spell the name of the person who sent the

19   wire?  Spell her last name.  Can you spell it?

20   A.  What I see here is looks like it's a corporation sending

21   the money.

22   Q.  A corporation?

23   A.  It's a name of a business.  Well, country.  Well, there's

24   also a name here which is Mrs. first name is just M, last name

25   is M-u-t-s-v-a-n-g-w-a.

             MICHAEL P. SNYDER, Official Court reporter

Legarreta - redirect by Alexakis

52

```
 1   Q.  M-u-t-s-v-a-n-g-w-a, correct?
 2             THE COURT:  Don't yell at the witness.
 3             MR. TUNICK:  I'm sorry, Judge.  I'm sorry.
 4   BY THE WITNESS:
 5   A.  There's also the name of a business here.
 6   BY MR. TUNICK:
 7   Q.  Okay.  The correct spelling of the name is
 8   M-u-t-s-v-a-n-g-w-a, is that true?
 9   A.  Yes.
10             MR. TUNICK:  Nothing further.
11             THE COURT:  Any more questions?
12                  REDIRECT EXAMINATION
13   BY MS. ALEXAKIS:
14   Q.  Mr. Legarreta, do you have the Exhibit BI Bank Records with
15   you or did I take that back?  BI Bank Records, do you have that
16   exhibit in front of you?
17   A.  Yes.  For the wire transfer.
18   Q.  I have handed you the exhibit that was previously admitted
19   into evidence, Government's Exhibit BI Bank Records.  Do you
20   see anywhere in those records about A Better World, Inc.?
21   A.  No.
22             MS. ALEXAKIS:  No further questions, Judge.
23             THE COURT:  Okay.  Anything further?
24             MR. TUNICK:  Nothing else, Judge.
25             THE COURT:  All right.  You may be excused then.
```

MICHAEL P. SNYDER, Official Court reporter

10:25:25 (line 5)
10:25:35 (line 10)
10:26:07 (line 15)
10:26:41 (line 20)
10:27:18 (line 25)

Smith - direct by Alexakis

53

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:27:42 | 5 |

THE WITNESS:  Okay, thanks.

(Witness excused.)

THE COURT:  Please call your next witness.

MS. ALEXAKIS:  The government calls Darcella Smith.

10:27:42    5    THE COURT:  Raise your right hand, please.

6    DARCELLA SMITH, PLAINTIFF'S WITNESS, SWORN

7    THE COURT:  Please be seated.

8                    DIRECT EXAMINATION

9    BY MS. ALEXAKIS:

10:27:51   10    Q.  Could you please state your name for the record.

11    A.  Darcella Smith.

12    Q.  Would you please spell it, Miss Smith.

13    A.  D-a-r-c-e-l-l-a S-m-i-t-h.

14    Q.  What do you do for a living, Miss Smith?

10:28:08   15    A.  I am a manager for US Bank.

16    Q.  Do you have a second job?

17    A.  Yes.  I'm a manager for Walmart as well.

18    Q.  Did you previously work for a bank called Mid-America Bank?

19    A.  Yes.

10:28:17   20    Q.  A few years later did National City Bank purchase

21    Mid-America?

22    A.  Yes.

23    Q.  Did you then work for National City Bank?

24    A.  Yes.

10:28:26   25    Q.  What was your role at National City Bank?

MICHAEL P. SNYDER, Official Court reporter

Smith - direct by Alexakis

54

1    A.  I was a personal banker.

2    Q.  And what were your responsibilities as a personal banker?

3    A.  Opening and closing accounts, outgoing wires.

4    Q.  How much contact did you have with customers as part of

10:28:40    5    your role as a personal banker?

6    A.  90 percent of the time.  The only time I didn't deal with

7    customers was during my lunch time.

8    Q.  Were you working as a personal banker for National City

9    Bank in December of 2008?

10:28:51    10    A.  Yes.

11    Q.  In early December of 2008, did you assist National City

12    Bank in an investigation into an incoming wire?

13    A.  Yes.

14    Q.  What did you do as part of the investigation?

10:29:05    15    A.  Contact the customer.

16    Q.  Who asked you to contact the customer?

17    A.  Our back office wire department.

18    Q.  What do you mean when you say the back office wire

19    department?

10:29:15    20    A.  The wire department is our back office that contacts us on

21    the retail side to contact customers.

22    Q.  Why did the back office ask you to contact a customer about

23    an incoming wire?

24    A.  The incoming wire was in question.

10:29:28    25    Q.  Who was the customer?

MICHAEL P. SNYDER, Official Court reporter

Smith - direct by Alexakis

55

1  A.  Prince Ben Israel Asiel.

2  Q.  Are you referring to Prince Asiel Ben Israel?

3  A.  Yes.

4  Q.  How did you -- or did you know Mr. Ben Israel?

10:29:43  5  A.  Yes.

6  Q.  How?

7  A.  He was our customer.  He was a customer at the bank.

8  Q.  Did you reach out to Mr. Ben Israel?

9  A.  Yes.

10:29:49  10  Q.  When did you reach out to Mr. Ben Israel?

11  A.  Right after being requested by my back office to do so.

12  Q.  And how do you know that you would have reached out right

13  away?

14  A.  Because it's my job.

10:30:01  15  Q.  How did you reach out to Mr. Ben Israel?

16  A.  Via phone unless other specified by the customer.

17  Q.  What other means did the customer have specified in terms

18  of being contacted by bank?

19  A.  Email.

10:30:12  20  Q.  Did Mr. Ben Israel respond when you reached out to him?

21  A.  Yes.

22  Q.  Did you receive an email in response to your request to Mr.

23  Ben Israel?

24  A.  Yes.

10:30:23  25       MS. ALEXAKIS:  If I may approach the witness, Judge?

       MICHAEL P. SNYDER, Official Court reporter

Smith - direct by Alexakis

56

1        THE COURT:  Yes.

2   BY MS. ALEXAKIS:

3   Q.  Miss Smith, I've handed you a document that's been marked

4   as Government's Exhibit Agreement.  Do you have that in front

10:30:42    5   of you?

6   A.  Yes.

7   Q.  Do you recognize that document?

8   A.  Yes.

9   Q.  Can you generally describe it.

10:30:47   10   A.  It's a document sent from myself, Darcella Smith, on

11   Tuesday, December 9, 2008, at 12:49 p.m., sent to Amy Hewitt,

12   and the subject is consulting agreement.

13   Q.  Who is Amy Hewitt?

14   A.  An employee of the bank.

10:31:03   15   Q.  Are you forwarding anything to Miss Hewitt in your email?

16   A.  Yes.

17   Q.  What are you forwarding to Miss Hewitt?

18   A.  A two-page document, consulting agreement document.

19   Q.  Was that consulting agreement attached to anything?  How

10:31:17   20   did you receive that consulting agreement?

21   A.  Through email.

22   Q.  And who was the email from?

23   A.  Princeasiel@aol.com.

24   Q.  When did you receive that email from princeasiel@aol.com?

10:31:32   25   A.  Tuesday, December 9, 2009, at 11:30 a.m..

MICHAEL P. SNYDER, Official Court reporter

1  Q.  Is there a subject on the email that you received from

2  princeasiel@aol.com?

3  A.  Yes, "Consulting agreement."

4  Q.  Is there anything in the body of the email that you

10:31:44  5  received from princeasiel@aol.com?

6  A.  Yes, an attachment.

7  Q.  Is there anything else written in the email?

8  A.  No.

9  Q.  How many pages is the consulting agreement?

10:31:55  10  A.  Two.

11  Q.  Did you read the consulting agreement?

12  A.  No.

13  Q.  What did you do with it?

14  A.  Forwarded it directly to our back office who requested it.

10:32:03  15  Q.  And is that Miss Hewitt in particular?

16  A.  Yes.

17  Q.  Why did you forward it to Miss Hewitt?

18  A.  Because she requested it.

19      MS. ALEXAKIS:  At this time, Your Honor, the

10:32:12  20  government moves to admit Government's Exhibit Agreement.

21      MR. TUNICK:  No objection.

22      THE COURT:  It's admitted.

23    (Government Exhibit Agreement received in evidence.)

24      MS. ALEXAKIS:  I have no further questions at this

10:32:32  25  time for Miss Smith.

MICHAEL P. SNYDER, Official Court reporter

Smith - cross by Tunick

58

                 1    THE COURT:  Thank you.

                 2                    CROSS-EXAMINATION

                 3    BY MR. TUNICK:

                 4    Q.  Ma'am, do you have that consulting agreement in front of

10:32:39         5    you?

                 6    A.  Yes.

                 7    Q.  The name of the person that signed Monica, do you see that

                 8    name?

                 9    A.  Yes.

10:32:50        10    Q.  Can you spell the last name that's on the consulting

                11    agreement.

                12    A.  M-u-t-s-u-a-n-g-w-a.

                13    Q.  Okay.  And you said that once this wire came in, you talked

                14    to Prince Ben Israel, correct?

10:33:10        15    A.  Yes.

                16          MS. ALEXAKIS:  Objection, Your Honor.  That misstates

                17    the evidence.

                18          THE COURT:  I think there needs to be --

                19          MR. TUNICK:  I'm sorry?

10:33:21        20          THE COURT:  I don't know what wire you're referring

                21    to.  It's confusing to me.

                22    BY MR. TUNICK:

                23    Q.  The wire that came in that was declined by your bank?

                24          MS. ALEXAKIS:  Objection, Your Honor.  Assumes facts

10:33:31        25    not in evidence.

                      MICHAEL P. SNYDER, Official Court reporter

1    THE COURT:  Sustained.

2  BY MR. TUNICK:

3  Q.  Ma'am, what did you talk to Prince Ben Israel about?

4  A.  I requested proof of the incoming wire, the purpose of

10:33:43    5  those funds.

6  Q.  And did anybody ask to see a contract so they can basically

7  approve that wire?

8    MS. ALEXAKIS:  Objection, lack of knowledge.

9    MR. TUNICK:  Judge, I'm asking her about if she knows.

10:34:01   10  I mean --

11    THE COURT:  Well, the question is too broad then.

12    MR. TUNICK:  Okay.

13  BY MR. TUNICK:

14  Q.  Do you know if anyone or yourself talked to Prince Ben

10:34:12   15  Israel about showing a contract to approve that wire?

16  A.  We needed proof of the purpose of the incoming wire.  It

17  wasn't specified what was needed.

18  Q.  Do you know who talked to Prince about that?

19  A.  Myself.

10:34:28   20  Q.  Okay.  Did you say that you would need a contract or

21  something to that effect?

22  A.  No.

23  Q.  Now, but you definitely said you needed some proof for the

24  wire, that's true, correct?

10:34:45   25  A.  The purpose of the incoming wire funds, yes.


     MICHAEL P. SNYDER, Official Court reporter

Smith - cross by Tunick

60

1  Q.  Okay.  And when did you talk to Prince, when was that

2  particular conversation?

3  A.  It would have been directly after I received the request

4  from my back office.

10:35:01  5  Q.  Okay.  Now, the email that you received with that

6  consulting agreement came from which email account?

7  A.  Princeasiel@aol.com.

8  Q.  And you don't know if Prince sent that email, correct?

9  A.  I know what the email address states.

10:35:30  10  Q.  You just know the email address, right?

11  A.  Yes.

12  Q.  Okay.  Now, you never heard the name, there's nothing in --

13  strike that.

14         There's nothing in those documents or anything before

10:36:00  15  you regarding Gregory Turner, correct, the name Greg Turner, is

16  that true?

17  A.  I didn't read the document.  I forwarded the document on.

18         MR. TUNICK:  Nothing else.

19         MS. ALEXAKIS:  Nothing further, Your Honor.

10:36:18  20         THE COURT:  All right.  Thank you.  You're excused.

21    (Witness excused).

22         MS. ALEXAKIS:  The government calls Amy Hewitt.

23         THE COURT:  Please raise your right hand.

24          AMY HEWITT, PLAINTIFF'S WITNESS, SWORN

10:36:51  25         THE COURT:  Please be seated.

       MICHAEL P. SNYDER, Official Court reporter

1       MS. ALEXAKIS:  Your Honor, if I could just approach to
2   see what the witness has?  Thank you.
3       THE COURT:  Yes.
4                   DIRECT EXAMINATION
10:37:24   5   BY MS. ALEXAKIS:
6   Q.  Could you please state your name for the record.
7   A.  Amy Hewitt.
8   Q.  Could you please spell your name for the record.
9   A.  A-m-y H-e-w-i-t-t.
10:37:33   10   Q.  Miss Hewitt, what do you do for a living?
11   A.  I work in banking.
12   Q.  What bank?
13   A.  Key Bank.
14   Q.  Where is Key Bank located?
10:37:41   15   A.  Cleveland, Ohio.
16   Q.  What are your responsibilities?
17   A.  I'm an anti-money laundering compliance advisor.
18   Q.  What does that mean?
19   A.  I'm consulted as a subject matter expert by lines of
10:37:51   20   business for any products, services or clients that could
21   expose a money laundering risk.
22   Q.  What is money laundering?
23       MR. TUNICK:  Objection to relevancy.
24       MS. ALEXAKIS:  Your Honor, I'm just laying a
10:38:02   25   background for the witness.

            MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

62

| | |
|---|---|
| 1 | MR. TUNICK:  You don't need to.  It's a foundation |
| 2 | witness. |
| 3 | MS. ALEXAKIS:  Your Honor, the jury has a right to |
| 4 | understand the witness' background. |
| 5 | THE COURT:  She may answer. |
| 6 | BY THE WITNESS: |
| 7 | A.  Money laundering is the use of illicit proceeds being |
| 8 | cleaned, so to speak, to appear to be legitimate. |
| 9 | BY MS. ALEXAKIS: |
| 10 | Q.  Did you work for a bank before you worked at Key Bank? |
| 11 | A.  Yes, I did. |
| 12 | Q.  And what bank did you work at? |
| 13 | A.  Bank of New York Mellon. |
| 14 | Q.  How long were you at Bank of New York Mellon? |
| 15 | A.  Four years. |
| 16 | Q.  And what did you do for Bank of New York Mellon? |
| 17 | A.  Anti-money laundering compliance advisor. |
| 18 | Q.  Before your work at Bank of New York Mellon, did you work |
| 19 | at National City or PNC Bank? |
| 20 | A.  Yes, I did. |
| 21 | Q.  Were you employed at National City Bank in December of |
| 22 | 2008? |
| 23 | A.  Yes. |
| 24 | Q.  What was your position with National City Bank at that |
| 25 | time? |

10:38:22 (line 5)
10:38:33 (line 10)
10:38:43 (line 15)
10:38:54 (line 20)
10:39:02 (line 25)

MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

1  A.  Anti-money laundering compliance advisor.

2  Q.  Did you also have another role?

3  A.  Yes.  I was the primary backup to the OFAC office for

4  National City.

10:39:12  5  Q.  What is OFAC?

6  A.  Office of Foreign Assets Control.

7  Q.  Is that a part of the treasury department?

8  A.  Yes, it is.

9  Q.  And what does it mean to be a bank's OFAC officer?

10:39:23  10  A.  I am consulted in the absence of the OFAC officer on any

11  products, services, individuals, transactions that could be

12  related to OFAC, and I also would screen any transactions for

13  potential OFAC-related issues.

14  Q.  Miss Hewitt, I'm going to show you Government Exhibit GT

10:39:50  15  Email 6.  This has already been admitted into evidence.

16        MR. JONAS:  I'd ask that we publish it to the jury.

17        THE COURT:  Okay.

18  BY MS. ALEXAKIS:

19  Q.  If you could focus on the very last line of the first page.

10:40:11  20        Do you see the beginning of an email, Miss Hewitt?

21  A.  Yes, I do.

22  Q.  What is the email address you see on the last line of that

23  page?

24  A.  Theafricanenvoy@yahoo.com.

10:40:20  25  Q.  And is there a name that corresponds to that email address?

MICHAEL P. SNYDER, Official Court reporter

1  A.  Gregory Turner.

2  Q.  If you could turn to the second page of the email, please.

3       Who is Mr. Turner writing to?

4  A.  Chicagomoi@aol.com.

10:40:43  5       MR. TUNICK:  This witness has no knowledge of this

6  particular document whatsoever.  She's a foundation witness.

7  It's improper.

8       MS. ALEXAKIS:  Your Honor, she's more than a

9  foundation witness.

10:40:53  10       THE COURT:  We'll take this up at sidebar.

11      (Discussion on the record at sidebar.)

12       THE COURT:  What are you going to ask her?

13       MS. ALEXAKIS:  Miss Hewitt is the individual who

14  investigated the wire and decided to decline it on behalf of

10:41:21  15  the bank.  So what we are trying to establish is the bank's

16  investigation into the wire, how the wire came about to begin

17  with.  She's laying out a story, a foundation.  During opening

18  statement Mr. Tunick said there would be no evidence whatsoever

19  that links Mr. Turner to this wire.  This email --

10:41:38  20       MR. TUNICK:  I didn't.

21       MS. ALEXAKIS:  Yes, you did.  This email links Mr.

22  Turner to the $90,000 wire.  It's already been admitted into

23  evidence.

24       MR. TUNICK:  Okay, regardless of that.

10:41:47  25       MS. ALEXAKIS:  No, let me finish, Mr. Tunick.

       MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

65

1    THE COURT:  Can you please keep it down.

2    MS. ALEXAKIS:  I'm sorry.  The email has been admitted

3 into evidence.  She's not -- she's going to be reading from the

4 email basic information that's set forth in the email.

10:42:04   5    MR. TUNICK:  Excuse me, Barry.

6    MS. ALEXAKIS:  No, I want to hear what my co-counsel

7 has to say.

8    MR. JONAS:  Your Honor, the thing here is there is

9 information in the email with Prince Ben Israel's bank account

10:42:15  10 information that the defendant asked for.  She receives it

11 back, that information.  That information goes directly toward

12 her testimony, it's the fact she walked out, it's the bank

13 account, the wire came in.  So she can testify about the

14 transaction, and the email relates directly to her testimony.

10:42:29  15    THE COURT:  Where did she get or see this?

16    MR. LEONARD:  She didn't.  She's never seen it in her

17 life, Judge.

18    MR. TUNICK:  That's all she's doing.

19    MR. JONAS:  She can still connect what is in --

10:42:40  20    MR. LEONARD:  She's never seen it in her --

21    MS. ALEXAKIS:  It's in evidence.

22    MR. LEONARD:  So what?

23    MR. JONAS:  She can still connect what's in that email

24 to the transaction.

10:42:49  25    MS. ALEXAKIS:  And it --

MICHAEL P. SNYDER, Official Court reporter

1      THE COURT:  So she's just going to stay this is -- I'm

2   still not sure.

3      MS. ALEXAKIS:  She's going to say, she's going to walk

4   through this email and explain to the jury or describe for the

10:43:00   5   jury what's set forth in the email, that Mr. Turner contacted

6   Mr. Ben Israel's assistant in order to get the account number

7   that he needed in order to effectuate the wire transfer.  It

8   goes directly to what defense said in its opening statement.

9      MR. TUNICK:  That's fine.

10:43:15   10      MS. ALEXAKIS:  Mr. Tunick, you said in your opening

11   statement that there's no evidence --

12      MR. TUNICK:  So what?  You can do it through a proper

13   witness.

14      MS. ALEXAKIS:  She's not an improper witness.

10:43:23   15      MR. TUNICK:  We don't just have witnesses allowed to

16   have a bank, someone from --

17      MS. ALEXAKIS:  You just had --

18      MR. TUNICK:  Excuse me.

19      THE COURT:  I'm not going to do this.

10:43:32   20      (End of discussion at sidebar.)

21      THE COURT:  We might as well go ahead and take a

22   morning break.

23      (Jury out.)

24      THE COURT:  We probably don't have to stay here.

10:44:29   25      MR. JONAS:  Your Honor, should the witness step out of

MICHAEL P. SNYDER, Official Court reporter

1    the room?

2         THE COURT:  Sure.

3         (Witness temporarily excused.)

4         MR. LEONARD:  Judge, they have to stop publishing

10:44:37    5    documents to the jury before they are in.  Just the fact that

6    it's in evidence doesn't mean they can show it to anybody they

7    want, especially when there's an objection.

8         THE COURT:  Okay.  That isn't going to get us anyplace

9    with this.

10:44:54   10         MR. TUNICK:  Judge, she has absolutely no knowledge.

11   All she's doing is reading off a document.

12         MS. ALEXAKIS:  Mr. Tunick, you just had a custodial

13   witness read off the spelling of an individual's name from a

14   document that she said that she never read.

10:45:10   15         How can you now say that you can't have a witness read

16   from a document?

17         THE COURT:  What do you think her testimony would be?

18         MS. ALEXAKIS:  I'm sorry, Judge?

19         THE COURT:  I want a proffer of her testimony.

10:45:22   20         MS. ALEXAKIS:  Her testimony will establish that Mr.

21   Turner asked for an account number in order to effectuate an

22   incoming wire.  She's going to read off of an email the account

23   number that came from Mr. Ben Israel's assistant.

24         That same account number is going to appear

10:45:37   25   consistently over the course of a number of documents including

MICHAEL P. SNYDER, Official Court reporter

1    the screen shot that shows the incoming wire coming from Miss

2    Mutsvanga, it's going to show up on bank statements from Mr.

3    Ben Israel.  So it will establish that Mr. Turner had the

4    account number and was trying to help establish the incoming

10:45:54    5    wire from Zimbabwe or from Miss Mutsvanga in to Ben Israel.

6    So when defense says in its opening statement that

7    there's no evidence whatsoever that will connect Mr. Turner to

8    this 90,000 wire, this evidence goes to that and refutes that

9    contention.

10:46:11    10    MR. TUNICK:  Judge, and they introduced that --

11    MS. ALEXAKIS:  I'm sorry, Mr. Tunick.  If I could

12    finish my proffer.

13    Miss Hewitt will then testify to bank records that the

14    government obtained from the African Banking Corporation in

10:46:25    15    Botswana that show that the wire was declined by National City

16    Bank, it will show the return of the funds, and it will show

17    that Chris Mutsvanga authorized Mr. Ben Israel to go to the

18    bank and personally withdraw $90,000 from Monica Mutsvanga's

19    account.  And then also through Miss Hewitt will introduce

10:46:47    20    evidence that, through bank records of Miss Mutsvanga, that Mr.

21    Ben Israel actually went to the bank in Botswana to withdraw

22    that $90,000.

23    MR. TUNICK:  Okay.  Then if that's going to happen,

24    surely I can introduce the signature cards that don't match the

10:47:03    25    consulting agreement.  Because now they have, they have said

MICHAEL P. SNYDER, Official Court reporter

1    they've laid the foundation for the Bank of Botswana records.

2    So they are going to have her read off the Bank of Botswana

3    records, and part of the Bank of Botswana records are her

4    passport, her opening checking account opening information and

10:47:20    5    everything that actually has the signature of Monica Mutsvanga.

6    So if we are going to go there, let's go there now.  That's

7    fine.  I mean, Judge, I don't think --

8                MS. ALEXAKIS:  We expected as much.

9                MR. LEONARD:  Well, they are going there anyway,

10:47:36    10    Judge.

11                THE COURT:  You don't have any objection?

12                MS. ALEXAKIS:  We don't have an objection to Mr.

13    Tunick showing the witness Monica Mutsvanga's signature.

14                THE COURT:  All right.  So we agreed on the testimony

10:47:45    15    then?

16                MR. LEONARD:  Not on this document.

17                THE COURT:  Well, I thought he just said he was, that

18    in that case, he wanted to do this.  I thought he was saying

19    fine.

10:47:55    20                MR. LEONARD:  He gets to do that anyways because

21    through her proffer they are offering this stuff.

22                THE COURT:  I can't really rule on things.  I've got

23    two people making different arguments.

24                MR. LEONARD:  We are on the same page, Judge.  We are

10:48:06    25    just making sure that we weren't going to be limited once we

                 MICHAEL P. SNYDER, Official Court reporter

1    got before the jury and have to do this again.  But as to that

2    document, this witness is not a party to it.  She's never seen

3    it, she's never received it.  She's a custodial witness.  It's

4    not part of her custodial documents.  Just because --

10:48:23    5         MS. ALEXAKIS:  Your Honor --

6         MR. LEONARD:  Just because --

7         Stop.

8         Just because it's in evidence doesn't mean they can

9    show her documents that she has no foundation, she's never seen

10:48:31    10   in her life.

11        THE COURT:  She certainly can't testify that she has

12   got any personal knowledge, if she doesn't any personal

13   knowledge of.

14        MS. ALEXAKIS:  Your Honor, I won't be asking her

10:48:36    15   questions to interpret the document.  I'm simply asking her to

16   read portions of the document.

17        THE COURT:  The purpose is then to compare the two

18   emails, is that it?

19        MS. ALEXAKIS:  I'm sorry, Judge?

10:48:46    20        THE COURT:  And the purpose then is to compare the

21   emails?

22        MS. ALEXAKIS:  The purpose is to establish Mr.

23   Turner's knowledge and involvement in the $90,000 wire coming

24   from Africa, from a Zimbabwean official.

10:48:58    25        MR. TUNICK:  Then it's cumulative.  They've produced

MICHAEL P. SNYDER, Official Court reporter

1    it.  They just said she's just going to read off of it.  They

2    have already introduced it, read that document to the jury.  So

3    there's nothing new.  That's the classic cumulative evidence.

4    They are just reintroducing something that is already

5    introduced and read before.

6              MS. ALEXAKIS:  Your Honor, she will be connecting the

7    account number that appears on the email to the fact that that

8    same account number appears on other documents.  That is not a

9    piece of evidence that has already been admitted.

10             MR. LEONARD:  That's what you do in closing argument,

11   Judge.  You bring a custodian in who can testify to her bank

12   records, and then you say:  You heard the custodian's

13   testimony.  Well, that's consistent with a document that came

14   in through a witness who knew something about this other

15   document, and that's why we think we have proven our case.

16             They don't get to show things to a custodian who has

17   no idea who these email people are, has never seen them before,

18   but they think now the door is open to show them anything they

19   want.

20             MS. ALEXAKIS:  Your Honor, they keep referring to Miss

21   Hewitt as a custodian.  I want to be clear for the record.

22   She's not a custodian.  She investigated this wire.  They are

23   trying to diminish her knowledge of the transaction by

24   repeatedly referring to her as a custodian.

25             THE COURT:  I really don't understand what her

MICHAEL P. SNYDER, Official Court reporter

1  knowledge is.

2       MS. ALEXAKIS:  She investigated the wire and decided

3  on behalf of the bank to decline it.

4       THE COURT:  That she can certainly testify to.

10:50:14  5       MS. ALEXAKIS:  What we are simply trying to do is

6  connect for the jury the fact that the account number that Mr.

7  Turner received from Ben Israel's assistant is the same account

8  number that the wire was directed to when it went to National

9  City Bank.

10:50:28  10       THE COURT:  I think you can do that too.

11       MS. ALEXAKIS:  Thank you, Judge.

12       THE COURT:  That's different from reading this whole

13  email.

14       MS. ALEXAKIS:  Well, we have to walk through the email

10:50:37  15  to show that Mr. Turner told Daniehlah, Mr. Ben Israel's

16  assistant, that the wire was coming, that it was supposed to be

17  about $80,000, and then she responds and says here's the bank

18  information you requested.  Without laying out that chain of

19  communication, it doesn't make sense as to why Mr. Ben Israel's

10:50:59  20  assistant would be emailing Mr. Turner with the account number.

21       And then if you look at the top of the email on the

22  chain, he then says something to the effect of, you know, the

23  wire is coming, it will be, you know, it will be coming, tell

24  the Prince that the wire is coming.

10:51:14  25       So it establishes that he is aware of the transfer and

MICHAEL P. SNYDER, Official Court reporter

1    in fact behind the scenes helping to make it happen, again

2    directly refuting the point the defense made in opening

3    statement that there is no evidence in the record allegedly

4    connecting Mr. Turner to this $90,000 wire.  That's the reason

10:51:31   5    why they don't want the jury to hear this evidence again.

6            MR. TUNICK:  They already heard the evidence.  That's

7    the whole point.  It's not -- how many witnesses can they do

8    this through?  Let them choose another witness who says let's

9    read this document again.  They already introduced it.  They

10:51:46   10   read from this document.  It's the classic cumulative evidence.

11   They cannot -- they haven't even responded to that.

12           MS. ALEXAKIS:  Mr. Tunick, are you then going to only

13   ask one witness to spell Miss Mutsvanga's name?

14           MR. LEONARD:  Judge, just keep in mind, this witness

10:52:00   15   has nothing to do with that document, doesn't know it existed,

16   didn't know it existed at the time, it had nothing to do with

17   her decisionmaking.  This is steps removed from her.  She has

18   no idea this email existed.  All of her investigation,

19   everything that she did had nothing to do with that because

10:52:17   20   it's not, wasn't part of her file, wasn't part of her inquiry.

21           So why are we taking emails from other people and

22   letting her just read from them?

23           MS. ALEXAKIS:  Your Honor, they are taking

24   inconsistent positions.  In one breath Mr. Tunick is saying

10:52:28   25   that he wants, now he wants Miss Hewitt to testify about the

MICHAEL P. SNYDER, Official Court reporter

 1  Botswana Bank records, and he has no problem with us showing
 2  her the other Botswana Bank records that the government wants
 3  to show her, when I'm not suggesting that Miss Hewitt works for
 4  this Botswana Bank.  But it's okay for them to show her those
 5  documents that she has no connection to, but the government
 6  can't show her this document that she allegedly has no
 7  connection.
 8              MR. TUNICK:  It's because --
 9              MS. ALEXAKIS:  Mr. Tunick I'm not done.
10              MR. TUNICK:  Oh, my gosh.
11              MS. ALEXAKIS:  These are inconsistent positions the
12  defense is taking in order to admit evidence that they believe
13  is favorable to them and show that to the jury and to make sure
14  that the jury doesn't see this other relevant piece of
15  evidence.
16              MR. TUNICK:  Judge, she does not understand.  The
17  Botswana Bank records have not been shown to the jury.  This
18  has.  That's the distinction.  One is cumulative, one is not.
19  I can't believe that that basic principle is not understood.
20  They already read from this document.  They already introduced
21  it.
22              THE COURT:  When did you read from the document?
23              MS. ALEXAKIS:  It was introduced into evidence through
24  Agent Noldin.
25              MR. TUNICK:  And he read the entire thing.

              MICHAEL P. SNYDER, Official Court reporter

1          MS. ALEXAKIS:  It doesn't --

2          THE COURT:  Oh, okay.  You're right, yesterday.

3          MS. ALEXAKIS:  But it doesn't mean that we can't

4     connect it.  What Mr. Noldin did is just lay out the evidence.

10:53:38  5     It doesn't mean that this witness can't connect the fact that

6     this account, that the jury can't have the aid of this witness

7     in terms of connecting the account number that appears in this

8     email with the account number that appears in subsequent

9     documents.

10:53:50  10          THE COURT:  I agree.  Okay.

11          MS. ALEXAKIS:  Thank you, Judge.

12     (Recess.  Jury out.)

13          MR. JONAS:  Your Honor, there's one issue.  You recall

14     we asked the defense to take a witness out of order.

11:02:11  15          THE COURT:  All right.

16          MR. JONAS:  We agreed on a condition, and that

17     condition is we get to determine when she goes.  We told the

18     defense that she would testify today.  They are now saying she

19     won't testify until tomorrow.  She's here.  She's in the

11:02:24  20     hallway.  If she's not going to testify today, then we withdraw

21     our agreement to have her taken out of order.

22          MR. LEONARD:  She got in late last night, Judge.  I

23     picked her up at the airport after 9 o'clock, and we haven't

24     had any chance to talk to her.  So we want to call her tomorrow

11:02:41  25     instead of today.  She's about a 15-minute witness.  So I don't

MICHAEL P. SNYDER, Official Court reporter

1    know why it would possibly make my difference.

2         MR. JONAS:  Then, Your Honor, I don't know why after,

3    during the break just now they couldn't have prepped her if

4    she's such a quick witness and why they haven't prepped her

5    before.

6         THE COURT:  Yes, I must say, I don't know why you pay

7    her to have her come in if you haven't a pretty good idea.  I

8    don't suppose it has to be right now.  We are going to have at

9    least an hour at lunch, maybe longer, depending how long it's

10   necessary to get things moved.  I'm not sure what the

11   difference is, but I don't -- if it's going to be a 15-minute

12   witness, then I suppose sometime today surely she could go

13   ahead with her testimony.

14        MR. LEONARD:  15 minutes for us.  I don't know what

15   that means for Mr. Jonas' cross.  Maybe he's committed to no

16   cross.

17        MR. JONAS:  Doubtful.  And it's not my cross.

18        THE COURT:  They have to have, you know, this is their

19   case.

20        MR. LEONARD:  The agreement as of yesterday was, until

21   this morning was that they are going to call Trotter, and we'd

22   put her on after Trotter, and then this morning, early morning

23   they changed that.

24        MR. JONAS:  Actually, last night I sent an email to

25   defense counsel saying we are pushing Trotter back, that they

MICHAEL P. SNYDER, Official Court reporter

1  should have Miss Palmer ready to go after these three witnesses

2  this morning.  I don't see how that makes much of a difference.

3          MR. TUNICK:  Trotter was supposed to last for a couple

4  hours.

11:04:14  5          THE COURT:  Pardon me?

6          MR. TUNICK:  It didn't make a difference because we,

7  Donne Trotter we expected to last a couple hours, and then

8  at --

9          THE COURT:  Well, it sounds to me like there's

11:04:24  10  maneuvering going on.  This is the government's case.  They've

11  agreed, and it's a good reason for the agreement, I probably

12  would have allowed it over their objection, to put this witness

13  on during, while the government's case was still going on.  But

14  I think if it had been that she was supposed to go on today,

11:04:54  15  she'll have to go on today.

16          MR. JONAS:  Thank you, Judge.

17          THE COURT:  Okay.

18      (Jury in.)

19          THE COURT:  Please be seated.  Okay.

11:07:14  20          MS. ALEXAKIS:  Your Honor, if I could move the screen?

21  BY MS. ALEXAKIS:

22  Q.  Miss Hewitt, when we left off we were looking at a November

23  29th, 2008 email that the defendant sent to chicagomoi@aol.com.

24          What is the subject of the email?

11:08:00  25  A.  "Wire transfer."

          MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

78

1    Q.  And can you read the first sentence of the email.

2    A.  "Please forward the swift info to the Prince on the Chicago

3    delegation to arrive in JNB on December 8 through 11th, 2008."

4    Q.  In your work in the banking industry, have you come across

11:08:18    5    the word "swift" before?

6    A.  Yes, I have.

7    Q.  What does it indicate?

8    A.  Often it indicates a wire transfer.

9    Q.  If I could direct your attention to the fifth line of the

11:08:26    10    email, the sentence that begins with the words "The transfer."

11    Can you read that sentence, please.

12    A.  "The transfer will be executed on Tuesday morning latest

13    80,000 US dollars."

14    Q.  Can you also read the next three sentences, please.

11:08:39    15    A.  "Additional funding is being discussed on Monday, but all

16    is a go at this point.  The swift info must include all info

17    including address of receiving bank.  Please double-check all

18    numbers and name on the account."

19    Q.  Miss Hewitt, if you could turn to the first page of that,

11:08:55    20    of the document, so further up in the email chain.

21        Do you see a response to the email that you just

22    reviewed from Mr. Turner?

23    A.  Yes, I do.

24    Q.  When is the response sent?

11:09:23    25    A.  November 29th, 2008.

MICHAEL P. SNYDER, Official Court reporter

1    Q.  Who is sending the response?

2    A.  Chicagomoi@aol.com.

3    Q.  And if we could scroll down so we can see the signature

4    block at the bottom of the email.

11:09:40   5             What is the name associated with that email address?

6    A.  Daniehlah Aytahniel.

7    Q.  Does the signature block include a job title?

8    A.  Yes.

9    Q.  What is that job title?

11:09:49   10   A.  Executive assistant to Prince Asiel.

11   Q.  If we could go back to the body of the email, please.

12             Could you please read the first sentence and paragraph

13   of the email, Miss Hewitt.

14   A.  "I will forward the agenda and bios no later than tomorrow.

11:10:11   15   The banking information is, accountholder:  Prince Asiel Ben

16   Israel, National City Bank, 150th Street, Cleveland, Ohio

17   44135."

18   Q.  Does Prince Asiel's assistant then provide a bank account

19   number?

11:10:26   20   A.  Yes.

21   Q.  What is that account number?

22   A.  0602908538.

23   Q.  Now, if we could focus on the top of the first page, the

24   top email in this email chain.  If you could actually focus on

11:10:39   25   the information at the top showing who sent and received the

1    email.

2         What is the date of this email, Miss Hewitt?

3    A.  December 1st, 2008.

4    Q.  How many days is that after the emails we were just

11:10:51    5    reviewing?

6    A.  Two.

7    Q.  Who is sending the email?

8    A.  Gregory Turner, theafricanenvoy@yahoo.com.

9    Q.  Who is receiving the email?

11:10:58    10   A.  Chicagomoi@aol.com.

11   Q.  Is that the same email address associated with Mr. Ben

12   Israel's assistant?

13   A.  Yes.

14   Q.  If you could focus on the body of the email now.  Miss

11:11:13    15   Hewitt, can you please read the first sentence of the email.

16   A.  "Please advise Prince the swift should be done today."

17   Q.  Miss Hewitt, you can set aside that document.

18        Were you involved in the investigation of an incoming

19   wire to National City Bank on December 5th, 2008?

11:11:32    20   A.  Yes, I was.

21   Q.  How did you come to be involved?

22   A.  The wire transfer was forwarded to me in my capacity as the

23   backup to the OFAC officer.

24   Q.  Why was the wire transfer forwarded to you?

11:11:43    25   A.  Because it referenced the country of Zimbabwe.

         MICHAEL P. SNYDER, Official Court reporter

1    Q.  Why would an association with Zimbabwe call the bank's

2    attention to the wire?

3    A.  Because there are specific entities and individuals that

4    are sanctioned on the OFAC SDN list that are from Zimbabwe.

11:11:57    5    Q.  Does the bank then give extra scrutiny to wires coming from

6    sanctioned individuals?

7    A.  Yes.

8    Q.  You should have in front of you a binder marked

9    Government's Exhibit BI Wire.  Do you have that?

11:12:10    10    A.  Yes.

11    Q.  This document has already been admitted into evidence.

12            MS. ALEXAKIS:  Judge may we publish it to the jury?

13            THE COURT:  Yes.

14            MR. TUNICK:  Can you show us the document?

11:12:26    15            MS. ALEXAKIS:  You don't have a copy?

16            MR. LEONARD:  What's the name of the document?

17            MS. ALEXAKIS:  It's the --

18            MR. TUNICK:  Go ahead.

19    BY MS. ALEXAKIS:

11:12:37    20    Q.  Do you have that in front of you?

21    A.  Yes.

22    Q.  Do you recognize this document?

23    A.  Yes, I do.

24    Q.  Generally speaking, what is this document?

11:12:43    25    A.  This is a snapshot of an incoming wire transfer.


            MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

1    Q.  What is the date of the incoming wire?

2    A.  December 5th, 2008.

3    Q.  And is there an email that's part of this document?

4    A.  Yes.

11:12:54    5    Q.  The screen shots embedded in the email?

6    A.  Yes.

7    Q.  And you received this email?

8    A.  Yes, I did.

9    Q.  Who sent you this email?

11:13:00    10    A.  Kelly Roby.

11    Q.  Who is Kelly Roby?

12    A.  Kelly Roby was an employee at National City Bank.  She

13    worked in the global wire transfer investigations.

14    Q.  Why is Miss Roby sending you this email?

11:13:11    15    A.  Because of the reference to Zimbabwe in the wire.

16    Q.  What is the date of the wire?

17    A.  December 5th, 2008.

18    Q.  And how many days is this after the last email that you

19    just reviewed?

11:13:27    20    A.  Four.

21    Q.  Who is the wire coming from?

22    A.  Mrs. M. Mutsvanga.

23    Q.  Is there an address associated with Miss Mutsvanga?

24    A.  Yes.

11:13:36    25    Q.  What is that address?

MICHAEL P. SNYDER, Official Court reporter

1   A.  P.O. Box HG902, Highlands, Zimbabwe.

2   Q.  Is there a bank associated with this wire?

3   A.  Yes.

4   Q.  What is that bank?

11:13:46   5   A.  African Banking Corporation of Botswana Proprietary

6   Limited.

7   Q.  Is there an address for the bank?

8   A.  Yes.

9   Q.  What is that address?

11:13:54   10   A.  Fairground Office Park, Gaborone, Botswana.

11   Q.  Do you see the amount of the wire listed on the screen

12   shot?

13   A.  Yes.

14   Q.  What is the amount?

11:14:02   15   A.  89,970 US dollars.

16   Q.  In your experience in the banking history, is there usually

17   a fee associated with incoming wires?

18   A.  Yes.

19   Q.  Can the amount of such fees be around $30?

11:14:15   20   A.  Yes.

21   Q.  If I could have you blow up the right-hand side of the

22   screen shot, please.

23      Who is the wire going to, Miss Hewitt?

24   A.  Prince Asiel Ben Israel.

11:14:29   25   Q.  And what city does Mr. Ben Israel reside in?

MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

```
       1    A.  Chicago, Illinois.

       2    Q.  What is the account number listed on the screen shot

       3    showing the incoming wire?

       4    A.  602908538.

11:14:45   5    Q.  Is that an account number at National City Bank?

       6    A.  Yes, it is.

       7    Q.  Have you seen this account number before?

       8    A.  Yes.

       9    Q.  Where have you seen it?

11:14:51  10    A.  In the previous email.

      11    Q.  Is there any explanation for the wire listed on the screen

      12    shot?

      13    A.  It says "Business consultancy fee less charges."

      14    Q.  You can set that document aside now, Miss Hewitt.

11:15:07  15        You testified that you investigated this wire, is that

      16    right?

      17    A.  Yes.

      18    Q.  What did you do as part of your investigation?

      19    A.  As part of my investigation, I attempted to establish a

11:15:17  20    relationship between the originator, Mrs. M. Mutsvanga, and the

      21    beneficiary, Prince Asiel Ben Israel, and would also conduct or

      22    conducted additional research via the internet.

      23    Q.  When you say to try and establish a relationship between

      24    the originator and the beneficiary, what do you mean by that?

11:15:37  25    A.  To determine any type of connection that would substantiate
```

MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

1   why Mr. Ben Israel was receiving a wire from Zimbabwe.

2   Q.  And in particular from Miss Mutsvanga?

3   A.  Yes.

4   Q.  What did your research about Miss Mutsvanga show?

11:15:52   5           MR. TUNICK:  Objection, calls for hearsay.

6           MS. ALEXAKIS:  Your Honor, it goes to her state of

7   mind.

8           THE COURT:  Okay, go ahead and answer.

9   BY THE WITNESS:

11:16:19   10  A.  I found that Mrs. Monica Mutsvanga is a politically exposed

11  person and the spouse of a Chris Mutsvanga.

12  BY MS. ALEXAKIS:

13  Q.  What do you mean when you say "politically exposed person"?

14          MR. TUNICK:  Judge, objection.

11:16:32   15          THE COURT:  Sustained.  It does seem like it's

16  hearsay.

17          MR. TUNICK:  Can the jury be told to disregard that?

18          MS. ALEXAKIS:  Your Honor, that's unnecessary.  You've

19  already instructed the jury.

11:16:45   20          THE COURT:  It's her particular evidence.  It doesn't

21  mean there isn't evidence.  Okay.

22  BY MS. ALEXAKIS:

23  Q.  Did you do research into Chris Mutsvanga?

24  A.  Yes.

11:16:55   25  Q.  What did you find out?

MICHAEL P. SNYDER, Official Court reporter

1       MR. TUNICK:  Same objection, calls for hearsay.

2       MS. ALEXAKIS:  Your Honor, it goes to her state of

3   mind on the decision she ultimately made about the wire.

4       THE COURT:  I hate to do this, but I'm afraid I'm

11:17:09   5   going to have to take a sidebar.

6       (Discussion on the record at sidebar.)

7       THE COURT:  Isn't there some other way that you can

8   just ask what she did and why she did it?

9       MS. ALEXAKIS:  I can ask --

11:17:33   10      THE COURT:  Rather than getting into something where

11  it's -- I mean, she actually can't say what their relationship

12  is when she doesn't know.

13      MS. ALEXAKIS:  I can ask her.

14      THE COURT:  So I think saying what did you determine

11:17:49   15  is really maybe not the best way to do it.

16      MS. ALEXAKIS:  Could I ask her what she found as a

17  result of the research?

18      THE COURT:  Why don't you ask her what she did and why

19  she did it?

11:18:01   20      MR. TUNICK:  Judge, can't we just say, "As a result of

21  your investigation, did you decline the wire?"  That's what

22  they are trying to do.

23      THE COURT:  Well, she can say why she declined it as

24  long as it's clear that she, that what she did, that is her

11:18:15   25  state of mind.  The way it's being asked, I think it's hard to

MICHAEL P. SNYDER, Official Court reporter

1    make that distinction.

2         MS. ALEXAKIS:  Okay.  So I've asked her what she did

3    as part of her investigation.  She said that she's done

4    third-party research trying to figure out the relationship.

11:18:30    5         At some point later in the examination I will ask her

6    what did she to do with the wire, and she'll say she decided to

7    decline it.

8         I will ask her why, and I expect she's going to

9    answer, her answer will include the fact that, based on what

11:18:44    10    she learned about the Mutsvangas and their relationship to

11    President Mugabe, that was part of her decision to decline the

12    wire.

13         THE COURT:  What is it that you believe she will say,

14    actually?

11:18:56    15         MS. ALEXAKIS:  She will say what I expect her to say,

16    that is, that in part why she declined the wire is because she

17    found out that Monica Mutsvanga was a politically exposed

18    person.  And I understand the objection has been sustained, but

19    what was going on is she found out she was a politically

11:19:12    20    exposed person which prompted the bank to do what the bank

21    typically does, additional scrutiny, and determined a person is

22    a politically exposed person, she did additional research and

23    found that Chris Mutsvanga is a senior aid to Mugabe.  And she

24    knows because of her work as a backup to the OFAC officer that

11:19:31    25    was essentially --

          MICHAEL P. SNYDER, Official Court reporter

11:19:44

1        THE COURT:  Oh, I think you're really treading on

2  really problematic hearsay.

3        MS. ALEXAKIS:  I can -- it does go to her state of

4  mind.  So if I'm going to ask her why --

5        THE COURT:  Actually, why do we care why she declined?

6  In the context of this case, what difference does it make?  She

7  declined it.  She did research.  This is her job.

8        MS. ALEXAKIS:  It goes to the fact that the bank found

9  some things.

11:19:57

10        THE COURT:  Well, then it seems to me that you are

11  going to the truth of it.

12        MS. ALEXAKIS:  Okay.  Then I would ask that the same

13  bar on asking her why she declined the wire apply to defense

14  counsel when I believe that they are going to ask her about the

11:20:11

15  alleged veracity of the consulting agreement, because that also

16  may go to her decision about why she declined the wire.

17        THE COURT:  Well, if --

18        MS. ALEXAKIS:  Because, as I expect her testimony, it

19  will be a two-part answer that the consulting agreement, it

11:20:26

20  will be in part based on the consulting agreement and in part

21  based on what she learned about Zimbabwean officials.  So if

22  I'm not allowed to elicit the fact that she learned troubling

23  information about the Zimbabwean officials connected with the

24  agreement --

11:20:40

25        MR. LEONARD:  She can say it's declined.  She has

MICHAEL P. SNYDER, Official Court reporter

1  admitted.  It's not relevant.  It's declined.

2          THE COURT:  Well, it may become more relevant in terms

3  of their decision depending on what you ask.

4          MR. LEONARD:  I don't understand that.  She declined.

5          THE COURT:  I think you can say --

6          MR. TUNICK:  That's why this whole thing about what

7  they are doing simply shouldn't be going through this witness.

8          THE COURT:  Well, I think she should just testify that

9  based on her investigation, she declined it.  Now, I am not

10  sure what will come up later, and I'm not sure that I won't

11  change my mind.

12          (End of discussion at sidebar.)

13  BY MS. ALEXAKIS:

14  Q.  Miss Hewitt, as part of your investigation into this

15  December 2008 wire to Mr. Ben Israel, did you reach out to a

16  local bank branch in Chicago?

17  A.  Yes, I did.

18  Q.  Why did you do that?

19  A.  To see if they had any additional information or could get

20  me additional information on the wire.

21  Q.  You should have a document in front of you, Miss Hewitt, a

22  folder marked Government Exhibit Agreement.

23          MS. ALEXAKIS:  Your Honor, this document has already

24  been admitted into evidence.  If we can show it to the jury?

25          THE COURT:  Go ahead.

MICHAEL P. SNYDER, Official Court reporter

BY MS. ALEXAKIS:

Q.  If you could focus on the top portion on the first page.

Can you generally describe this document, Miss Hewitt.

A.  This is an email I received from Darcella Smith in response to my inquiry on the wire.

Q.  Miss Darcella Smith, another employee at National City Bank at that time?

A.  Yes.

Q.  What is the subject of the email that you received from Miss Smith?

A.  Consultancy agreement.

Q.  When did Miss Smith email you?

A.  December 9th, 2008.

Q.  And how many days is this after the wire?

A.  Four.

Q.  What does the first sentence of her email say?

A.  "Here's the info you requested."

Q.  If you could focus on the bottom half of the email please, the first page.

Is Miss Smith forwarding anything to you?

A.  She is forwarding me a prior email.

Q.  And who is that email from?  What's the email address?

A.  Princeasiel@aol.com.

Q.  What is the date on that email?

A.  December 9th, 2008.

MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

91

```
         1   Q.  Is there anything in the body of that email?
         2   A.  No.
         3   Q.  Are there any attachments to the email?
         4   A.  It appears that there is, yes.
11:23:34 5   Q.  What is the attachment?
         6   A.  "Consulting agreement PDF."
         7   Q.  If you could turn to the second page of the exhibit.
         8           What is the title of the document that you're looking
         9   at?
11:23:47 10  A.  "Consulting agreement."
        11   Q.  If you could blow up the first paragraph, please.
        12           Can you please read that paragraph, Miss Hewitt.
        13   A.  "Agreement made this 26th day of November 2008 by and
        14   between Prince Asiel Ben Israel, hereinafter referred to as the
11:24:07 15  consultant, and Monica Mutsvanga, hereinafter referred to as
        16   client."
        17   Q.  November 26, 2008, how close is that to the date of the
        18   wire that we have been discussing?
        19   A.  About nine days.
11:24:19 20  Q.  Now, if you could turn to the second page of the consulting
        21   agreement, please, the third page of the exhibit.
        22           Miss Hewitt, can you read the first sentence that
        23   appears after the word "compensation."
        24   A.  "The client will pay contractor a fee not to exceed
11:24:45 25  3,405,000 US dollars plus expenses."
```

MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

92

1  Q.  Miss Hewitt, can you read the second paragraph on this

2  page, please.

3  A.  "The payments will be made in four installments:  90,000 US

4  dollars at the signing of this contract, 1,105,000 US dollars

11:25:10  5  upon completion of the Zimbabwe meeting, date to be determined,

6  and 1,105,000 US dollars upon completion of the South African

7  meeting, date to be determined, and 1,105,000 US dollars upon

8  completion of this project.  The project will be considered

9  complete when the written report is submitted."

11:25:31  10  Q.  If we could focus on the middle of the agreement.

11         Is there a date associated with this contract?

12  A.  Yes.

13  Q.  What is that date?

14  A.  November 26, 2008.

11:26:00  15  Q.  You can set the document aside now, Miss Hewitt.

16         Based on the information you gathered as part of your

17  investigation into the wire, what did you/to do with respect to

18  the wire?

19  A.  I returned it.

11:26:16  20  Q.  And when did you return it?

21         I see that you're going back.  Are you going back to

22  Government Exhibit BI Wire?

23  A.  Yes, I am.

24         December 10th, 2008.

11:26:31  25  Q.  Do you see handwriting on the top of that page?

MICHAEL P. SNYDER, Official Court reporter

1  A.  Yes, I do.

2  Q.  Is that your handwriting?

3  A.  Yes, it is.

4  Q.  What does it say?

11:26:36  5  A.  "Returned December 10, 2008."

6  Q.  Miss Hewitt, you should have in front of you a folder

7  that's marked Government's Exhibit BI Bank Record.  Do you have

8  that?

9  A.  Yes.

11:26:47  10  Q.  This document has already been admitted into evidence, so

11  if we could publish that, please.

12          Can you generally describe this document, Miss Hewitt.

13  A.  This is a bank statement from National City Bank for Prince

14  Asiel Ben Israel.

11:27:09  15  Q.  And if you take a closer look at the document, you see that

16  there's multiple bank statements included in the exhibit?

17  A.  Yes.

18  Q.  How many bank statements do you see there?

19  A.  Three.

11:27:20  20  Q.  And what time period do these banks statements cover?

21  A.  October 25th, 2008 through January 23rd, 2009.

22  Q.  If he could show the first page.  And if you focus on the

23  top right-hand corner of the document, do you see an account

24  number listed there?

11:27:39  25  A.  Yes, I do.

MICHAEL P. SNYDER, Official Court reporter

1   Q.  What is the account number?

2   A.  602908538.

3   Q.  Do you recognize that account number?

4   A.  Yes.

11:27:49   5   Q.  Is it the same account number as the one where the $90,000

6   was directed to as part of the December 5th, 2008 wire?

7   A.  Yes.

8   Q.  Is that the same account number that Mr. Ben Israel's

9   assistant emailed to Mr. Turner?

11:28:00   10  A.  Yes.

11  Q.  In reviewing these monthly statements that you're holding,

12  is there any indication that Mr. Ben Israel ever received a

13  $90,000 wire during the October 2008 through January 2009 time

14  frame through National City Bank?

11:28:12   15  A.  No.

16  Q.  Is there any indication that he received, Mr. Ben Israel

17  received an $80,000 wire during that same time frame?

18  A.  No.

19  Q.  You can set that document aside, Miss Hewitt.

11:28:32   20       MS. ALEXAKIS:  Your Honor, at this time the government

21  moves to admit two government exhibits, Government Exhibit

22  Botswana Bank 3 and Government Exhibit Botswana Bank 2 pursuant

23  to 18 USC 3505.

24       MR. TUNICK:  And, Judge, that's fine as long as it

11:28:49   25  establishes the foundation for all the Botswana Bank records,

MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

1    obviously.

2         MS. ALEXAKIS:  Your Honor, at this time that's fine.

3    We'll admit Government Exhibit Botswana Bank 1 as well also

4    pursuant to 18 USC Section 3505.

11:29:14    5         MR. TUNICK:  So that lays the foundation for all the

6    Botswana Bank records.  Thank you.

7         THE COURT:  Okay.  I think that's agreed if I'm

8    hearing it right.

9         MS. ALEXAKIS:  No, you are, Judge.  These are foreign

11:29:26    10   bank records.

11        THE COURT:  Okay, that's fine.

12        MS. ALEXAKIS:  They came with a certificate of

13   authenticity.

14        THE COURT:  Right.

11:29:39    15      (Government Exhibits Botswana Bank 1 through 3 received

16     in evidence.)

17   BY MS. ALEXAKIS:

18   Q.  Miss Hewitt, I'll hand you a document that's been marked

19   Botswana Bank 3.  Do you have that in front of you?

11:29:49    20   A.  Yes.

21        MS. ALEXAKIS:  Your Honor, could we publish this to

22   the jury?

23        THE COURT:  Yes.

24   BY MS. ALEXAKIS:

11:29:54    25   Q.  What is this document?

              MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

96

1    A.  This is a letter from the manager of African Banking

2    Corporation.

3    Q.  And is there an address associated with African Banking

4    Corporation?

11:30:24    5    A.  Yes.

6    Q.  What is that address?

7    A.  ABC House, Plot 50669 Fairground Office Park Gaborone.

8    Q.  Is this the same bank that we saw earlier associated with

9    the December 5th, 2008 wire?

11:30:38   10    A.  Yes.

11    Q.  Is that the same address for the bank?

12    A.  Yes.

13    Q.  Now, if you could focus on the subject line.

14         Miss Hewitt, can you please read the subject line of

11:30:58   15    the letter.

16    A.  "Regarding withdrawal of funds US dollars 90,000 cash by

17    Prince Asiel Ben Israel from Monica Mutsvanga account number

18    BWMUTM003CALUSD00000.

19    Q.  If we could focus on the first paragraph of this letter,

11:31:19   20    please.  I know it's not the best copy, Miss Hewitt, but could

21    you please read that into the record, the first paragraph.

22    A.  "This letter serves to authorize Prince Asiel Ben Israel,

23    born the 30th of April 1941, and holder of USA passport number

24    0127714527 issued February 20th, 2003, and expires February 19,

11:31:48   25    2013, of address 4846 South Forrestville, Chicago, 60615 to

MICHAEL P. SNYDER, Official Court reporter

1   collect US dollars 90,000 from our account in Botswana."

2   Q.  If you could focus on the second paragraph, please.

3        Miss Hewitt, can you please read that into the record.

4   A.  "The funds will be collected on Tuesday the 16th of

11:32:12   5   December 2008 at 9 a.m.."

6   Q.  If you could focus on the signature block, please.

7        Miss Hewitt, who signed this letter?

8   A.  Christopher H. Mutsvanga.

9   Q.  Now, I believe you testified earlier, and this may have

11:32:27  10   been a slip of the tongue, you said this is a letter from the

11   bank.  This is actually a letter to the bank?

12   A.  Correct.

13   Q.  And who is it from?

14   A.  Christopher H. Mutsvanga.

11:32:37  15   Q.  You can set that document aside, Miss Hewitt.

16        I'm handing you Government Exhibit Botswana Bank 2.

17        MS. ALEXAKIS:  If we could publish that, Your Honor,

18   to the jury?

19        THE COURT:  Yes.

11:32:56  20   BY MS. ALEXAKIS:

21   Q.  If you could focus on the top right-hand corner, please.

22        Do you see the name of a bank listed there?

23   A.  Yes, I do.

24   Q.  What bank is that?

11:33:17  25   A.  African Banking Corporation.

MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

1  Q.  Have you seen the name of this bank before?

2  A.  Yes.

3  Q.  Where?

4  A.  This is the name of the bank that sent the wire on December

11:33:25  5  5th, 2008.

6  Q.  Do you see the name of an individual?

7  A.  Yes.

8  Q.  Who is that individual?

9  A.  M. Mutsvanga.

11:33:32  10  Q.  And what is the address listed?

11  A.  P.O. Box HG902 Highlands, Zimbabwe.

12  Q.  Is there -- have you seen this name and address before?

13  A.  Yes.

14  Q.  Where?

11:33:42  15  A.  This is the same name and address associated with the wire

16  received on December 5th, 2008.

17  Q.  Taking a look at the overall document, what does it appear

18  to be?

19  A.  A bank statement.

11:33:54  20  Q.  From which bank?

21  A.  African Banking Corporation.

22  Q.  Now, if I could direct your attention to the second page of

23  this exhibit.  And in particular, you're going to see two

24  entries for December 4th, 2008.  If I could focus your

11:34:11  25  attention on the second of those December 14, 2008 entries.

MICHAEL P. SNYDER, Official Court reporter

Hewitt - direct by Alexakis

99

1    MS. ALEXAKIS:  Judge, if I could have a moment?

2    THE COURT:  Sure.

3    (Pause.)

4    MS. ALEXAKIS:  Your Honor, we are going to do this the

11:35:29  5  old fashioned way.

6  BY MS. ALEXAKIS:

7  Q.  Miss Hewitt, can you see the second entry for December 4th,

8  2008?

9  A.  Yes.

11:36:14  10  Q.  And what does that entry on that statement reflect?

11  A.  An entry for an outgoing telegraphic transfer in the amount

12  of $90,000.

13  Q.  Is there a description associated with the transfer?

14  A.  Yes.

11:36:29  15  Q.  What is the description?

16  A.  "Business consultancy."

17  Q.  Is there an account number associated with the transfer?

18  A.  Yes.

19  Q.  What is that account number?

11:36:36  20  A.  0602908538.

21  Q.  Is that the same account number we have now seen a couple

22  of times?

23  A.  Yes.

24  Q.  Whose account is that, the 06?

11:36:52  25  A.  Oh, that is Prince Asiel Ben Israel's account at National

MICHAEL P. SNYDER, Official Court reporter

Hewitt - cross by Tunick

100

1    City Bank.

2    Q.  Miss Hewitt, I'm showing you the third page of this

3    exhibit.  If I could direct your attention to the entry that's

4    for December 23rd, 2008.  Do you see that on the screen in

11:37:27    5    front of you?

6    A.  Yes.

7    Q.  What does that line reflect on the statement?

8    A.  This is returned funds for the benefit of Monica.  It's an

9    incoming telegraphic transfer in the amount of $89,970.

11:37:42    10    Q.  Do you believe that's the returned funds for National City

11    Bank?

12    A.  Yes.

13    Q.  If you could focus on the entry right above that December

14    16, 2008.  Do you see that line?

11:37:51    15    A.  Yes.

16    Q.  What does that line reflect?

17    A.  A withdrawal by Prince A. Ben Israel in the amount of

18    $90,000.

19          MS. ALEXAKIS:  I have no further questions at this

11:38:15    20    time, Judge.

21          THE COURT:  Okay.

22                  CROSS-EXAMINATION

23    BY MR. TUNICK:

24    Q.  Good morning, ma'am.

11:38:33    25          Now, let's just clarify this for the jury.  So you're

MICHAEL P. SNYDER, Official Court reporter

Hewitt - cross by Tunick

1    out of Cleveland, correct?

2    A.  Yes, I am.

3    Q.  And you got notice that there was a wire transfer into an

4    account that there was some questions about, correct?

11:38:46   5    A.  There was a question on the wire.

6    Q.  There was a question about the wire because it came from

7    Zimbabwe, correct?

8    A.  Correct.

9    Q.  And then you notified Darcella Smith in the Chicago branch,

11:38:59  10    correct?

11    A.  I notified the branch in Chicago.

12    Q.  Okay.  Do you remember who -- was it Darcella Smith that

13    you spoke to?

14    A.  I don't remember who I spoke to.

11:39:07  15    Q.  Okay.  You spoke to a person from the Chicago branch and

16    said that we need some additional information, correct?

17    A.  Yes.

18    Q.  And then it was approximately -- do you remember the date

19    that Darcella got back to you?  Was it December 9 Darcella

11:39:23  20    Smith sent you an email, correct?

21    A.  Was it December 9th?  Yes, it was December 9, 2008.

22    Q.  And do you recall when you told Darcella that you need some

23    additional information?

24    A.  Can you ask that question again?

11:39:44  25    Q.  Well, you got the response on December 9.  Do you remember

MICHAEL P. SNYDER, Official Court reporter

Hewitt - cross by Tunick

1    when you talked to the local bank that you would like some

2    additional information?

3    A.  No, I do not.

4    Q.  Okay.  So she responds, and she gets, submits this

11:39:59    5    consulting agreement, correct?

6    A.  She forwarded a consulting agreement, yes.

7    Q.  And that's the information, it says "Attached is the

8    information you requested," true?

9    A.  Yes.

11:40:09    10    Q.  Okay.  And attached to that info that you requested was the

11    consulting agreement, correct?

12    A.  Yes.

13    Q.  Let's focus and start with the signatures.

14        Now, can you see the signatures on the consulting

11:40:42    15    agreement that Darcella Smith forwarded to you?

16    A.  Yes, I do.

17    Q.  Okay.  Now, it says "Client:  Prince Asiel Ben Israel,"

18    correct?

19    A.  Yes.

11:40:54    20    Q.  It says "Consultant:  Monica Mutsvanga," correct?

21    A.  Yes.

22    Q.  And by Monica Mutsvanga's name are some initials in

23    parentheses, correct?

24    A.  There is something in parentheses.  There are letters in

11:41:12    25    parentheses.

MICHAEL P. SNYDER, Official Court reporter

Hewitt - cross by Tunick

103

1   Q.  There's letters in parentheses, correct?

2   A.  Yes.

3   Q.  Now, all right, so we got that.  So now can we move to the

4   beginning of the consultant agreement.

11:41:40   5          Can you just read the second and third paragraph for

6   the jury.  It starts with "Whereas"?

7   A.  "Whereas the client desires to engage in the services of

8   the consultant to perform for the client consulting services

9   regarding the functions for the operation of Prince Asiel Ben

11:42:00   10  Israel as an independent contractor and not as an employee, and

11  whereas consultant desires to consult with the board of

12  directors, the officers of the client and the administrative

13  staff and to undertake for the client consultation as to the

14  direction of certain functions in said management structure."

11:42:19   15         MR. TUNICK:  Now, can you go to paragraph 2 of the

16  consultant agreement.

17  BY MR. TUNICK:

18  Q.  And can you just read the consultation paragraph to the

19  jury.

11:42:37   20  A.  "Consultants shall be available to consult with the board

21  of directors, the officers of the client and the heads of the

22  administrative staff at reasonable times concerning matters

23  pertaining to the organization of the administrative staff, the

24  fiscal policies of the client, the relationship of the client

11:42:55   25  with its employees or with any organization representing its

MICHAEL P. SNYDER, Official Court reporter

| | |
|---|---|
| 1 | employees and in general the important problems of concern in |
| 2 | the business affairs of the client.  Consultant shall not |
| 3 | represent the client, its board of directors, its officers or |
| 4 | any other members of the client in any transactions or |
| 11:43:14   5 | communications, nor shall consultant make claim to do so." |
| 6 | Q.  Okay.  Now, do you see anything in this document about the |
| 7 | government of Zimbabwe at all? |
| 8 | A.  The government of Zimbabwe, no. |
| 9 | Q.  Okay.  Now, can we go back to the signatures again, please. |
| 11:43:40   10 | And the signature line where Monica Mutsvanga, it spells out |
| 11 | the name Monica, correct? |
| 12 | A.  Yes, it does. |
| 13 | Q.  Okay.  And there is also some, it looks like purported |
| 14 | signature of Monica Mutsvanga, correct? |
| 11:43:57   15 | A.  Yes. |
| 16 | Q.  Okay.  Now, I'm showing you what's been marked in evidence, |
| 17 | or I'm going to mark in evidence as Defendant's Exhibit No. 1. |
| 18 |      MR. TUNICK:  Judge, we have laid the foundation to |
| 19 | this already. |
| 11:44:15   20 | BY MR. TUNICK: |
| 21 | Q.  I'm going to ask you to step down from the witness stand. |
| 22 |      Now, you're a forensic -- what is your title with the |
| 23 | bank? |
| 24 | A.  Anti-money laundering compliance officer. |
| 11:44:30   25 | Q.  And do you analyze signatures as part of that job? |

MICHAEL P. SNYDER, Official Court reporter

A.  In standard practice, no.

Q.  Okay.  Have you analyzed signatures for comparison basis when you have to approve like a wire or a --

A.  I have compared signatures before, yes.

11:44:47  Q.  Okay.  So I want you to compare --

MS. ALEXAKIS:  Objection, Your Honor.  Mr. Tunick is trying to turn her into an expert witness.

THE COURT:  Sustained.

BY MR. TUNICK:

11:44:58  Q.  All right.  Well, I want you to take a look at this, what's Defendant's Exhibit No. 1.

MR. TUNICK:  Judge, I move for the admission of Defendant's Exhibit No. 1 at this time because we have laid the foundation.

11:45:12  THE COURT:  Any objection?

MS. ALEXAKIS:  I'm sorry.  I'm not sure what exhibit you're referring to.

MR. TUNICK:  This exhibit.

MS. ALEXAKIS:  What exhibit?

11:45:17  MR. TUNICK:  Defendant's Exhibit No. 1.

MS. ALEXAKIS:  You haven't laid the foundation for that.

I'm sorry, Your Honor.  The government objects.

MR. TUNICK:  Judge, they just said --

11:45:25  THE COURT:  Let me see what it is.

MICHAEL P. SNYDER, Official Court reporter

1          (Discussion on the record at sidebar.)

2               MS. ALEXAKIS:  Your Honor, it's our case in chief.  He

3     can't bring evidence using our witnesses.

4               THE COURT:  That's true.  I don't -- this really is

11:45:57    5     probably the end of this story.

6               MR. TUNICK:  It is the end of the story.

7               THE COURT:  You can't put in your evidence in their

8     case in chief.

9               MR. TUNICK:  Yes, but they just said we could lay the

11:46:07   10     foundation, the foundation was laid when they said they

11     admitted all the Botswana Bank records pursuant to the --

12               THE COURT:  Okay, but this isn't bank records.

13               MR. TUNICK:  Sure it is.  This is the Botswana, these

14     are all from Botswana Bank.

11:46:20   15               THE COURT:  Well, then in that case they are in

16     evidence.

17               MR. TUNICK:  Okay.

18               THE COURT:  Are these part of the records that are in

19     evidence?  They either are or they aren't.

11:46:34   20               MR. TUNICK:  Actually, this is from HSBC.  These four

21     are from Botswana.

22               MS. ALEXAKIS:  So then they are not the evidence, and

23     this is a demonstrative.

24               MR. TUNICK:  Well, we can admit this.

11:46:44   25               THE COURT:  What is the purpose of this anyway?

MICHAEL P. SNYDER, Official Court reporter

Hewitt - cross by Tunick

107

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:46:51 | 5 |

1      MR. LEONARD:  Admit sheets of paper and ask to publish
2  it.
3          MS. ALEXAKIS:  We will submit --
4          MR. TUNICK:  Okay, all right.
5          THE COURT:  What is the point of it?
6          MR. TUNICK:  Judge, it's the same thing.  I am going
7  to just show the signature just like they did, for this
8  witness.
9          THE COURT:  What signatures are we talking about now?
10          MR. TUNICK:  These signatures on the Botswana Bank
11  documents, these are the Botswana Bank documents.  I will
12  publish it the old fashioned way then.
13          THE COURT:  Are you still trying to show that this
14  isn't her signature?
15          MR. TUNICK:  Yes, yes.  But I won't ask her for her
16  opinion.  I'm just going to ask her if this is --
17          THE COURT:  I don't know if that's disputed, is it?
18          MS. ALEXAKIS:  That it's not her signature?
19          MR. TUNICK:  It doesn't matter.  I want to present it
20  to the jury.
21          MR. JONAS:  Argument.
22          MR. TUNICK:  That's the same thing they did.
23          THE COURT:  Wait a minute.  Wait a minute.
24          MR. JONAS:  Argument.
25          THE COURT:  Are you disputing?  Why don't you just

MICHAEL P. SNYDER, Official Court reporter

Hewitt - cross by Tunick

108

1    agree?

2              MR. JONAS:  We can't.  We never said -- we've said --

3              THE COURT:  You don't know if it's her signature?

4              MR. JONAS:  We don't know.

11:47:42   5              THE COURT:  That's true.

6              MR. TUNICK:  So I just want to show the jury the

7    records.

8              MR. LEONARD:  They are already in evidence.

9              MR. TUNICK:  They are in evidence.

11:47:47  10              MR. JONAS:  This isn't in evidence.

11              MR. LEONARD:  The board is not, but we have pieces of

12   paper.  So what?  You can blow it up.

13              THE COURT:  Okay.

14         (End of discussion at sidebar.)

11:47:54  15   BY MR. TUNICK:

16   Q.  Okay.  Would you take a look at this.  It's a Botswana Bank

17   record.  Do you see the signature under the picture of someone

18   who purports to be Monica Mutsvanga?

19   A.  Yes.

11:48:51  20   Q.  Do you see the name of Monica spelled out at the beginning?

21   A.  I cannot discern that from this copy.

22   Q.  All right.  Let's try this document.  This is a signature

23   card.  You're familiar with signature cards, correct?

24   A.  Yes, I am.

11:49:14  25   Q.  And a signature card is what?

MICHAEL P. SNYDER, Official Court reporter

Hewitt - cross by Tunick

1    A.  This is the document at a bank that a client will sign

2    verifying that they are who they say they are.

3    Q.  Okay.  And do you see the name Monica Mutsvanga on the

4    signature card?

11:49:34    5    A.  Yes.

6    Q.  Do you see a signature?

7    A.  I see a signature.

8    Q.  Do you see a name Monica spelled out under -- strike that.

9        Do you see a name Monica spelled out in the signature?

11:49:48    10    A.  I can't tell from this copy.

11    Q.  Okay.  Let's try this one.  This is also a Botswana Bank

12    record.

13        Do you see the signature, a couple signatures on this

14    document?

11:50:16    15    A.  Yes, I do.

16    Q.  Okay.  And let's start with the top signature.  Do you see

17    the name Monica spelled out on this signature?

18    A.  No, I do not.

19    Q.  Okay.  Now, I'm showing you what's an account opening form

11:50:38    20    from ABC Bank in Botswana.  You know what an account opening

21    form is, correct?

22    A.  Yes.

23    Q.  Do you see the signature at the bottom of the account

24    opening form?

11:50:50    25    A.  Yes, I do.

MICHAEL P. SNYDER, Official Court reporter

Hewitt - cross by Tunick

110

1    Q.  Okay.  It's circled here?

2    A.  Yes.

3    Q.  Do you see the name Monica spelled out on that signature

4    form?

11:50:59    5    A.  No, I do not.

6    Q.  Okay.  In fact, what does it appear to you, the first name?

7    What is it?  What do those first two letters appear like?

8    A.  Two M's, MM.

9    Q.  Okay.  I'm showing you also an account opening form for

11:51:30    10   Monica Mutsvanga.  Do you see the signature by Miss Mutsvanga's

11   name?

12          MS. ALEXAKIS:  Objection, Your Honor.  The document

13   that the defendant just showed the jury hasn't been admitted in

14   evidence.

11:51:48    15         MR. TUNICK:  Judge, we'll admit it.  All right.  Just

16   one moment, Judge.

17      (Pause.)

18   BY MR. TUNICK:

19   Q.  Maybe you can read this particular account opening form a

11:52:13    20   little bit better.

21          MS. ALEXAKIS:  Can I ask what you're showing to the

22   jury?

23          MR. TUNICK:  This is an ABC bank record.

24          Judge, may I have a moment?

11:52:35    25         THE COURT:  Sure.


MICHAEL P. SNYDER, Official Court reporter

Hewitt - cross by Tunick

111

```
 1        (Pause.)
 2   BY MR. TUNICK:
 3   Q.  I'm going to show you another Botswana bank record.  Do you
 4   see the passport?
 5   A.  Yes, I do.
 6   Q.  Do you see a picture of Monica or what purports to be
 7   Monica Mutsvanga on the passport?
 8   A.  Yes.
 9   Q.  Do you see a signature under her name?
10   A.  Yes, I do.
11   Q.  Does it appear that Monica is spelled out?
12   A.  I can't tell from this.
13   Q.  Okay.  Do you see any version of Monica at all under her
14   name?
15   A.  I don't.
16   Q.  Okay.  And you previously said something about SDN,
17   specially designated nationals, correct?  In your
18   investigation, as part of your job, you said you contact OFAC
19   for specially designated nationals?
20   A.  Did I contact OFAC?  I said I'm the backup to the OFAC
21   officer.
22   Q.  You're a backup to the OFAC officer?
23   A.  Of National City Bank.
24   Q.  Do you know anything about specially designated nationals?
25   A.  Yes, I do.
```

MICHAEL P. SNYDER, Official Court reporter

Hewitt - redirect by Alexakis

1  Q.  Okay.  Is Monica Mutsvanga a specially designated national?

2  A.  I don't recall.

3          MR. TUNICK:  No further questions.

4                    REDIRECT EXAMINATION

11:54:43  5  BY MS. ALEXAKIS:

6  Q.  Miss Hewitt, you testified that as part of your

7  investigation into the December 5th, 2008 wire, you did

8  research to determine who the originator of the wire was,

9  correct?

11:54:55  10  A.  Correct.

11  Q.  Does that mean that you did research into Monica Mutsvanga?

12  A.  Yes, I did.

13  Q.  And what did you find out about Monica Mutsvanga?

14          MR. TUNICK:  Same objection.

11:55:03  15          MS. ALEXAKIS:  Your Honor, the defense has opened the

16  door about asking whether Miss Hewitt knew that Monica

17  Mutsvanga was a specially designated national.  I should be

18  allowed to now establish what Miss Hewitt did find out about

19  Monica Mutsvanga.

11:55:18  20          THE COURT:  I think it --

21  BY MS. ALEXAKIS:

22  Q.  Miss Hewitt, under the consulting agreement that we've been

23  talking about, what was the amount of the first payment that

24  was owed per the agreement to Mr. Ben Israel?

11:55:38  25          MR. TUNICK:  Objection.  This is beyond my scope.

          MICHAEL P. SNYDER, Official Court reporter

Case: 1:13-cr-00572 Document #: 253 Filed: 04/16/15 Page 113 of 196 PageID #:2175
Hewitt - redirect by Alexakis
113

1  Cumulative.

2        THE COURT:  No.  I can see -- please don't belabor it,

3  but she may answer it.

4        MS. ALEXAKIS:  Thank you, Judge.

11:55:51   5  BY THE WITNESS:

6  A.  Ask the question again.

7  BY MS. ALEXAKIS:

8  Q.  What was the amount of the first payment that was owed to

9  Mr. Ben Israel under the agreement?

11:55:58  10  A.  90,000 US dollars.

11  Q.  And according to the agreement, when was that to be paid?

12  A.  At the signing of the contract.

13  Q.  How much was the amount of the wire that he received

14  shortly after the contract was signed?

11:56:12  15  A.  89 --

16        MR. TUNICK:  Objection.  Assumes a fact not in

17  evidence, shortly after the contract was signed.

18        MS. ALEXAKIS:  Your Honor, I asked Miss Hewitt --

19        THE COURT:  The date of the contract.

11:56:23  20        MS. ALEXAKIS:  I'm sorry, Judge?

21        THE COURT:  To the date of the contract.

22        MS. ALEXAKIS:  She's already testified to the date of

23  to the contract.

24        THE COURT:  I know.  You just changed the language,

11:56:33  25  though.

        MICHAEL P. SNYDER, Official Court reporter

BY MS. ALEXAKIS:

Q.  How much was the amount of the wire that Mr. Ben Israel,
that was directed to Mr. Ben Israel's account on December 5th,
2008?

A.  $89,970.

Q.  A separate set of questions, Miss Hewitt.

What was the purpose of the bank receiving this
consulting agreement?  Why was it provided to the bank?

A.  This was provided to the bank because I requested to see a
copy of it.

Q.  And why did you request to see a copy of the agreement?

A.  Because a consulting agreement was referenced in the wire,
and I wanted supporting documentation to substantiate that.

Q.  You testified that there is nothing in the document about
the Republic of Zimbabwe, correct?

A.  There was nothing in the document about the government of
Zimbabwe.

Q.  If there had been something about the government of
Zimbabwe, would that have raised a red flag for the bank?

A.  Yes.

Q.  Did you want the consulting agreement in order to make a
decision as to whether or not to allow the wire to go through?

A.  This was taken into consideration as to whether or not the
wire was approved.

MS. ALEXAKIS:  No further questions, Judge.

MICHAEL P. SNYDER, Official Court reporter

1          THE COURT:  Thank you.

2          MR. TUNICK:  The witness may be excused, Your Honor.

3          THE COURT:  All right.  Thank you.

4      (Witness excused.)

11:58:24    5          THE COURT:  Can we have a short sidebar.  I want to

6  know who's next.

7      (Discussion on the record at sidebar.)

8          THE COURT:  I just want to know whether we should call

9  the next witness or go ahead now and take a lunch.

11:58:44   10          MR. JONAS:  Let's take lunch.

11          MR. LEONARD:  We are good with that.

12          THE COURT:  Okay.

13          MR. LEONARD:  And then we are moving for sure?

14          THE COURT:  Yes.

11:59:01   15      (End of discussion at sidebar.)

16          THE COURT:  We seem to be having -- we are going to go

17  to lunch now.  They seem to be having trouble adjusting the

18  temperature in here.  It doesn't always work so well when you

19  get so many people in here, so we are going to move to a

11:59:16   20  different courtroom for the rest of this trial.  It will be on

21  25.  Maybe you want to, let me just see if she's got the keys.

22  Well, I suppose the simple thing, I'm not sure which is better.

23  We just need keys to get to the jury room, so maybe you should

24  go ahead, go to lunch, come back here, and you'll take them up

11:59:54   25  to the jury room, Judge Zagel's jury room.  Actually, your key

         MICHAEL P. SNYDER, Official Court reporter

 1   will open it.

 2          THE MARSHAL:  It will.

 3          THE COURT:  That's right.  You can go up there if you

 4   want.  You can take everything and maybe take them up so you

 5   know where to come back to.

 6          THE MARSHAL:  So you want me to, we are going to go on

 7   lunch break now?

 8          THE COURT:  You can either take them now.  I don't

 9   know how much, how many things are in there.  We'll make sure

10   we get coffee or whatever is left from the morning up there.

11   If you would just get the jurors and their things, maybe go

12   ahead and take them up there now, and then they can go to lunch

13   from there.

14          THE MARSHAL:  Okay.

15          THE COURT:  All right.  They do have to readjust a

16   little equipment.  I think I'd better say 1:15 to hopefully

17   make sure we've got everything in order.  It's up on 25.  It's

18   at the far end, at the other end.  And actually in that case we

19   will switch things, and when you come back from lunch, if you

20   will use that elevator, and if everybody else will then use

21   this elevator, I think we should be fine.

22          THE MARSHAL:  2503 is courtroom, Judge Zagel.

23          THE COURT:  That's right.

24       (Jury out.)

25          MR. JONAS:  I've been advised that we need an hour and

          MICHAEL P. SNYDER, Official Court reporter

1     15 minutes.

2                THE COURT:  Start fast.

3                MR. JONAS:  Yes.  They are on their way.

4                THE COURT:  I gave you exactly an hour and 15 minutes.

12:01:57    5     Okay.

6                MR. TUNICK:  Judge, Mr. Durkin is here with respect to

7     his client, Donne Trotter.  He wanted to clarify something on

8     the record.

9                THE COURT:  Sure.  What is it?

12:02:12   10                MR. DURKIN:  Good morning, Judge.  Tom Durkin on

11    behalf of the next witness Donne Trotter.

12                MR. JONAS:  I don't know if he's the next witness, but

13    go ahead.

14                MR. DURKIN:  Well, all right.  There was some issue

12:02:22   15    that was left open about the possibility of cross-examination

16    that I now understand is moot, and I just wanted to have that

17    clarified on the record.

18                MR. TUNICK:  Judge, we were originally seeking to

19    cross-examine Mr. Trotter about the potential $2,000 -- Judge,

12:02:40   20    strike that.  We are not going into anything related to Mr.

21    Trotter based on what we know now.

22                THE COURT:  Okay.

23                MR. JONAS:  Your Honor, it's a lunch break.  I assume

24    it will be an hour and 15 lunch break.  Mr. Leonard has more

12:02:57   25    than enough time to prepare Miss Palmer.  I think Miss Palmer

MICHAEL P. SNYDER, Official Court reporter

1  should go on right after lunch.

2        MR. TUNICK:  Judge, I want to clarify just for the

3  record, because there is someone from the press here, that we

4  are not going into any allegations of a previously raised, and

5  that's all.

6        THE COURT:  Okay.

7        MR. DURKIN:  Judge, I have one issue.  I have a

8  hearing in front of Judge Darrah that was originally scheduled

9  for 1:30.  I moved it to 2:00 thinking that we were going to

10  get started this morning.  Can I get some, any idea what time?

11        MR. JONAS:  Your Honor, if we are back at 1:15 and

12  they call Miss Palmer and she's truly a 15-minute witness and

13  we cross, I would expect --

14        Well, can I have one moment, Your Honor?

15     (Pause.)

16        THE COURT:  What kind of hearing?

17        MR. DURKIN:  A motion to suppress.

18        MR. JONAS:  Your Honor, Mr. Durkin, how long do you

19  think that's going to be?

20        MR. DURKIN:  A couple hours.

21        MR. JONAS:  We can try to delay Mr. Trotter's

22  testimony as long as possible so that it can be later in the

23  afternoon.

24        THE COURT:  Well, you have another witness to put on?

25        MR. JONAS:  Yes.  The defense will go with Miss

MICHAEL P. SNYDER, Official Court reporter

1  Palmer.  Then we have at least two more witnesses that we can

2  put on after Miss Palmer before we would then get to Mr.

3  Trotter.

4          MR. LEONARD:  That's fine with us.

5          MR. DURKIN:  That's where I will be.

6          THE COURT:  Okay.  All right.  I guess that's what

7  we'll do.

8          MR. DURKIN:  Okay.  Thank you.

9       (Recess from 12:05 p.m. to 1:15 p.m..)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                MICHAEL P. SNYDER, Official Court reporter

1               IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS

2                      EASTERN DIVISION

3  UNITED STATES OF AMERICA,       )    No. 2013 CR 572
               Plaintiff,   )    October 1, 2014

4           v.           )    1:30 p.m.
  C. GREGORY TURNER,          )

5            Defendant.   )

6          TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HON. ELAINE E. BUCKLO

7                 VOLUME III
  APPEARANCES:

8

9  On behalf of Plaintiff:  MR. BARRY JONAS
                    MS. GEORGIA N. ALEXAKIS
                    ASSISTANT UNITED STATES ATTORNEY

10                   219 South Dearborn Street, 5th floor
                   Chicago, Illinois 60604

11                   (312) 353-5300

12                   MR. DAVID RECKER
                   US DEPARTMENT OF JUSTICE

13                   COUNTERESPIONAGE SECTION
                   600 E Street N.W., 10th floor

14                   Washington, D.C. 20004
                   (202) 233-2261

15

16  On behalf of Defendant:  MR. JAMES D. TUNICK
                    LAW OFFICES OF JAMES D. TUNICK

17                   30 North LaSalle Street, Suite 2140
                   Chicago, Illinois 60602

18                   (312) 580-1839

19                   MR. MICHAEL I. LEONARD
                   LEONARD LAW OFFICES, INC.

20                   230 North LaSalle Street, Suite 1620
                   Chicago, Illinois 60601

21                   (312) 380-6559

22

23              MICHAEL P. SNYDER, FCRR
              Official Court Reporter

24            United States District Court
      219 South Dearborn Street, Room 2244A

25            Chicago, Illinois 60604
              (312) 435-5563

1      (Proceedings in open court.  Jury out.)

2          THE COURT:  When the jury comes in, are there going to

3   be any issues anybody is anticipating with respect to this

4   testimony?  You said it was 15 minutes.  I'm still not sure

01:30:26   5   what it is she's testifying.  She's testifying about a meeting?

6          MR. LEONARD:  Yes.

7          THE COURT:  That's what it amounts to?

8          MR. LEONARD:  Excuse me?

9          THE COURT:  She's testifying about a meeting, right?

01:30:35   10          MR. LEONARD:  Yes.

11          THE COURT:  That she had.

12          MR. LEONARD:  Correct, the Biden meeting.

13          THE COURT:  Are there any issues?

14          MR. JONAS:  Well, assuming they are not going to try

01:30:46   15   to get the Biden video in.

16          MR. LEONARD:  Oh, absolutely, Judge.

17          THE COURT:  Oh, no.  On what basis?

18          MR. LEONARD:  Judge it's a demonstrative of what took

19   place.

01:30:53   20          THE COURT:  No.

21          MR. LEONARD:  Why can the government show

22   demonstratives and use cumulative evidence?  We are limited to

23   photographs?  We can't show a video which is better evidence?

24          THE COURT:  It seems to me the only evidence, to the

01:31:04   25   extent it has any relevance, is what she told your client,

MICHAEL P. SNYDER, Official Court reporter

1    isn't it?

2         MR. LEONARD:  Judge, who says it happened?  Who says

3    it happened and who were there?

4         THE COURT:  Maybe it didn't.

01:31:15    5         MR. LEONARD:  Exactly.  That's the whole point.  And

6    the government could argue that if we don't put on evidence to

7    show it took place.

8         MR. JONAS:  The evidence is the witnesses' testimony.

9    It's up to the jury to recall the witness or not.

01:31:24    10        MR. LEONARD:  It's the demonstrative corroborative

11   evidence of what took place, Judge.  How can that be

12   prejudicial in any way?

13        THE COURT:  No.

14        MR. JONAS:  Judge, you already ordered on this.

01:31:33    15        MR. LEONARD:  You didn't rule, Judge.  There is no --

16   there is absolutely no reason it should be limited.  It

17   corroborates her testimony.  We are in a technology age.

18        THE COURT:  You know, we really did have a whole bunch

19   of discussion about this.  The whole thing is very much --

01:31:54    20        MR. LEONARD:  Judge, especially after they have

21   introduced cumulative evidence after cumulative evidence.  This

22   is corroborative of the witness' testimony and it's

23   demonstrative of it.

24        MR. JONAS:  Judge --

01:32:03    25        MR. LEONARD:  The Joe Biden person on the video is

         MICHAEL P. SNYDER, Official Court reporter

1  better evidence and more corroborative than someone talking

2  about it, Judge.  It's the same evidence, but it's a better

3  version.

4       THE COURT:  They are not objecting to putting her

5  evidence in.  Frankly, you could argue that it isn't relevant

6  at all, apart from the fact that -- I mean, what they could do,

7  the only relevance, or couldn't do, and, of course, members of

8  government, whether they could meet with somebody is entirely

9  different than whether somebody could be acting as an agent --

10       MR. LEONARD:  We don't disagree, Judge.

11       THE COURT:  -- for a foreign country.  So the only

12  issue that it could go to at all is -- well, we've agreed.  The

13  only issue, the only issue is the issue of willfulness, and all

14  that has to do with is then would be something that she said to

15  him that might affect presumably his mindset.

16       MR. LEONARD:  Sure.

17       THE COURT:  And that's it.

18       MR. LEONARD:  But certainly she's going to describe

19  what she saw and what she communicated.  Why can't we show a

20  demonstrative --

21       THE COURT:  There's no question that that can't come

22  in.

23       MR. LEONARD:  We can't even show a picture of people

24  who were there, Gono?  They show pictures all day long.

25       THE COURT:  You see, part of the problem is indeed

                MICHAEL P. SNYDER, Official Court reporter

1      taking her out of order.

2              MR. LEONARD:  Mr. Jonas --

3              THE COURT:  Except what she said or showed to Mr.

4      Turner, it's completely irrelevant.

01:33:53   5      MR. LEONARD:  It's corroborative of whether it

6      happened, what she's reporting is just a made-up lie or what

7      really happened.

8              THE COURT:  Frankly, if it didn't happen, but she told

9      him it did, that could still have the limited relevance that it

01:34:06   10     would have.

11             MR. LEONARD:  Judge, after you let them go far afield

12     over and over, cumulative --

13             THE COURT:  I'm sorry, counsel, but I don't think I

14     have.  Anyway --

01:34:15   15     MR. LEONARD:  Are you saying we can't even show a

16     black and white picture of the event including her to

17     corroborate the fact --

18             THE COURT:  Are you making an offer of proof that she

19     showed him those pictures?

01:34:27   20     MR. LEONARD:  I'm not.

21             MR. JONAS:  We object to admissibility then.

22             THE COURT:  Then it's sustained.

23             MR. JONAS:  Thank you, Judge.

24             MR. TUNICK:  He clearly saw the pictures.  There was

01:34:35   25     no question.  There was a conversation.

              MICHAEL P. SNYDER, Official Court reporter

1      THE COURT:  When?  Is he going to testify to that?

2      MR. TUNICK:  There are emails.

3      MR. LEONARD:  We don't have to make the decision,

4  Judge.

01:34:42    5      THE COURT:  I agree.  I don't want you to.  But all it

6  is is making me think that --

7      MR. TUNICK:  Judge --

8      THE COURT:  Why didn't you do this by deposition?

9      MR. TUNICK:  Here's what went forward, okay?  Miss

01:34:56   10  Palmer will say that she was obviously at the senate

11  building --

12      THE COURT:  Well, let's hear what she says.

13      MR. TUNICK:  -- with the Congressional Black Caucus.

14  She was there when Joe Biden came in the room.  But forget

01:35:09   15  about Joe Biden.  But she communicated with him about the

16  meeting directly thereafter, and she did send him pictures by

17  email.  There's no question about that.

18      Now, the conversation, the source of the government's

19  evidence, the pictures and the video, came from the source that

01:35:28   20  told where it came from.

21      At any rate, the pictures were sent to our client by

22  email.  They occurred at a later date than the conversation,

23  but they were sent to him.  There's no question about that.

24      THE COURT:  When is she going to say they were sent to

01:35:46   25  him?

MICHAEL P. SNYDER, Official Court reporter

1    MR. TUNICK:  The exact date --

2    THE COURT:  I don't want the exact date, but I'd like

3  to know it wasn't in 2014?

4    MR. TUNICK:  No, no.

01:35:53  5    MR. JONAS:  Your Honor, more importantly is the

6  question of who sent it to him.  And we haven't seen anything

7  indicating that this witness that they are going to put on is

8  the one that sent it to him.  And we are talking about this

9  witness' testimony.

01:36:04  10    MR. TUNICK:  She sent them to him.  They provided the

11  emails.

12    MR. JONAS:  If she says "I sent photos to Greg Turner

13  of that event with Gideon Gono," that's one thing.

14    But if it's just a matter of Mr. Leonard's argument to

01:36:17  15  show the picture to corroborate the event happened, it's

16  completely irrelevant and shouldn't come in.  The same for the

17  video.

18    THE COURT:  I agree.

19    MR. JONAS:  Thank you.

01:36:25  20    THE COURT:  Okay.  Let's bring the jury in, and let's

21  get your witness.  I'll explain to them.

22    (Jury in.)

23    THE COURT:  In this courtroom all the chairs are the

24  same probably.

01:38:20  25    Okay, please be seated.  Good afternoon.

MICHAEL P. SNYDER, Official Court reporter

Palmer - direct by Leonard

1          All right.  First of all, we are going to take a

2     witness out of order, there is a defense witness who will be,

3     as I understand it, is out of the country, and so everybody has

4     agreed that we don't usually do that, but they could put on

01:38:52   5     this witness at this point in time.

6          Okay.  Would you raise your right hand, please.

7          CELESTINE PALMER, DEFENDANT'S WITNESS, SWORN

8          THE COURT:  All right, please be seated.

9                     DIRECT EXAMINATION

01:39:09   10    BY MR. LEONARD:

11    Q.  Good afternoon, ma'am.

12         Could you state and spell your name for us, please.

13    A.  My first name is Celestine, C-e-l-e-s-t-i-n-e.  The last

14    name is Palmer, P-a-l-m-e-r.

01:39:32   15    Q.  Miss Palmer, where do you live?

16    A.  Los Angeles, California.

17    Q.  Is that the area in which you grew up?

18    A.  Yes.

19    Q.  And what is your educational background?

01:39:44   20    A.  My educational background is I have my BA degree in

21    education and a master's degree in counseling and psychology.

22    Q.  And what was your primary occupation over the years?  Was

23    that in the field of education?

24    A.  Yes.

01:40:06   25    Q.  And who were you employed by?

                    MICHAEL P. SNYDER, Official Court reporter

Palmer - direct by Leonard

128

|  |  |
|---|---|
| 1 | A.  Los Angeles Unified School District. |
| 2 | Q.  And how long did you work for the Los Angeles Unified |
| 3 | School District? |
| 4 | A.  33 years. |
| 01:40:17  5 | Q.  And did you have any other occupations over the years |
| 6 | besides that employment? |
| 7 | A.  Since then I did, yes.  I worked as an executive |
| 8 | administrator for a Bishop in the African Methodist Episcopal |
| 9 | Church. |
| 01:40:34 10 | Q.  Did you have any other businesses that you put together |
| 11 | yourself, anything involving Africa and art or anything along |
| 12 | those lines? |
| 13 | A.  Yes.  I have an African imports business, Celestial |
| 14 | Enterprises. |
| 01:40:46 15 | Q.  And are you married now? |
| 16 | A.  No, my husband is deceased. |
| 17 | Q.  Where is your husband from? |
| 18 | A.  He was born in west Africa, born in Sierra Leone, lived in |
| 19 | Nigeria all his life. |
| 01:41:00 20 | Q.  And have you yourself traveled to Africa over the years? |
| 21 | A.  Yes, I have. |
| 22 | Q.  For business purposes for one reason? |
| 23 | A.  Well, basically I originally started going to visit family. |
| 24 | That was my purpose of going to Africa then. |
| 01:41:15 25 | Q.  Okay. |

                    MICHAEL P. SNYDER, Official Court reporter

Palmer - direct by Leonard

129

1    A.  And then subsequently business.

2    Q.  And what type of business trips would you make to Africa

3    over the years?

4    A.  Mainly to buy art and fabrics, different things that I

01:41:29    5    wanted to bring back to the states and sell.

6    Q.  And are you familiar with my client Gregory Turner?

7    A.  Yes, I am.

8    Q.  And how long have you known that gentleman?

9    A.  Since 1984.

01:41:45    10   Q.  Ma'am, I want to call your attention to the year 2006 and

11   in the fall or so of 2006.

12   A.  Yes.

13   Q.  Did you attend a meeting or a reception at the United

14   States Senate?

01:41:59    15   A.  Yes, I did.

16   Q.  And were other people present besides yourself?

17   A.  Yes, quite a few.

18   Q.  Was Gideon Gono from the country of Zimbabwe, was he

19   present at this meeting in the United States Senate in 2006

01:42:15    20   that you attended?

21   A.  Yes.

22   Q.  And were there other individuals from the United States

23   Congress who were present at this meeting in the United States

24   Senate that included Gideon Gono?

01:42:28    25   A.  There was Joseph Biden, who is now our vice-president;

MICHAEL P. SNYDER, Official Court reporter

Palmer - direct by Leonard

130

1 Congresswoman Diane Watson was there; Congresswoman Kilpatrick

2 was there; and there were some other Congress people who came

3 in and out, but I can't recall their names.

4 Q. And did you observe Senator Biden shake hands with Gideon

01:42:57 5 Gono?

6 A. Yes.

7 Q. And did you observe Mr. Gono give sort of a speech or a

8 presentation to the group?

9 A. Yes, he did. He spoke.

01:43:09 10 Q. After that event concluded, over the next days or weeks did

11 you have the opportunity to talk to my client, Mr. Turner,

12 about what you had seen at that event?

13 A. Yes, I did, by telephone.

14 Q. So you had a telephone conference with Greg Turner sometime

01:43:25 15 after the event?

16 A. Yes.

17 Q. And probably within a few days to a week or so after the

18 event?

19 A. Yes. I'm not sure exactly which day it was.

01:43:33 20 Q. And when you talked to Greg about the event, did you

21 describe for him the things that you described for us here

22 today?

23 A. Yes.

24          MR. LEONARD: Could I have a moment, Judge?

01:43:42 25          THE COURT: Yes.

          MICHAEL P. SNYDER, Official Court reporter

1          (Pause.)

2    BY MR. LEONARD:

3    Q.  Just some additional questions.  I forgot to ask you about

4    some other attendees at the meeting.

01:44:09    5          Besides Mr. Gono, were there other representatives of

6    the country of Zimbabwe present at this meeting in the United

7    States Senate?

8    A.  Yes, there were a couple.

9    Q.  Do you remember Rose Mazula?

01:44:24   10    A.  Yes.

11   Q.  Do you remember if she was affiliated with one of the

12   political parties in the country of Zimbabwe?

13          MR. RECKER:  Objection, Your Honor.

14          THE COURT:  Sustained.  For one thing, you're leading

01:44:37   15   the witness.

16   BY MR. LEONARD:

17   Q.  Miss Mazula, was she from a nonpolitical organization?

18   A.  Yes.  That I know of.  I don't know all the details.

19   Q.  Do you recall that being the Zimbabwe Progress Fund?

01:44:56   20   A.  Yes.

21   Q.  And do you remember who some of the other folks were who

22   were present at this meeting in the Senate besides Mr. Gono and

23   Rose Mazula, any other folks from Zimbabwe you can recall

24   today?

01:45:08   25   A.  From Zimbabwe?  There were, but I don't remember their

              MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

1    names, you know, to tell you.

2    Q.  Okay.

3    A.  There were two or three other people I know.

4    Q.  And in connection with this case against Mr. Turner, have

01:45:28    5    the government agents and agents contacted you a number of

6    times?

7    A.  Yes.

8         MR. LEONARD:  Nothing further at this point, Judge.

9                   CROSS-EXAMINATION

01:45:50    10   BY MR. RECKER:

11   Q.  Good afternoon, Miss Palmer.

12   A.  Good afternoon.

13   Q.  What was your relationship with Congresswoman Diane Watson?

14   A.  A friend.

01:45:58    15   Q.  Did you work for the Congresswoman?

16   A.  No.

17   Q.  Did you engage in official functions with the

18   Congresswoman?

19   A.  I don't know what you mean by official functions.

01:46:06    20   Q.  Did you task staff members to undertake certain actions?

21   A.  No, no.

22   Q.  Is the Congresswoman a friend of yours?

23   A.  Yes.

24   Q.  A very close friend?

01:46:18    25   A.  Yes.

                    MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

133

1  Q.  Mr. Leonard just asked you about the FBI coming to your

2  house to talk to you.  Did they come out to your house in

3  California?

4  A.  Yes.

01:46:30  5  Q.  Did you refuse to speak with the FBI at that time?

6  A.  No, I never refused to speak with them.

7  Q.  Did you tell the agents -- you told the agents at the time

8  that you were angry you received a subpoena, didn't you?

9  A.  I did what?

01:46:45  10  Q.  You told the FBI agent who came to your house that gave you

11  a trial subpoena to come here and testify that you were not

12  happy with that, you were angry?

13  A.  I never said I was angry.

14  Q.  Are you friends with the defendant?

01:46:59  15  A.  Yes.

16  Q.  Good friends?

17  A.  Yes.

18  Q.  Do you recall an FBI --

19  A.  Excuse me.

01:47:13  20  Q.  Do you recall a couple weeks ago when you were interviewed

21  on the telephone by the FBI?

22  A.  Yes.

23  Q.  You told the FBI during that interview that you didn't play

24  an organizational role in this 2006 reception on Capital Hill,

01:47:42  25  correct?

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

134

1    MR. LEONARD:  Objection to scope, Judge.  Beyond the
2    scope.
3    BY THE WITNESS:
4    A.  I didn't understand.
01:47:57    5    THE COURT:  She may answer.
6    BY MR. RECKER:
7    Q.  Did you tell the FBI that you didn't play an organizational
8    role with respect to that 2006 event on Capital Hill,
9    reception?
01:48:06    10    A.  I don't recall telling them anything.
11    THE COURT:  I don't think that was actually the
12    question.
13    BY MR. RECKER:
14    Q.  In fact, you told the FBI that you didn't, that you thought
01:48:18    15    an embassy planned that event, isn't that right?
16    A.  I don't recall telling him who planned it, but I didn't say
17    the embassy planned it.
18    Q.  You told the FBI a couple weeks ago on the telephone that
19    the details of this 2006 event with Gideon Gono were vague, is
01:48:39    20    that correct?  They were vague to you?
21    A.  Yeah.  They are right now.
22    Q.  You also told the FBI man that you did not coordinate with
23    anyone else regarding the appearance of Gideon Gono at this
24    event, correct?
01:48:57    25    A.  Say that again.

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

135

1    Q.  You told the FBI a couple weeks ago on the telephone that

2    you didn't coordinate the appearance of Gideon Gono at this

3    event in 2006, is that right?

4            MR. LEONARD:  Objection to relevance and scope.

01:49:18    5            THE COURT:  On those two objections, I will overrule

6    those.  She can answer.  She can answer.

7    BY MR. RECKER:

8    Q.  Ma'am, did you tell the FBI a couple weeks ago on the

9    telephone that you didn't coordinate with anyone to bring

01:49:55    10   Gideon Gono to this event in 2006?

11   A.  I think you're mixing up -- the question is not correct.

12   Q.  Just a yes or no, ma'am.  Did you tell the FBI that you

13   coordinated with somebody to bring Gideon Gono to the United

14   States?

01:50:15    15   A.  That I did or I did not?

16   Q.  That you did not.

17   A.  I'm not sure what I told them because I don't remember that

18   question of asking me did I coordinate or with somebody else.

19   Q.  Did you coordinate the event?

01:50:30    20   A.  I was a part of it.

21   Q.  Did you send an email to the defendant on or about February

22   6, 2006, in which you provided a draft letter to Gono and

23   invited him to attend a reception in Washington, D.C.?

24   A.  Did I do what now?

01:50:48    25   Q.  Did you send the defendant an email back in February of

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

1  2006 attaching a letter or an invitation asking for, seeking

2  Gideon Gono's attendance at this event?

3  A.  I don't recall that.

4  Q.  If I showed you a document, would it refresh your

01:51:07  5  recollection of that?

6  A.  It may.

7        MR. LEONARD:  Can I approach, Your Honor?

8        THE COURT:  Yes.

9  BY MR. RECKER:

01:51:20  10  Q.  I'm handing you what is marked as Government's Exhibit GT

11  Email 200.  This document is not in evidence.  Will you read

12  that to yourself and let me know if it refreshes your

13  recollection.

14        Do you recall sending an email in February of 2006?

01:52:00  15  A.  Yes.

16  Q.  And what did you say, what did you ask in the email?  You

17  asked that Gideon Gono be invited to come to Washington, D.C.,

18  didn't you?

19  A.  Let me see that again.  I need to look at that because I'm

01:52:17  20  not sure.  I don't remember what it said.

21  Q.  Just read it to yourself.

22  A.  I see that, but I don't recall sending it to him.

23  Q.  That's not your, that's not your name on the line where it

24  says your name wrote and then the following, Celestine Palmer?

01:53:45  25  A.  As I said, I see that as a draft, but I don't remember

                MICHAEL P. SNYDER, Official Court reporter

1  sending it.

2  Q.  Right, ma'am, but it says Celestine Palmer, and it has an

3  email address as celestinepal@aol.com wrote.

4  A.  Yes.

01:54:00   5  Q.  And after that it said "wrote," and then there's the text

6  of the letter.  You sent that to the defendant in February of

7  2006, correct?

8  A.  I'm not sure.

9  Q.  Do you recall the defendant replying and asking for a

01:54:23   10  draft -- a guest list for this reception?

11         MR. LEONARD:  Objection again to relevance and scope.

12         THE COURT:  Sustained.

13  BY THE WITNESS:

14  A.  I can't remember.

01:54:41   15  BY MR. RECKER:

16  Q.  Ma'am, you spoke to Mr. Turner before the event occurred,

17  correct?

18         MR. LEONARD:  Objection to relevance and scope.

19         THE COURT:  Sustained.

01:54:58   20  BY MR. RECKER:

21  Q.  Ma'am, did you send an email to the defendant in February

22  of 2011 saying you would look into possible locations for this

23  event to occur in Washington?

24         MR. LEONARD:  Objection, relevance, scope, and also I

01:55:26   25  think it couldn't be 2011.

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

138

1      MR. RECKER:  2006, I'm sorry.

2      MR. LEONARD:  Also, Judge, it's relevance and scope.

3      THE COURT:  Yes.  I guess I'm going to have to take a

4  sidebar.

01:55:36   5      (Discussion on the record at sidebar.)

6      THE COURT:  Where are you going?  It's very limited

7  direct.  What is the point of this?

8      MR. JONAS:  In opening statement, defense talked about

9  how Celestine Palmer told the defendant after the event that

01:56:11  10  Gono was there.  Mr. Turner got it all, in pantomime, acted

11  surprised, oh, my God, Gideon Gono is there, amazing, when in

12  fact the defendant and the witness were engaged in

13  conversations before the event to get Gideon Gono over.  So the

14  defendant was instrumental in getting Gideon Gono to the event.

01:56:32  15  It wasn't for the first time after the event that he heard he

16  was there; he was aware why, and that's important to -- it goes

17  directly to the testimony.

18      MR. LEONARD:  Judge, they could have called her in

19  their case.  They made a tactical decision.  They are not going

01:56:47  20  to call her as a witness.

21      We have a very limited direct.  They can't ask

22  whatever they want to now because they made the tactical

23  decision.  It's not relevant, it's beyond the scope.

24      THE COURT:  I think it really is beyond the scope.

01:57:11  25  How is it not beyond the scope of direct?

MICHAEL P. SNYDER, Official Court reporter

1    MR. JONAS:  Because the direct, the point of the

2  direct was the event and what the witness told the defendant

3  about the event, and we are getting now the full picture of

4  what she talked to the defendant about regarding this event.

01:57:25   5  It's -- they limited it to conversations afterwards.  They want

6  to give this jury the impression that the defendant for the

7  first time Gideon Gono was there after the event.  We are

8  entitled to give a full picture on the same issue and show the

9  jury that, no, their conversations before the event that she

01:57:40  10  had with the defendant about Gideon Gono coming.

11    MR. LEONARD:  Judge, we can make a decision as they

12  did to shape the evidence however we want.  We chose to call

13  the witness for a limited purpose.  They chose not to subpoena

14  or call her as a witness.  We all agreed it was a limited

01:57:56  15  purpose.  We didn't go into anything else.  It doesn't open the

16  door to anything.  Just because they want her now to address

17  subjects we didn't address don't open that up.  It's beyond the

18  scope.

19    MR. JONAS:  It's the same subject, Judge.  It's all

01:58:08  20  about this event and what she told the defendant.

21    MR. LEONARD:  How is it what she told him afterwards

22  now opens the door to whatever was said before the event?  It

23  makes no sense.

24    MR. JONAS:  It absolutely does, Judge.  It's right on

01:58:20  25  the point.

    MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

140

1      THE COURT:  I guess it does.  I couldn't figure out.

2  I didn't know why you were cross-examining her at all, but on

3  that I guess I can't disagree that it just trying to --

4      MR. LEONARD:  We wouldn't have taken her out of turn

01:58:42  5  and done this and limited her evidence if it was just going,

6  they could ask whatever they want.

7      MR. TUNICK:  Judge, you said that the --

8      MR. LEONARD:  When we go beyond the scope on their

9  people, you sustain their objections.

01:58:54  10     THE COURT:  You told me that, this is not accurate,

11  but you can bring the agent back.  You're taking her out of

12  order, and they can't do anything about it.

13     MR. LEONARD:  Judge, they decided they didn't want to

14  call her at all.  That was their decision.  They withdrew their

01:59:11  15  subpoena for her.  We decided we would call her for a very

16  small purpose.  It does not open the door.  They could have

17  done what -- they decided they didn't want to call her at all.

18     MR. TUNICK:  What she said after goes to his

19  knowledge.

01:59:25  20     THE COURT:  Well, I had no idea that she had any

21  conversation or supposedly had a conversation with him before.

22     MR. LEONARD:  If everything is fair game I'd like to

23  ask her about Greg's work in Africa before 2006.  I didn't go

24  there because you told us we couldn't.

01:59:39  25     MR. JONAS:  That goes to a court order.  We are

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

141

1    staying within the four corners of the direct.

2        THE COURT:  I guess I have to ask you, are you going

3    to use her testimony to try to argue that he was then

4    surprised, that he hadn't known about this before?

01:59:55    5        MR. LEONARD:  The significance --

6        THE COURT:  Because I didn't remember that.

7        MR. LEONARD:  The significance of the event really is

8    Joe Biden shaking hands with Gideon Gono in the Senate Building

9    and Greg learning of it.  That's the significance.  That's what

02:00:09   10   matters.  And despite whatever he would have known that there

11   might be a meeting, nobody in the world anticipated that the

12   sponsor of the sanctions was going to show up and embrace

13   Gideon Gono and Gono would be allowed to give a speech.  That's

14   the crux of it.  If they want to start taking her backwards,

02:00:27   15   we'll go to Africa, her knowledge of Greg's works in Africa.

16       MR. JONAS:  That's ridiculous, Judge.  We made an

17   argument that goes to the four corners of the direct testimony.

18       Just so you know, we didn't call her in our case

19   because she was not cooperative with the FBI.  She said she was

02:00:43   20   angry for receiving the subpoena.

21       MR. LEONARD:  A subpoena is a subpoena is a subpoena.

22   They know it.  They cause people to come here all the time.

23       MR. JONAS:  No point in putting on a witness that's

24   not going to be cooperative for the government.

02:00:54   25       THE COURT:  All right.  The current, if we go back to

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

142

1 the current question, I guess the questions were whether she

2 coordinated with him or talked to him about the invitation,

3 which I suppose also goes to what the relationship was.

4          MR. RECKER:  Or sent him an invitation.

02:01:17  5          THE COURT:  All right.  I guess I.

6          MR. RECKER:  Or coordinated it.

7          THE COURT:  I agree.

8          Do you have a lot more questions on this?

9          MR. RECKER:  There's a couple more on that subject.

02:01:29  10          THE COURT:  I'll see where it goes.  Okay.

11      (End of discussion at sidebar.)

12 BY MR. RECKER:

13 Q.  Ma'am, you coordinated with the defendant to get Gideon

14 Gono to attend this event in 2006 in Washington, isn't that

02:02:12  15 right?  You spoke to him about it?

16 A.  Yes.

17 Q.  And you coordinated with him on some of the organizational

18 details of the event including bringing Gono to the United

19 States?

02:02:23  20 A.  Well, I didn't have anything to do with bringing Gono.  I

21 was informed that he was going to be here, and then I was just

22 a coordinator of the reception of his presence.  I did not

23 coordinate his coming here.

24 Q.  Ma'am, I provided you a document just a minute ago.  You

02:02:42  25 read it.  I can give it to you again.

          MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

143

1  A.  I am just telling you the facts.

2  Q.  Did you not send that email which includes an invitation to

3  Gideon Gono?

4         MR. LEONARD:  Objection.  We've already been through

02:02:55  5  this, Judge.

6         THE COURT:  I think she gave an answer.

7  BY MR. RECKER:

8  Q.  Do you recall the defendant replying to you and asking you

9  to supply a guest list for him to review?

02:03:08  10        MR. LEONARD:  Objection, irrelevant and scope.

11        THE COURT:  What was the question?

12        MR. RECKER:  I asked if she --

13  BY THE WITNESS:

14  A.  I don't remember.

02:03:14  15        MR. RECKER:  I asked if she recalled if the defendant

16  replied to her invitation to the Governor.

17        THE COURT:  I didn't hear what you said.

18        MR. RECKER:  Sorry.

19  BY THE WITNESS:

02:03:22  20  A.  I don't because I didn't --

21  BY MR. RECKER:

22  Q.  If I show you a document, would it refresh your

23  recollection of that?

24  A.  Yes, if you show me.

02:03:31  25  Q.  I'm again showing you GT Email 200.  It's not in evidence.

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

1    Just read it to yourself at the top.

2    A.  Oh, this is the same one.  But I didn't, I did not have a

3    guest list.

4    Q.  I'm sorry, ma'am?

02:03:50    5    A.  I never had a guess list.

6    Q.  Okay, but do you recall the defendant replying to you and

7    asking for a guest list for the event?

8    A.  You know, I don't remember that, honestly.  If he did, I

9    didn't because I don't have -- I was traveling.

02:04:19    10    Q.  Do you recall sending an email to the defendant also in

11    February of 2006 indicating that you would research locations

12    for this reception to be held in Washington D.C.?

13             MR. LEONARD:  Same objections.

14             THE COURT:  She may answer.

02:04:35    15    BY THE WITNESS:

16    A.  I don't recall.

17    BY MR. RECKER:

18    Q.  If I show you a document, would it refresh your

19    recollection?

02:04:43    20    A.  Yes.

21    Q.  Showing you GT Email 201, please just read it to yourself.

22             Do you recall that, ma'am?

23    A.  Yes.

24    Q.  Do you recall telling the defendant that you'd spoken

02:05:23    25    recently with Representative Watson and she was positive about

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

1    the meeting, the reception in Washington?

2         MR. LEONARD:  Same objections, Judge.

3         THE COURT:  The question is do you recall.

4         THE WITNESS:  Pardon me?

02:05:38    5    THE COURT:  The question is do you recall.

6         THE WITNESS:  I really don't.  I'm just going by the

7    paper he has, but I don't recall.

8    BY MR. RECKER:

9    Q.  Do you want to take a look at it again, ma'am?

02:05:49   10   A.  No.

11   Q.  Will it refresh your recollection of whether you said that?

12   A.  No.

13   Q.  It won't?

14   A.  I don't remember, honestly.

02:06:00   15   Q.  Ma'am, you told the FBI that you didn't know Gono was,

16   Gideon Gono was part of the government of Zimbabwe, is that

17   correct?

18        MR. LEONARD:  Objection, relevance, scope, hearsay.

19        THE COURT:  Sustained.

02:06:19   20   BY MR. RECKER:

21   Q.  Did the defendant send you an email on February 21st, 2006,

22   and tell you that Gono was the chairman of the Reserve Bank of

23   Zimbabwe?

24        MR. LEONARD:  Same objections.

02:06:35   25   THE COURT:  Is this around the same time?

          MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

146

|  |  |  |
|---|---|---|
| | 1 | MR. RECKER:  It's about a week and a half later, just |
| | 2 | before the event. |
| | 3 | THE COURT:  She may answer. |
| | 4 | BY MR. RECKER: |
| 02:06:51 | 5 | Q.  Ma'am? |
| | 6 | A.  Pardon me? |
| | 7 | Q.  Do you recall sending the defendant an email? |
| | 8 | A.  Saying what? |
| | 9 | Q.  Saying, the defendant sent you an email on February 21st, |
| 02:07:03 | 10 | 2006, where he told you that Gideon Gono was the chairman of |
| | 11 | the Reserve Bank? |
| | 12 | A.  He told me or I told him? |
| | 13 | Q.  He told you.  Do you remember that? |
| | 14 | A.  Can I see the email, please? |
| 02:07:17 | 15 | Q.  Yes.  Can I show you a document?  Would it refresh your |
| | 16 | recollection, ma'am? |
| | 17 | THE COURT:  She asked to see it. |
| | 18 | BY MR. RECKER: |
| | 19 | Q.  Showing you GT Email 207.  Just read it to yourself. |
| 02:07:44 | 20 | A.  This one? |
| | 21 | Q.  The top email. |
| | 22 | A.  That was sent to me? |
| | 23 | Q.  Correct.  Do you recall that, ma'am? |
| | 24 | A.  I recall seeing it now, but I wouldn't recall that. |
| 02:09:44 | 25 | Q.  Does this refresh your recollection that you received an |

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

1  email from the defendant who told you that Gideon Gono was the

2  chairman of the Reserve Bank?

3  A.  Right.

4  Q.  Just a yes or no, ma'am.

02:09:57  5  A.  Yes.

6  Q.  Okay.  You told the FBI that you were told by staff of the

7  reception's host, the reception on Capital Hill, that Gono

8  would be at the event, is that correct?

9          MR. LEONARD:  Objection, relevance, scope, hearsay.

02:10:28  10          THE COURT:  Would you repeat that, please.

11          Oh, the FBI.

12  BY MR. RECKER:

13  Q.  You told the FBI that you were told by the staff of the

14  reception's host, whoever that might be, that Gono would be

02:10:42  15  there?

16  A.  I don't remember saying that.  I think they kind of

17  misunderstood what I said.  That's not what I said.

18  Q.  And just before the event, ma'am, just a couple days before

19  the event, do you recall sending on two occasions a draft

02:11:02  20  invitation to the defendant that listed yourself as one of the

21  sponsors of the event inviting Gono?

22  A.  Yes.

23  Q.  Do you recall sending both of those emails?

24  A.  Yes.

02:11:17  25  Q.  And Gono was in the middle of the invitation and identified

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

148

1   as the chairman of the Reserve Bank of Zimbabwe, do you recall

2   that?

3   A.  Yes.

4   Q.  Isn't it true that you told the FBI that the 2006 reception

02:11:35   5   for Gono was hosted by Joe Biden's staff?

6           MR. LEONARD:  Objection, hearsay, it's not impeaching,

7   scope, relevance.

8           THE COURT:  She may answer.

9   BY THE WITNESS:

02:11:56  10  A.  What is it?

11  BY MR. RECKER:

12  Q.  You told the FBI that you were told by staff of the

13  reception's host that Gono was coming, is that correct?

14  A.  I don't recall telling them that.

02:12:08  15  Q.  Okay.  Ma'am, did you attend this event?

16  A.  Yes.

17  Q.  Do you recall who attended, who was in attendance?  Was Joe

18  Biden there?

19  A.  Yes, he was.

02:12:18  20  Q.  Was his office a host or was it -- isn't it true he was

21  just walking by the office?

22  A.  No, that's not true.

23  Q.  And opened the door because Representative Watson's guests

24  couldn't get in the room?

02:12:32  25  A.  No.  It was his office that arranged the room.


                MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

149

1    Q.  Who else was in attendance?

2    A.  That I personally know?

3    Q.  Yes.  Or whose names do you know?

4    A.  In terms of just individuals or do you want names of people

02:12:58    5    that I recall being there?

6    Q.  Were a number of Congresspeople there, Congressmen there?

7    A.  There were several, but I didn't know them, so I don't

8    remember who they were.  But I did know Congresswoman

9    Kilpatrick because I know her.  I knew Diane Watson because I

02:13:16    10    know her.  But there were other Congresspeople that came

11    through.  It was a reception.  People just walked in, said

12    hello, greeting, and then they left.  It was no formal, except

13    for the presentation, that was it.

14    Q.  Did you see -- so you testified that then Senator Joe Biden

02:13:44    15    was there?

16    A.  Yes.

17    Q.  Did you see him provide any services to Gideon Gono at the

18    time?

19    A.  Any what?

02:13:50    20         MR. LEONARD:  Objection, Judge, relevance.

21    BY MR. RECKER:

22    Q.  Services?

23    A.  I don't know.  I wasn't watching him.  I don't know what he

24    was doing.  When you say "services," I don't understand that.

02:14:06    25         THE COURT:  That's a good point.  There was an

MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

1    objection.  You answered before I could go on.  It's hard to

2    rule on.  I would sustain the objection because I, several

3    reasons.

4              MR. RECKER:  Okay.

02:14:21    5    BY MR. RECKER:

6    Q.  Did Joe Biden give some remarks at this event?

7    A.  He spoke, yes.

8    Q.  Did he shake Gideon Gono's hand?

9    A.  Yes.

02:14:31    10   Q.  And then did he leave?

11   A.  Yes.

12   Q.  Okay.  Isn't it true that Joe Biden said to the audience or

13   to the reception guests that he wasn't supposed to be there and

14   he had somewhere else to be, and he left?

02:14:49    15   A.  They were all voting during that time, so people weren't --

16   everybody moved in and out.

17   Q.  Didn't he say he had a meeting at another location to be

18   at?

19   A.  I don't know.  He probably had, but I don't recall exactly

02:15:06    20   what he said.

21   Q.  Did you see Gideon Gono provide any money to Joe Biden?

22   A.  No.

23   Q.  How about to Representative Diane Watson?  Did he give her

24   any money?

02:15:17    25   A.  No.

              MICHAEL P. SNYDER, Official Court reporter

Palmer - cross by Recker

1   Q.  How about Representative Fauntroy?

2   A.  No.

3   Q.  Any money provided to them?

4   A.  I didn't see any money going around.  It was not that kind

02:15:25   5   of --

6   Q.  Did you see any Congressperson chasing the cash?

7        MR. LEONARD:  Judge, when is this going to end?  This

8   is absolutely ridiculous and beyond the scope.

9        THE COURT:  I agree.

02:15:40   10   BY MR. RECKER:

11   Q.  Were you part of the defendant's lobbying team to get the

12   sanctions lifted on SDNs in Zimbabwe?

13        MR. LEONARD:  Objection to scope and relevance, Judge.

14        THE COURT:  I suppose it goes to bias.  You may

02:15:55   15   answer.

16   BY THE WITNESS:

17   A.  No.

18   BY MR. RECKER:

19   Q.  Did the defendant pay you any money to attempt to lift

02:16:04   20   sanctions on --

21   A.  No.

22        MR. LEONARD:  Objection, relevance and scope, Judge.

23        THE COURT:  Sustained.

24        MR. RECKER:  That's it, Your Honor.

02:16:15   25        MR. LEONARD:  Judge, in light of that, could we have a

MICHAEL P. SNYDER, Official Court reporter

1    sidebar?  We want to play a video.

2            THE COURT:  No.

3            MR. LEONARD:  Could we have a sidebar?

4            THE COURT:  Yes.

02:16:26    5        (Discussion on the record at sidebar.)

6            THE COURT:  They just gave you tons of more

7    information than you would have brought out.  I don't know why,

8    but if they want to make your case for you, let them make your

9    case for you.  But that doesn't make --

02:16:56    10           MR. LEONARD:  Judge, it's our decision what we think

11   is our case.  And you told us specifically we couldn't go into

12   all these things, and then you turn around and let them do

13   whatever they want, ask about.

14           THE COURT:  You know, I'm getting tired of that.  That

02:17:08    15   is not true, and there's no reason to play a video of what --

16   how would the video change anything?  You just admit he's

17   there.  She's testified Biden organized it.  You're going to

18   have to take that answer.

19           MR. LEONARD:  They opened the door to it, Judge.

02:17:25    20           THE COURT:  To what?  What would the video show?

21           MR. LEONARD:  What happened.  It will show Biden

22   coming in and shaking hands.

23           THE COURT:  We are already so far off.  She says he

24   shook hands.

02:17:35    25           MR. LEONARD:  That's now in doubt.  They are calling

              MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

153

1   into question what happened.

2          THE COURT:  None of this is relevant.  The only thing

3   that's relevant is what she ever said to him.

4          MR. LEONARD:  You let them ask questions about whether

02:17:44   5   they gave out cash at the meeting.

6          THE COURT:  No.  I stopped them as soon as you

7   objected.  Sustained.  Let's go on.

8       (End of discussion at sidebar.)

9          THE COURT:  Any more questions?

02:18:06   10          MR. LEONARD:  No questions, Judge.

11          THE COURT:  Okay.  You're excused.  Thank you.

12       (Witness excused.)

13          THE COURT:  We'll go back to the government's case.

14          MR. RECKER:  The government calls Alice Holmes McKoy.

02:19:24   15          THE COURT:  If you will raise your right hand, please.

16          ALICE HOLMES McKOY, PLAINTIFF'S WITNESS, SWORN

17          THE COURT:  Please be seated.  Thank you.

18          MR. TUNICK:  Your Honor, may I approach the witness

19   and hand her something?

02:19:43   20          THE COURT:  Yes, you may.

21                    DIRECT EXAMINATION

22   BY MR. RECKER:

23   Q.  Would you state and spell your name for the record.

24   A.  Alice, A-l-i-c-e, Holmes, H-o-l-m-e-s, McKoy, M-c-K-o-y.

02:20:03   25   Q.  Miss Holmes McKoy, are you currently employed?

            MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1   A.  No, I'm not.

2   Q.  Are you retired?

3   A.  Yes, I am.

4   Q.  What was your most recent position?

02:20:13   5   A.  Director of special projects and scheduling for former

6   Congresswoman Diane Watson.

7   Q.  And did Congressman Diane Watson have multiple offices?

8   A.  Yes.

9   Q.  Is that common for members of Congress?

02:20:26   10   A.  Yes.  There is a congressional office and a district

11   office.

12   Q.  And which office did you work in for Congresswoman Watson?

13   A.  Washington, D.C..

14   Q.  And what was your title?

02:20:39   15   A.  Director of special projects and scheduling.

16   Q.  And how long did you hold that title?

17   A.  From 2004 to 2011.

18   Q.  Can you describe generally what your duties with that

19   position were?

02:20:52   20   A.  My duties were to coordinate special events under the

21   Congresswoman's auspices and to schedule her on her daily

22   appointments, meetings and requests for hearings.

23   Q.  Could you provide a couple of examples of events that you

24   planned when you worked for the Congresswoman?

02:21:12   25   A.  I was the key staff on a congressional gold medal ceremony

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1    for the late Dr. Dorothy Height.  I also planned a reception

2    for honoring Shoshana Johnson who was the first

3    African-American prisoner of war in the Iraq conflict.  I also

4    organized the congressional screening for Rosa Parks'

02:21:38    5    autobiography that was held in the capital, held in the

6    National Trade Center for the congressional offices.

7    Q.  And just generally speaking, what kinds of things would you

8    do in planning these events?

9    A.  Set up the catering, the venue, sponsorships for the

02:21:57    10    underwriting of the events.

11    Q.  Are you familiar with the Congressional Black Caucus?

12    A.  Yes, I am.

13    Q.  And what is that?

14    A.  It's a 43-member body of congressional members, a 43-member

02:22:11    15    body of African-American congressional members who are

16    organized to support African-American issues and legislation.

17    Q.  Did you have an organizational role in two Congressional

18    Black Caucus events in September of 2009?

19    A.  Yes, I did.

02:22:30    20    Q.  Can you very generally describe those two events.

21    A.  During the annual black caucus, the Congressional Black

22    Caucus weekend there are several events that take place.  Each

23    member is given an opportunity to host a reception and panels

24    related to their particular interests areas, their legislative

02:22:55    25    interest areas.  I coordinated a reception and a panel that

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

156

1    year.

2    Q.  So the two events were a reception and panel, an issues

3    panel?

4    A.  Yes.

02:23:05    5    Q.  Okay.  Where would these be held?

6    A.  They would be held in Washington.

7    Q.  Washington D.C.?

8    A.  Yes.

9    Q.  Let's start first with the issues panel that you planned.

02:23:17    10   Can you generally describe the things that you did to plan that

11   panel.

12   A.  The panel that I planned had to do with Africa.  We

13   identified a theme for the panel which had to do with Zimbabwe,

14   which way, point and counterpoint, and that was identifying

02:23:41    15   speakers to come and sending out letters and invitations,

16   confirming them, and to facilitate them being able to

17   participate.

18   Q.  And how did you/to put Zimbabwe on the agenda?

19   A.  It was a suggestion to me.

02:24:00    20   Q.  Who suggested it to you?

21   A.  Mr. Turner.

22   Q.  Who were the participants that you had initially tried to

23   get to speak on this panel?

24   A.  Mr. Gideon Gono and Imani Countess.

02:24:16    25   Q.  How did you/on putting Gideon Gono on the panel?

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1    A.  It was suggested to me by Mr. Turner.

2    Q.  Okay.  Did you know what Gideon Gono's title was at the

3    time you were planning this event?

4    A.  Yes.  I was told that he was with the Bank of Zimbabwe.

02:24:34    5    Q.  And who had told you that?

6    A.  Mr. Turner.

7    Q.  Did you draft invitations for potential speakers for this

8    panel?

9    A.  Yes, I did.

02:24:46    10    Q.  Did the defendant ask for an invitation from you for Mr.

11    Gono?

12    A.  Yes.

13    Q.  Did you draft an invitation and put it on Representative

14    Watson's official stationary?

02:25:01    15    A.  Yes.

16    Q.  Did the Congresswoman sign the invitation?

17    A.  It was electronically signed.

18    Q.  Did you cause it to be, to become electronically signed?

19    A.  Yes.

02:25:17    20    Q.  What did you do with this invitation once you had it

21    signed?

22    A.  Emailed it to Mr. Turner.

23    Q.  How did you know what his email address was?

24    A.  He had emailed other documents.

02:25:25    25    Q.  Prior to this event that you were planning?

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1  A.  Yes.

2  Q.  Did you show anybody in Congresswoman Watson's office the

3  invitation before you sent it out?

4  A.  No, I did not.

02:25:39  5  Q.  Did you show it to Congresswoman Watson?

6  A.  No.

7  Q.  All right.  So you mentioned a reception as well?

8  A.  Yes.

9  Q.  Can you describe, you know, what that involved, what steps

02:25:55  10  you took to plan that?

11  A.  I planned the catering, the venue selection, usually get a

12  partner to work with us to support us and also do an invitation

13  list.

14  Q.  You said you usually get a partner to work with you.  Why

02:26:13  15  do you do that?

16  A.  Because in, during that particular period, it's not a

17  direct congressional event; it's one that's held in conjunction

18  with the congressional offices.  So you get a partner that

19  supports the issue, and then they raise the funds and then they

02:26:35  20  pay for the cost of the event.

21  Q.  Okay, so the partner is responsible for fundraising,

22  funding the event?

23  A.  Yes, they help with the funding.

24  Q.  Okay.  So does the funding go typically to the partner or

02:26:47  25  does it go to the Congresswoman's office?

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1  A.  It goes to the partner.

2  Q.  Were these two events generally scheduled around the same

3  time?

4  A.  Yes.

02:26:55   5  Q.  So you were planning them at the same time as you led up to

6  them?

7  A.  Correct.

8  Q.  Okay.  What was the purpose of the reception, and what was,

9  what was the --

02:27:07  10  A.  It's an event to have constituents who travel to the

11  caucus, to the conference every year to be able to have a

12  meeting opportunity with a member of Congress.

13  Q.  And what was the title of the reception?

14  A.  It was an afri-gala.

02:27:24  15  Q.  Okay.  And what were your responsibilities for planning

16  that?

17  A.  To select the venue, to organize the catering, to get

18  sponsorships so that the cost of the event would be defrayed.

19  Q.  You mentioned a partner for purposes of funding.  Who was

02:27:44  20  the partner for this reception, this afri-gala?

21  A.  Leadership Africa.

22  Q.  And what is Leadership Africa?

23  A.  It's an NGO organization that handles education for Africa.

24  Q.  Where is it based?

02:28:01  25  A.  Washington, D.C..

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1   Q.  Do you know who heads up Leadership Africa?

2   A.  Walker Williams is the CEO.

3   Q.  Okay.  In addition to the issues forum, were you also

4   contacted by the defendant in connection with this afri-gala?

02:28:20   5   A.  Yes.

6   Q.  How so?

7   A.  Well, we talked about a reception and getting sponsors to

8   support it.

9   Q.  Okay.  In terms -- so he was, he was seeking to support,

02:28:40   10   provide support for it?

11   A.  We were seeking support for the reception.

12   Q.  Okay.  And why did he contact you?

13   A.  He contacted me to ask about the Congressional Black Caucus

14   events that were taking place and what we were going to be

02:28:57   15   doing, and I told him that we were planning a reception, and it

16   had to do with Africa, and we were honoring some African

17   business people and executives who had a strong portfolio in

18   African affairs in Washington.  He indicated that he would be

19   interested in supporting that.

02:29:19   20   Q.  How much support did he indicate he was willing to provide

21   for the gala?

22   A.  Initially it was going to be for the gala in two maybe

23   tables for the Congressional Black Caucus dinner that year, so

24   it was $25,000.

02:29:38   25   Q.  And initially how did he indicate he planned to get you the

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

161

1    $25,000?

2    A.  He would wire.

3    Q.  Did he ultimately wire it to you?

4    A.  No, he did not.

02:29:52    5    Q.  Did you ultimately receive any funding from the defendant

6    for this reception?

7    A.  I received $5,000.

8    Q.  Who did you receive it from?

9    A.  From Mr. Ben Israel.

02:30:07    10    Q.  What were the circumstances surrounding how you received

11    it?

12    A.  He called and told me that he had a donation from Mr.

13    Turner, and then he indicated that he needed to meet me and

14    told me to come to the office.

02:30:23    15         THE COURT:  Maybe if you sit back, I think that --

16         Are you having trouble hearing?  Yes.

17         I think it would be better if you sit back or move the

18    microphone.  I think it echoes and makes it harder.  Just stay

19    away from the microphone.  I think you'll do better, I think

02:30:39    20    we'll do better.

21         THE WITNESS:  Okay.  I'm sorry.

22    BY MR. RECKER:

23    Q.  So you said you received the $5,000 from Ben Israel?

24         MR. TUNICK:  I'm going to object to hearsay.

02:30:52    25         THE COURT:  That was her testimony.  Go ahead.

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

BY MR. RECKER:

Q.  What did Mr., where did Mr. Ben Israel want to provide the
funding to you?

A.  I told him to come to the office.

02:31:11   Q.  And which office was that?

A.  The congressional office where I was located.

            THE COURT:  I am not sure what you just said.

BY THE WITNESS:

A.  I asked him to come to the congressional office where I was
02:31:40   located, and it was to the congressional office where I worked.

BY MR. RECKER:

Q.  And was that Congresswoman Diane Watson's office in
Washington, D.C.?

A.  Yes.

02:31:52   Q.  Did Ben Israel show up at the office?

A.  Yes, he did.

Q.  How did he pay you the $5,000 in funds?

A.  It was a cash donation in an envelope.

Q.  And did he just pay you there in the office or somewhere
02:32:11   else?

A.  I stepped out in the corridor.

Q.  You testified that you spent a number of years in
Washington planning a lot of different events and galas.  For
any of these other events that you planned, had you ever
02:32:27   received cash for funding for any of those events?

            MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1   A.  No, I did not.

2   Q.  What did you do with the cash?

3   A.  I took it home that evening, and then the next day --

4       THE COURT:  I can't hear you.

02:32:38   5   BY THE WITNESS:

6   A.  I took it home that evening and took it to Mr. Walker's

7   office the next day at Leadership Africa.

8   BY MR. RECKER:

9   Q.  I'll just ask that you speak up.

02:32:47   10   A.  Okay.

11   Q.  Thank you.

12       And in what form did you provide the funding to Walker

13   Williams at Leadership Africa?

14   A.  It was in the same envelope that it was given.  I gave him

02:33:00   15   exactly what was given to me.  It was in an envelope.

16   Q.  You should have in front of you what's referred to as

17   Government's Exhibit GT Email 35.  If you could refer to that?

18   A.  Yes, I have it here.

19       MR. RECKER:  Your Honor, this is an email that she was

02:33:43   20   a party to.  It's in evidence.  Can we publish it?

21       THE WITNESS:  I'm sorry?

22       THE COURT:  Okay.

23   BY MR. RECKER:

24   Q.  Ms. McKoy, this is an email string between yourself and the

02:34:09   25   defendant.  Could you flip to the second page for me and look

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1 at the bottom.  If we could highlight the last email string.

2        Do you see that last email on the bottom of the second

3 page?

4 A.  Yes.

02:34:27  5 Q.  That's an email from you to the defendant dated July 30th.

6 You wrote to the defendant:

7        "The sunshine came yesterday and was most appreciated.

8 The question is how do you wish to be recognized or is this

9 anonymous?  I'm told that the sunshine is due back next week.

02:34:46  10 Have a wonderful afternoon."

11        What did you mean by that when you wrote that to the

12 defendant?

13 A.  I meant that the initial donation had come and that I

14 wanted to know how he wanted to be acknowledged on invitation

02:35:01  15 and the materials we were preparing, and I was told that the

16 balance of his contribution would be coming next week.

17        THE COURT:  I'm sorry.  I couldn't hear the last part.

18 BY THE WITNESS:

19 A.  I was told that the balance of his contribution would come

02:35:17  20 next week.

21 BY MR. RECKER:

22 Q.  Okay, so --

23 A.  That's the sunshine.

24 Q.  And so the sunshine that came, what you referred to as the

02:35:27  25 funding, was that the $5,000 cash payment you received?

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

165

1   A.  Yes.

2   Q.  Okay.  And so the sunshine that's due back next week you

3   interpreted, was that the remainder of the funding?

4   A.  That's correct.

02:35:39   5   Q.  Okay.  Turning back to the issues forum that you were

6   planning at the same time as the afri-gala event.

7          You testified earlier that the defendant suggested

8   Gono as the speaker for the event, correct?

9   A.  Correct.

02:36:04   10   Q.  Did you ever speak with Gideon Gono?

11   A.  No, I did not.

12   Q.  Did you ever communicate with anybody in his office?

13   A.  Yes, I did.

14   Q.  And who was that?

02:36:14   15   A.  His secretary.

16   Q.  Do you remember the name of Gideon Gono's secretary?

17   A.  Denise.

18   Q.  How did you know to contact Gideon Gono's secretary?

19   A.  The information was given to me by Mr. Turner.

02:36:30   20   Q.  And again, if you could continue to speak up.

21   A.  The information was given to me by Mr. Turner.

22   Q.  Okay.  What did you talk to Gideon Gono's secretary about?

23   A.  To confirm whether he was going to accept the invitation to

24   come speak at the panel.

02:36:50   25   Q.  I want to refer you now to what's marked as Government's

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

166

1    Exhibit 42, which is in evidence.

2              MR. RECKER:  Can we publish that to the jury?

3              THE COURT:  Yes.

4    BY MR. RECKER:

02:37:07    5    Q.  I want to back up just for a second, Alice.

6              Why did you call Governor Gono's secretary?

7    A.  To confirm whether Mr. Gono would be able to accept the

8    invitation to speak at the panel.

9    Q.  All right.  I want to refer you to another email string

02:37:34   10    between yourself and the defendant.  If you look down at the

11    bottom on the first page, if we could highlight that.  This is

12    an email from the defendant to you.  It's dated September 8,

13    2009.  The subject line is "CBC issue forum."  The defendant

14    wrote:

02:37:55   15              "Hi, sis.

16              "Your talking points with Gono.

17              "One.  You simply want clarity on the proposed

18    presentation on the effects of sanctions for the issues forum.

19    Purpose was to give both sides of the issues and effects.

02:38:11   20              "Two.  Give an insight on his emergency monetary

21    policies.  I'm not able to articulate that aspect.

22              "Three.  Lay out the case for removal of the

23    presidential law SDERA in 2010.  This is also not in my area of

24    expertise.

02:38:30   25              "Four.  Thank him for support of Better World and the

MICHAEL P. SNYDER, Official Court reporter

1    gala for Diane.

2            "Five.  If no one is coming to make the issues forum,

3    you must know in writing today."

4            Do you see that?

02:38:43   5    A.  Yes.

6    Q.  What did you understand that to mean?

7    A.  That if I were able to speak to Mr. Gono, if I were able to

8    speak to Mr. Gono, those were some of the points that needed to

9    be made to him.

02:38:59   10   Q.  And why would you make these points to him?  Why was that a

11   -- what was your understanding of why you should make those

12   points to Mr. Gono?

13   A.  To convince him to come to the gala and come to the panel

14   and to indicate that we were appreciative of his support for

02:39:20   15   Better World and the gala, the afri-gala dinner, the afri-gala

16   reception.

17           I guess I need to sit little closer.  Okay.

18   Q.  Did Gono ever send a response to the invitation that you

19   sent to him on Diane Watson's stationary?

02:39:46   20   A.  No, he did not.

21   Q.  Did the defendant ever ask you to invite someone besides

22   Gono to speak at the issues panel?

23   A.  Yes, at some point I was asked to invite another gentleman

24   because Mr. Gono was not able to come.

02:40:01   25   Q.  And who was that additional person?

             MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1   A.  Chris Mutsvanga.

2   Q.  And who did you know him to be?

3   A.  He was an ambassador from Zimbabwe.

4   Q.  Did you issue an invitation to Chris Mutsvanga like you did

02:40:19   5   with Gono to speak at the panel?

6   A.  Yes, I did.

7   Q.  How did you know what his title was?

8   A.  Mr. Turner informed me who he was.

9   Q.  Was this second invitation, you drafted the second

02:40:43   10   invitation, did you also sign digitally the second invitation

11   for Mr. Mutsvanga?

12   A.  Yes.

13   Q.  And what did you do with this invitation?

14   A.  I sent it to Mr. Turner by email.

02:40:55   15   Q.  And why did you do that?

16   A.  Because I was asked to do that.

17   Q.  And who asked you to send it to him?

18   A.  Mr. Turner.

19   Q.  Did you show this invitation to anyone in the

02:41:07   20   Congresswoman's office before emailing it to the defendant?

21   A.  No.

22   Q.  Did you show it to the Congresswoman before you emailed it

23   to him?

24   A.  No.

02:41:16   25   Q.  I now want to refer you to Government Exhibit GT Email 41.

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1        Ms. McKoy, this is another email string between

2    yourself and the defendant.

3        MR. RECKER:  Your Honor, this is already in evidence.

4        THE COURT:  All right.

02:41:42    5        MR. RECKER:  If we could flip to page 2 and go to the

6    last email in the string.

7    BY MR. RECKER:

8    Q.  This is an email from you to the defendant dated September

9    2nd, 2009.  The subject line is "Denise," and you wrote:

02:42:00   10        "I did call and speak with her, and she has requested

11   an email to handle this request.  I did try something, but it

12   bounced back.  It's now past 5P, so I want to know whether this

13   should be put in writing at this point.  Your feedback is

14   appreciated.  The email that I have is dnaicker@rbz.co.zw."

02:42:30   15        Do you see that?

16   A.  Yes.

17   Q.  What did you mean when you wrote this to the defendant?

18   A.  I was letting him know that I did try to make the call, and

19   I sent an email, but it bounced back, and that was the email

02:42:46   20   address that I had.

21   Q.  How did you get the email address?

22   A.  I got it from Mr. Turner.

23   Q.  And whose email address did you understand it to be?

24   A.  It was to Mr. Gono's secretary, Denise.

02:42:59   25   Q.  All right.  I want you to look at the next email up which

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1   actually starts on the bottom of the first page.

2         This is an email from the defendant to you.  It's

3   dated September 3rd, 2009.  The defendant wrote:

4         "The call alone was a plus.  At least they know there

02:43:23   5   is some official concern.  Did she put you on hold first?  He

6   is claiming the President put things on hold, but we doubt

7   this."

8         Do you know who he's referring to when he says "the

9   President"?

02:43:35   10   A.  President Mugabe.

11   Q.  "Chris wants to pass on to foreign affairs."

12         Do you know who he's referring to when he says

13   "Chris"?

14   A.  Mr. Mutsvanga.

02:43:46   15   Q.  "I think the fax might be better."  Then there's a number.

16   "Attention Dr. Gono.  Simply request confirmation on

17   participation on the forum period.  And you have verbally heard

18   from me and Prince, but still nothing official.  I think he

19   will rethink the support with this fax."

02:44:08   20         What did you understand that to mean?

21   A.  I understood that the call was of value and that sending a

22   fax might be better.

23   Q.  And why would you want to send a fax?  What was your

24   understanding of that?

02:44:29   25   A.  To get confirmation as to whether he would be able to

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1   participate.

2   Q.  Okay.  Did you actually send a fax?

3   A.  No.

4   Q.  Finally, you sent a reply to the defendant in the middle of

02:44:46   5   page 1.  This is an email from you to the defendant dated

6   September 3rd, 2009?

7   A.  I'm sorry.  Let me just get back to where you are.  What

8   page is it again?

9   Q.  There's a sticker on the front that says GT Email 41.

02:45:11   10   A.  Okay.

11   Q.  All right.  Do you see the email in the middle?  It's from

12   you to defendant dated September 3rd, 2009.

13   A.  Okay.

14   Q.  In the email you wrote to defendant:

02:45:30   15        "I just noted that Chris wants to pass on to foreign

16   affairs.  That would be a red flag as they will contact state

17   here to query about everything.  That might be the reason for

18   the hold.  I don't want any questions on why we are trying to

19   bring in sanctioned officials.  I cannot afford for the

02:45:48   20   Congresswoman to be hit with more media because she's in the

21   middle of a firestorm about Castro comments.  She's already

22   hot, and they keep emphasizing to me that they don't want any

23   unnecessary problems.  What I see workable is getting someone

24   already on the ground to represent the position as a

02:46:04   25   counterpoint for Imani Countess.  Zimbabwe is an important

MICHAEL P. SNYDER, Official Court reporter

Case: 1:13-cr-00572 Document #: 253 Filed: 04/16/15 Page 172 of 196 PageID #:2234
McKoy - direct by Recker
172

1    topic, so I can justify the discussion, but not the blowback

2    about sanctioned officials.  This segment for both is ten

3    minutes each plus Q&A.  It's a two-hour forum.  To go through

4    all the channels of this might not be worth it.  Food for

02:46:27   5    thought."

6             Can you summarize what you meant by what you wrote

7    here.

8    A.   There was issues dealing with sanctioned individuals, there

9    were issues about the Congresswoman having -- there were issues

02:46:42   10   about dealing with sanctioned individuals.  It was becoming

11   very challenging to try to move forward with Mr. Gono, and at

12   this particular time we were concerned about the

13   Congresswoman's comments that had been made with regard to

14   Castro, so we did not want to continue to have a difficult

02:47:07   15   program put together.

16   Q.   Who were the sanctioned individuals you were talking about

17   in this email?

18   A.   Mr. Gono.

19   Q.   What did the defendant say to you in reply in the last

02:47:35   20   email at the top of this?  Actually I'll read it for you.  The

21   defendant sent an email in reply a short while later, also on

22   September 3rd, 2009.  He wrote:

23             "I agree and think the fax will bring the proper

24   response tomorrow morning.  Let's pray hard.  You get the

02:48:00   25   call."

                    MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1    What did you understand that to mean?

2  A.  That the fax, that the fax to them may bring a positive

3  response.

4  Q.  And what would a positive response be?

02:48:18   5  A.  That they would be able to come to the panel.

6  Q.  Okay.

7        MR. RECKER:  That's all I have, Your Honor.

8        THE COURT:  Thank you.

9        MR. RECKER:  Actually, we have, I have two calls to

02:48:35  10  play, Your Honor.

11        THE COURT:  All right.

12        MR. RECKER:  The first call is labeled Government's

13  Exhibit 11/12/2010 Call.

14        MR. LEONARD:  What was that?

02:49:08  15        MR. RECKER:  11/12/2010.

16        Your Honor, we need to redistribute the transcripts

17  for these two calls.  We have them back there.

18        THE COURT:  Okay.

19        MR. RECKER:  The first call should be labeled as, if

02:50:58  20  we could flip to the first tab, GT Call 1 will be the first

21  call.

22      (Audio played.)

23  BY MR. RECKER:

24  Q.  Miss McKoy, is that your voice on that call?

02:53:16  25  A.  Yes, sir.


        MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1  Q.  Do you recognize the other speaker on that call?

2  A.  Mr. Turner.

3  Q.  And what did you mean about the statement you said about

4  the Governor Gono thing?

02:53:26  5  A.  The reception that was held in 2006.

6  Q.  What did you mean that it got the Congresswoman in trouble?

7  What do you mean by that?

8  A.  The sponsor pulled out at the last minute, and we

9  subsequently learned that he was sanctioned.

02:53:42  10  Q.  Okay.  And how did the Congresswoman get into trouble?

11        MR. LEONARD:  Objection to relevance, Judge.

12  BY THE WITNESS:

13  A.  I didn't hear that.

14        THE COURT:  Just a minute.

02:54:02  15        MR. RECKER:  State of mind, Your Honor.

16        THE COURT:  I'm going to have to have a sidebar.

17     (Discussion on the record at sidebar.)

18        THE COURT:  What on earth is this?

19        MR. JONAS:  Judge, this is the discussion about the

02:54:36  20  two events that the defense put in play about the Joe Biden

21  thing.  What happened is Congresswoman Watson, this is this

22  reference to --

23        THE COURT:  Yes, I get that.

24        MR. JONAS:  So they are putting out there now is the

02:54:51  25  defendant found out Joe Biden was there, and, therefore, he

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1    thought everything was okay.  But what really happened is Joe

2    Biden's staff, when they found out that Joe Biden got very mad

3    at Congresswoman Watson's staff, and that's what she's talking

4    to the defendant about.  It goes to the state of mind to

02:55:09    5    counter what his state of mind was.

6              MR. LEONARD:  State of mind of who, if --

7              MR. JONAS:  It's the defendant's state of mind because

8    that's who she's talking to and telling the defendant.

9              MR. LEONARD:  The defendant's state of mind is

02:55:18    10   irrelevant to if the Congresswoman got in trouble.  That goes

11   to the defendant's state of mind.  That's absolutely absurd.

12   That's ridiculous.

13             MR. JONAS:  If the defendant is being told that they

14   got into trouble because Gono is a sanctioned individual, it

02:55:31    15   absolutely goes to his state of mind.

16             THE COURT:  But this is 2011.

17             MR. JONAS:  Except if -- yes, that's true, except

18   there is -- the witness can be asked if she had conversations

19   about this with the defendant about this prior to 2011.

02:55:48    20             THE COURT:  Well, that's -- why didn't you tell me

21   that this was where we were going?

22             MR. LEONARD:  The fact that the Congresswoman got in

23   trouble is hugely prejudicial.  It's irrelevant to the case,

24   plus the jurors think that somehow there's something wrong with

02:56:03    25   this and, therefore, if a congressman got in trouble for it, it

MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

1    must be a problem.  There's nothing per se wrong with the

2    event.

3           The funny thing is Mr. Jonas is arguing the opposite

4    side.  He's always been saying the evidence isn't relevant to

02:56:16    5    if they have interaction with him, and now he's arguing exactly

6    the opposite.  Whether the congressman got in trouble doesn't

7    matter to this case.

8           MR. JONAS:  It actually does.

9           MR. LEONARD:  Years later a discussion about years

02:56:28    10   later in 2011.

11          MR. JONAS:  It does if it's --

12          MR. LEONARD:  After the conspiracy.  Come on, Judge.

13          MR. JONAS:  It does if it goes to show the defendant

14   knew that Gono was a sanctioned individual.  But, you know,

02:56:39    15   Judge, this isn't that important.  We will stop right here.

16          THE COURT:  Okay.

17       (End of discussion at sidebar.)

18          MR. JONAS:  Judge, can we go back?  I'm really sorry,

19   Judge.

02:57:08    20          THE COURT:  Okay.

21          Are they wanting a break now?

22          THE MARSHAL:  Yes.

23          THE COURT:  All right.  We'll take a break.

24       (Jury out.)

02:58:17    25       (Discussion on the record at sidebar.)


            MICHAEL P. SNYDER, Official Court reporter

McKoy - direct by Recker

177

1    THE COURT:  Go ahead.

2    MR. JONAS:  Judge, I just wanted to say there are

3  conversations between the defendant and this witness and again

4  talking about the 2006 event.  And the witness mentions Biden,

02:58:48    5  who was still a senator, tried to take over the room.  And she

6  says defendant says he is, and she says there was no person,

7  and the next line is important.  "He could have gotten burned

8  for it."  That's what the defendant says regarding Joe Biden,

9  and that goes to his state of mind and his knowledge of Gideon

02:59:11   10  Gono being a sanctioned individual.

11    THE COURT:  Okay.  We didn't take all this up before.

12    MR. JONAS:  There were no objections to it before,

13  Judge.

14    MR. LEONARD:  We now understand the significance.  We

02:59:24   15  object to the entire tape.  It's absolutely irrelevant.  It's

16  2011, and them kibitzing about an event that happened years

17  ago --

18    THE COURT:  I'm going to go look at it a minute.

19  Where are we?

02:59:42   20    MR. JONAS:  This is GT Call 7, the last one.

21    (End of discussion at sidebar.)

22    THE COURT:  Well, we have a problem.  One of the

23  jurors' -- Mr. Chism's cousin apparently just died at the

24  hospital, and he's very upset.

03:01:42   25    MR. LEONARD:  Can we just take a break for the day so

MICHAEL P. SNYDER, Official Court reporter

1    he can come back tomorrow?

2            MR. JONAS:  We have no objection to that, Judge.

3            THE COURT:  Right.  Okay.  We'll do that.  Is it

4    alright if I just go tell them that we'll break for the day?

03:01:58  5            MR. LEONARD:  Sure.

6            MR. JONAS:  Yes.

7            THE COURT:  And then we'll come back to this.

8        (Jury in.)

9            THE COURT:  Okay.  A couple people, at least one juror

03:04:06  10   has something that she left on the -- I hope it's there.  Okay.

11   We'll see you in the morning.

12       (Jury out.)

13       (Witness temporarily excused.)

14           THE COURT:  I guess really if all of you want to --

03:04:37  15   we've lost half the group.

16           So what you're wanting to put in, well, I guess there

17   wasn't any objection to it, but is this 2011 phone call.

18           This is really deciding, this is an appropriate

19   sidebar, so I guess we'll have to go off to the side and deal

03:06:46  20   with it.  Or you could make things easier for us.  Okay.

21           A SPECTATOR:  We'll go outside.

22           THE COURT:  Well, we wouldn't have to stand over here.

23   Thank you.

24           This is what troubles me is that we are now again

03:07:26  25   going back to 2006.  I thought all we were ever focusing on

MICHAEL P. SNYDER, Official Court reporter

1    that, and nobody contradicted me, was just what had been said

2    to Mr. Turner about it, and somehow this has taken on a life of

3    its own.  I'm bothered by that.  I mean, frankly, I didn't

4    understand the cross-examination of -- well, whether I

03:07:58    5    understood it is irrelevant.  Anyway.

6              MR. JONAS:  Your Honor, in this call Miss McKoy says

7    in the middle of the call "I did the Gono piece.  You know how

8    much that cost us politically at the time?"

9              The defendant says, "Yeah."

03:08:14    10             And then a few lines down he says, talking about

11    Senator Biden, "and he could have got burned for it."

12             Now, that shows the defendant knows and knew past

13    tense that there was a problem with Biden being there with Gono

14    because of Gono.  And the defense during opening statement

03:08:32    15    already made a big deal about this 2006 event.  They've made a

16    big deal about Biden being there.  They, you know, said very

17    strongly about how this, how the defendant was surprised that

18    Biden was there; he thought because of it, it was okay for him,

19    the defendant, to deal with Gono.

03:08:48    20             And this call is a piece of evidence that shows that

21    he knew that, no, it wasn't okay for Biden to be there and that

22    Biden could have got in trouble because Gono was a sanctioned

23    individual in 2006.

24             MR. LEONARD:  Judge, if you look at it, it's five

03:09:02    25    years later.  She says "I did the Gono piece.  You know how

MICHAEL P. SNYDER, Official Court reporter

1    much that cost us politically at the time?"

2         "Yeah."

3         So of course he could have learned over the five years

4    that there were some political ramifications back to her from

03:09:16    5    who knows how.  But that doesn't open the door to his state of

6    mind at the time he's talking to Celestine Palmer five years

7    earlier.

8         MR. JONAS:  Judge, it does because the conspiracy is

9    2008 through 2010.  It ends shortly before this call.  So if

03:09:32    10    Mr. Leonard says the defendant could have learned about Gono

11    being sanctioned sometime between the 2006 event and this call,

12    well, then in all likelihood that's going to be before or

13    during the conspiracy.

14         MR. LEONARD:  Judge, whether it cost them politically

03:09:49    15    or not doesn't matter.  That gives a prejudicial impact upon

16    the jury.  There is nothing wrong with the event.  So the fact

17    that the jury is going to hear that there was some political

18    heat put on this congresswoman because she got involved with

19    this event when it's not illegal -- Mr. Jonas was actually

03:10:09    20    arguing the opposite side of us for months, and now he's

21    switched sides.  But he wanted to keep the Biden thing out

22    because he said he didn't matter, it was lawful activity, who

23    cares.  And now he's arguing just the opposite and trying to

24    say that because somehow Mr. Turner learned over five years

03:10:25    25    that her boss took some political heat, they can talk about it.

MICHAEL P. SNYDER, Official Court reporter

1    MR. JONAS:  Your Honor, first of all, we are not

2 changing our position.  We are not saying there's anything

3 wrong with that event.  It was a meeting that wasn't in

4 violation of the sanctions against Mr. Gono.  We've been saying

03:10:38    5 that all along.

6    Mr. Leonard, on the other hand, I have a transcript of

7 him specifically saying to the Court that this was a secret,

8 illegal meeting.  He repeated that multiple times to Your

9 Honor.

03:10:49    10    THE COURT:  Well, whatever he said.

11    MR. LEONARD:  I don't think if the jury was there.

12    MR. JONAS:  Talk about changing your position.

13    Anyway, Judge, the point is what's inside the

14 defendant's head.

03:10:58    15    THE COURT:  Right.

16    MR. JONAS:  And if there's discussion regarding that

17 Gono was a problem with meeting with Biden, it counterbalances

18 their defense about the state of mind.

19    MR. LEONARD:  We are talking about it five years

03:11:09    20 later, Judge.  Who knows how and what he heard.

21    And also my bigger problem too in addition that it

22 does not go to his state of mind is the fact that it gives a

23 prejudicial inference to the jury, because if they think that

24 there was something wrong with this and congressional people

03:11:26    25 and senators took on some backlash against this witness' boss,

MICHAEL P. SNYDER, Official Court reporter

1 they may infer there's something wrong, that this is somehow

2 illicit conduct.

3      THE COURT:  I actual thought the argument had been

4 that -- you wouldn't be the only one here who has taken a

03:11:43  5 different position at a different time, but I thought the whole

6 point had been supposedly that how could Mr. Turner be held

7 liable for something when it --

8      Hello.

9      A SPECTATOR:  Can I come in, Judge?

03:12:00  10      THE COURT:  Well, this is a sidebar, so if you do, we

11 are just going to go over to the side.  Thank you.

12      A SPECTATOR:  Okay.  Never mind.

13      MR. LEONARD:  But it's framed as such a different

14 issue, Judge.  We are talking about a specific piece of

03:12:11  15 evidence that they want to bring in five areas later.  If it

16 was, you know, at the time of the event and he admitted

17 something at the time of the event five years earlier, then

18 maybe there might be some relevance.  But it's twofold.

19      It doesn't go to state of mind five years earlier.

03:12:25  20      Secondly, it lets the jury think that there is

21 something wrong with this, and Turner was involved with

22 something bad, and this Gono thing event is bad.

23      It's not bad.  And they shouldn't be allowed to draw

24 negative inferences from how other senators and people in

03:12:40  25 Congress reacted to it.  And that's what they'll do.  What

MICHAEL P. SNYDER, Official Court reporter

1  other reason is the jury going to think that's being offered

2  for?

3  MR. JONAS:  Your Honor, Mr. Leonard is talking about

4  defendant's state of mind in 2006.  But what we really are

03:12:51  5  going to argue is that state of mind carried forward during the

6  time period of the conspiracy.  So it's really whether the

7  defendant learned any time from 2006 to 2010 that Gideon Gono

8  was a sanctioned individual, which, by the way, is in an email

9  from Alice Holmes McKoy to him that's in evidence, right in the

03:13:08  10  middle of this conspiracy.

11  THE COURT:  That's why I would prefer to stick to that

12  period.

13  MR. JONAS:  But that goes, that email goes to show

14  that the defendant was aware that Gono was a sanctioned

03:13:21  15  individual, and this phone call carries through on that with

16  regard to his knowledge.  It supports that point.

17  MR. LEONARD:  How do we know, Judge?  We don't know.

18  It's 2011, after the conspiracy.  It then forces us to call Mr.

19  Turner, who doesn't have to be called.  That's the only way we

03:13:38  20  can rebut it when they introduce the state of mind evidence

21  outside the scope of the conspiracy.

22  MR. JONAS:  You're introducing state of mind evidence

23  outside the scope of the conspiracy, then why does Celestine

24  Palmer testify?

03:13:50  25  MR. LEONARD:  We are just talking about this piece of

MICHAEL P. SNYDER, Official Court reporter

1   evidence in 2011 five years later.

2        MR. JONAS:  No, Judge.  So a piece of evidence three

3   years before, two years before the conspiracy.  Judge --

4        THE COURT:  Tell me, which part was --

03:14:03  5        MR. JONAS:  I'll make an offer here, Judge.  We will

6   withdraw these calls if Your Honor strikes Celestine Palmer's

7   testimony.

8        MR. LEONARD:  Then why did you introduce evidence

9   about Biden through other witnesses?

03:14:18  10        MR. JONAS:  Who?

11        MR. LEONARD:  You guys.

12        MR. JONAS:  Who?  What other witnesses?

13        MR. LEONARD:  This witness.  There is references to

14  Biden.

03:14:25  15        MR. JONAS:  In response to what you put forward

16  already through Celestine Palmer.

17        MR. LEONARD:  We have a deal for you guys.  Agree to

18  the videotape; we'll withdraw our objections.

19        MR. JONAS:  No.

03:14:43  20        THE COURT:  I think I lost my place on this.  Where in

21  this, what is the --

22        MR. LEONARD:  It's beginning at line 30 on page 1.

23        Your Honor --

24        MR. JONAS:  Your Honor, there are some more people in

03:15:05  25  the courtroom.  May I have one moment, Your Honor?

        MICHAEL P. SNYDER, Official Court reporter

1     A SPECTATOR:  I'm sorry, Judge.

2     THE COURT:  No, it's going to be tomorrow morning.  We

3 had a juror, a family member died.

4     A SPECTATOR:  That's fine.  The FBI didn't make it

03:15:29   5 clear to me.  I thought they wanted to talk to my client, but

6 they are going to send him home.

7     THE COURT:  Okay.

8     A SPECTATOR:  Thank you.

9     THE COURT:  Well, let's just come over here so they

03:15:46  10 don't feel like we are -- are they leaving?  Okay.

11     MR. JONAS:  They are with us.

12     THE COURT:  Okay.

13     Oh, I guess it's this one statement.  I don't know.

14 I'll think about it overnight, but I am, I'm skeptical as to

03:17:28  15 whether a statement in 2011 says anything about his knowledge

16 during the time of the conspiracy, the alleged conspiracy.  I'm

17 trying to think back to what the earlier, in terms of the

18 testimony, okay.

19     So as far as you're -- let me hear both of you.  You

03:18:22  20 could stipulate that there wasn't anything wrong with the

21 2006 --

22     I mean, by the way, I have a question.  Can a

23 sanctioned individual come into the United States?

24     MR. JONAS:  Yes.  That's what OFAC has informed me.

03:18:41  25     THE COURT:  Pardon me?

MICHAEL P. SNYDER, Official Court reporter

1    MR. JONAS:  I asked the OFAC, not on the stand, but I

2  asked the OFAC witness that question, and she said yes.

3    MR. LEONARD:  Your Honor, I think that's something we

4  might be asking for an instruction on at the end of the case so

03:18:58    5  that the jury understands that.

6    THE COURT:  Tell me once more what your theory is as

7  to why I should let something that that much afterwards -- it

8  isn't like, it isn't the same as, it just isn't admitting, it's

9  not something admitting something he did.  It's not admitting

03:19:35   10  that he had knowledge at the time.

11    MR. JONAS:  It acknowledges he has knowledge.  It

12  shows he has knowledge.  He's saying the vice-president could

13  have got burned for it.  This is shortly after the conspiracy

14  ending, and the jury can use that.

03:19:51   15    THE COURT:  How much after?

16    MR. JONAS:  I think weight is the issue, not

17  admissibility, Judge.  They can argue that this is after the

18  fact.

19    MR. LEONARD:  I think --

03:20:03   20    THE COURT:  In truth it could mean something else

21  anyway.  I suppose it could mean politically this wouldn't have

22  been a good idea.

23    MR. JONAS:  Well, I think the witness could be asked

24  "What was your understanding what the defendant meant when he

03:20:15   25  said that?"

MICHAEL P. SNYDER, Official Court reporter

1    THE COURT:  Well, let's see what she says right after
2  that.
3    MR. LEONARD:  I think you make a good point, Judge.
4  If he had been saying in 2011 on the tape something that told
03:21:14   5  the jury that he knew back in '06, then it might be relevant.
6  But it's post conspiracy, and it's not reflective upon his
7  state of mind during the conspiracy.
8    And another prejudicial effect about people thinking
9  there's something wrong with it because of the backlash against
03:21:32  10  this person's boss.
11    MR. JONAS:  Your Honor, would it help to play the
12  call?  If you want to hear it.
13    THE COURT:  I don't know that it's going to help, but
14  go ahead and play it if you want.
03:22:00  15    (Audio played.)
16    THE COURT:  How is that not unfairly prejudicial in
17  terms of relevance?  I mean, it doesn't show knowledge at the
18  time.
19    MR. JONAS:  Judge, I think the defendant volunteering
03:24:03  20  that statement shows that he knew that Gono was a problem.  And
21  in the earlier call we played from November 2010, which I think
22  is within the time period of the conspiracy, they have a
23  similar conversation although not quite as direct.
24    THE COURT:  That was in the first one?
03:24:21  25    MR. JONAS:  GT Call 1.  The Congresswoman got in

MICHAEL P. SNYDER, Official Court reporter

1    trouble with the Governor Gono thing.

2         And I come back, Your Honor, to the email between

3    Alice Holmes McKoy and the defendant during the time of the

4    conspiracy where Alice Holmes McKoy is questioning the wisdom

5    of bringing Gono in because of bringing sanctioned individuals

6    in, and this just builds upon that, these calls.

7         THE COURT:  No, I don't think so.

8         MR. JONAS:  Judge, there is one other issue, not on

9    this, not on the calls.  When we were preparing Miss McKoy to

10   testify on Sunday, when she got here from California, we

11   specifically told her that if she wants to speak to the

12   defense, it's up to her, it's her decision.

13        This morning she was told not to talk to anybody

14   meaning witnesses, and she may have misunderstood that.  We

15   told her again maybe there was a misunderstanding; she's

16   perfectly free to speak to the defense.  It's up to her.  She's

17   here if they want to talk to her.

18        MR. LEONARD:  We will, but it's certainly something we

19   can bring out on cross-examination her statements to us.  It's

20   fair game that it's her position that Mr. Recker told her that

21   she couldn't talk to us, and that that's fair game for

22   cross-examination.

23        MR. JONAS:  That's not, Judge.  There was a

24   misunderstanding when Mr. Recker met with her she can't talk to

25   witnesses.

         MICHAEL P. SNYDER, Official Court reporter

1          THE COURT:  Is she here?

2          MR. JONAS:  She is here.

3          THE COURT:  Go tell her that's not the case.

4          MR. LEONARD:  I know, but, Judge, why -- again, this

03:25:56  5  happens all the time in cases where a witness is not

6  cooperative to one side but they are cooperative to the other.

7  It happens all the time, and we bring it up all the time in a

8  case to show their bias.  We spent hours with these guys, with

9  this team, hours and hours talking with them.  We try to talk

03:26:11  10  to you; you won't do it, and, as a matter of fact, you say "My

11  lawyer Mr. Recker says I can't talk to you."

12          Whether they want to clarify the misunderstanding on

13  redirect, have at it, but it's fair game for cross.

14          MR. JONAS:  No, it's not, Judge.  It's not relevant.

03:26:25  15  MR. LEONARD:  It absolutely is.  It goes to her bias.

16          MR. JONAS:  What would go to her bias if she said "I

17  don't want to talk to you," not what she heard someone else

18  tell her.

19          MR. LEONARD:  But that's even worse, Judge, when the

03:26:36  20  lawyers instruct -- and actually there's like, I think there's

21  a rule on this.  But when a lawyer instructs someone they can't

22  talk to the other side, there's an adverse inference that

23  should be drawn.

24          THE COURT:  Wait a minute.  We don't have an issue

03:26:47  25  here because she's here, you're here.  You can go tell her

MICHAEL P. SNYDER, Official Court reporter

1    right now that she's --

2             MR. LEONARD:  I know.

3             THE COURT:  -- free to talk.

4             MR. LEONARD:  If she cooperates with us, I'm sure --

03:26:57   5             THE COURT:  Well, then really you're just trying to

6    put something on the lawyers, and that's not really -- you're

7    supposed to be cross-examining the witness, not trying to

8    undermine --

9             MR. LEONARD:  If she cooperates with us and talks to

03:27:06   10   us, I'm not going to try to impeach her because she did

11   cooperate with us.  But so far her position has been her lawyer

12   Recker says she is not to cooperate with us.

13            THE COURT:  Who is her lawyer?

14            MR. LEONARD:  Mr. Recker.

03:27:15   15            MR. JONAS:  Mr. Leonard is mischaracterizing.  He's

16   not her lawyer.  It's the government prosecutor.  And what he

17   told her was not talk to witnesses, and she misunderstood.  I

18   mean, that --

19            MR. LEONARD:  Great.

03:27:27   20            MR. JONAS:  She's here.  She's available.

21            MR. LEONARD:  If we meet with her today, it all goes

22   away.

23            THE COURT:  Well, even if she doesn't, as long as it's

24   very clear that she can, what's the difference?  Then it seems

03:27:38   25   to me you're not trying to show a bias on her part; you're just

               MICHAEL P. SNYDER, Official Court reporter

1  trying to make the government look bad.

2        MR. LEONARD:  No, let's look at it if the tables were

3  turned.  If me and Tunick were out telling our witnesses that,

4  hey, if Jonas or his crew contact you, you can't talk to

5  them --

6        THE COURT:  Well, that's right.  If that's what --

7        MR. LEONARD:  It would come out in cross a hundred

8  percent of the time.

9        THE COURT:  I totally agree with you on that.  It's

10 just that --

11       MR. LEONARD:  It's just --

12       THE COURT:  They say they are not doing it, and it

13 isn't like she's on the stand now and there isn't time.

14       MR. LEONARD:  Judge, I agree with you.  It may all go

15 away in the next few minutes.

16       MR. JONAS:  No, Judge, no.  The problem here is this.

17 When I specifically told Ms. McKoy on Sunday night that if she

18 wants to speak to the defendant, it's completely up to her, her

19 response is she'd rather not.  I told her it's totally up to

20 you.

21       If she now says to them "I don't want to speak to

22 you," they are going to try to turn around and say that the

23 government influenced her and told her not to speak to them.

24       That is not true.  Your Honor sees the point exactly.

25       MR. LEONARD:  Let's just see what happens.  Let's see

MICHAEL P. SNYDER, Official Court reporter

1  if she talks to us.  If she doesn't, we can readdress it.  But

2  this is the same woman, Judge, who asked them for a job.

3        MR. JONAS:  Whoa.  She did not ask the government for

4  a job.  Let's be clear about that.

03:28:51  5        THE COURT:  I don't know anything about that.

6        MR. LEONARD:  Well, it appears that she did.

7        THE COURT:  What?

8        MR. JONAS:  Where?

9        MR. LEONARD:  Wasn't that in the 302s?

03:29:00  10        MR. JONAS:  Judge, I'm not aware of this woman asking

11  the government for a job.

12        THE COURT:  Well, just make sure you go tell her now

13  before she leaves that, you know, you make it utterly clear if

14  she wants to talk to defense, she can.  And as long as -- I

03:29:13  15  mean, it's not her lawyer, but as long as she does, then

16  there's no basis.

17        MR. LEONARD:  Judge, it may all go away.  I'm not

18  going to create something that's not there.  If she talks to

19  us, it's great.

03:29:24  20        THE COURT:  It isn't there if she's not being told

21  that she can't talk.

22        MR. LEONARD:  But, Judge, if the witness -- well, we

23  should just not worry about it and see if anything comes of it.

24  But if a witness testifies under oath on the stand that they

03:29:38  25  were told by the prosecutors not to talk to us, that might be

MICHAEL P. SNYDER, Official Court reporter

1　her testimony.  We don't have to accept Mr. Jonas' version of
2　events.

3　　　　　THE COURT:  I agree if she says that.  Frankly, I
4　don't think it goes very far, but, yes, you can ask that.

03:29:52　5　　　　　MR. JONAS:  Can I make a suggestion here?  Can we
6　bring her in here and stand her right here, and Your Honor can
7　instruct her that she's free to talk to the defense.

8　　　　　MR. LEONARD:  We don't think it's necessary.  We'll go
9　talk to her right now.

03:30:02　10　　　　　MR. JONAS:  Because what they want to do is ask, tell
11　her the government told you not to talk to us.  That's what
12　they want to do.

13　　　　　MR. LEONARD:  I'm not going to do that, Judge.

14　　　　　MR. JONAS:  Mr. Leonard has left open the door where
03:30:13　15　if she doesn't want to talk to them, he's going to say you were
16　instructed not to talk to us, and that's not right.

17　　　　　MR. LEONARD:  Let's see what she says, Judge.

18　　　　　But, again, we never have to, just because the
19　government says so, accept their version of events.

03:30:26　20　　　　　THE COURT:  I totally agree.

21　　　　　MR. LEONARD:  So it may be much ado about nothing.
22　Let's see what happens, and if there's an issue tomorrow, we'll
23　raise it with you.

24　　　　　THE COURT:  Well, we'll just make it clear, why don't
03:30:37　25　we just clear it up right now?

　　　　MICHAEL P. SNYDER, Official Court reporter

1    MR. LEONARD:  Tunick makes a great sandwich.  She may

2 want to come hang out with us.

3    THE COURT:  Does he?

4    MR. TUNICK:  I missed that.

03:31:29 5    THE COURT:  Where did she go?

6   (Witness now present.)

7    THE COURT:  We are trying to, okay.  So we had to

8 adjourn today because of something, an illness or death of a

9 family of a juror.

03:33:04 10    There seemed to be some dispute.  You, of course, are

11 free to talk to the government or the defense, and you don't

12 have to talk to anybody, but we wanted to make sure that you

13 understood that if you decided you wanted to talk to the

14 defense, that you're free to do that.  Do you understand that?

03:33:26 15    THE WITNESS:  Okay.

16    MR. JONAS:  Do you understand, Miss McKoy?

17    THE WITNESS:  Yes.

18    MR. JONAS:  You can speak to them if you want.  It's

19 your choice.  Do you understand?

03:33:35 20    THE WITNESS:  Yes, I do.

21    MR. JONAS:  No one is directing you to, nobody is

22 telling you to or not.  It's up to you.

23    THE WITNESS:  Well, the question is do I want to speak

24 to the defense?

03:33:47 25    MR. JONAS:  No, I think we are just making clear --

     MICHAEL P. SNYDER, Official Court reporter

1    THE COURT:  You don't even have to tell me whether you

2    want to or not.  There was a dispute between them as to --

3    MR. LEONARD:  Could we just make a record on the

4    issue?

03:34:02  5    THE COURT:  Sure.

6    MR. LEONARD:  Miss Recker, do you remember my name is

7    Mr. Leonard?  Miss McKoy, I'm sorry.  My name is Mike Leonard.

8    You met me earlier today?

9    THE WITNESS:  Yes.

03:34:14  10    MR. LEONARD:  And I asked you if you would talk to me?

11    THE WITNESS:  Yes, you did.

12    MR. LEONARD:  And you indicated Mr. Recker said that

13    you could not do so.

14    THE WITNESS:  Yes, at the time I was misinformed.

03:34:23  15    MR. LEONARD:  Okay.

16    MR. JONAS:  Misinformed.  Do you remember Sunday night

17    when we met?

18    THE WITNESS:  Yes.

19    MR. JONAS:  And I told you it's up to you if you want

03:34:28  20    to speak to them?

21    THE WITNESS:  Well, I didn't remember at the time.

22    MR. JONAS:  At the time today?

23    THE WITNESS:  Right.

24    MR. JONAS:  But you remember now that I told that to

03:34:38  25    you?

MICHAEL P. SNYDER, Official Court reporter

1          THE WITNESS:  Yes.

2          THE COURT:  All right.  Anyway, it's a nonissue.  You

3  most certainly, as they'll tell you, if you want to talk to Mr.

4  Leonard, you may.  If you don't want to talk to him, you don't

03:34:48    5  have to.

6          MR. TUNICK:  You can talk to me too.

7          MR. LEONARD:  We are good guys too.

8          THE COURT:  Okay.  We'll see you tomorrow morning.

9  Sorry.

10      (Proceedings adjourned from 3:35 p.m. to 9:30 a.m.,

11  October 2, 2014.)

12                C E R T I F I C A T E

          I, Michael P. Snyder, do hereby certify that the

13  foregoing is a complete, true, and accurate transcript of the

    proceedings had in the above-entitled case before the Honorable

14  ELAINE E. BUCKLO, one of the judges of said Court, at Chicago,

    Illinois, on October 1, 2014.

15

16                    */s/ Michael P. Snyder*

                    Official Court Reporter

17                    United States District Court

                    Northern District of Illinois

18                    Eastern Division

19

20

21

22

23

24

25

          MICHAEL P. SNYDER, Official Court reporter